UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 04-cr-10286-PBS |
| ) | |
| v.  ) | VIOLATIONS: |
| ) | 18 U.S.C. § 1344 (Bank Fraud) |
| ) | 18 U.S.C. § 1014 (False Statements) |
| MICHAEL W. ALCOTT,  ) | 18 U.S.C. § 1952 (Travel Act) |
| Defendant.  ) | 18 U.S.C. § 3147 (Penalty Enhancement) |
| ) | |

**SUPERSEDING INFORMATION**

The United States Attorney charges that:

**GENERAL ALLEGATIONS**

1. At all times material to this Information, Defendant MICHAEL W. ALCOTT ("ALCOTT") was an individual who resided in Scituate, Massachusetts.

2. At all times material to this Information, ALCOTT was founder and president of ARK Associates, Inc. d/b/a Accounting Recruiters International ("ARK Associates"). ALCOTT founded ARK Associates in 1999 as a temporary and permanent employment placement firm specializing in employees with business finance backgrounds. ARK Associates' offices were located at 1250 Hancock St., Suite 504S, Quincy, Massachusetts and 25 Corporate Drive, Burlington, Massachusetts.

**South Shore Savings Bank**

3. In or about July 13, 2000, ALCOTT and ARK Associates entered into a lending relationship with South Shore Savings Bank ("South Shore"), a federally insured financial institution.

4.   South Shore and ARK Associates entered into a Loan and Security Agreement (the "Line of Credit") establishing a $500,000 line of credit. ALCOTT signed the Line of Credit on behalf of ARK Associates. ALCOTT and his wife were also guarantors on the Line of Credit.

5.   As a condition of the Line of Credit, ALCOTT was required to submit financial information to South Shore. This included both financial statements and account receivable information for ARK Associates.

6.   ALCOTT submitted false and fraudulent financial information to South Shore. ALCOTT submitted account receivable information to South Shore that inflated the true account receivable information for ARK Associates. ALCOTT also submitted false annual financial statements for ARK Associates for the fiscal years 2000, 2001 and 2002. These financial statements falsely reported that ARK Associates was a profitable business when, in fact, ARK Associates was not profitable.

7.   Not only were the financial statements ALCOTT submitted to South Shore false, but ALCOTT also falsely represented to South Shore that the 2000 and 2001 financials for ARK Associates submitted to South Shore had been "reviewed" by an independent auditor, Kevin P. Martin & Associates, P.C., a/k/a, KPM ("KPM"). In a "review," an auditor provides limited assurance on an entity's financial statements. As part of a review, an auditor makes some inquiry into client management, accounting practices, internal control structure, and analytical procedures used by the organization.

8.   Although ARK Associates did hire KPM to perform "reviews" of the 2000 and 2001 financials, ALCOTT submitted to South Shore financial information that was different from that upon which the KPM actually performed its review procedures. As the table below

demonstrates, the financial statements reviewed by KPM showed ARK Associates suffering losses, whereas the financial statements ALCOTT submitted to South Shore reported a growing profit:

| Financial Statement Entry | Actual Review by KPM | Submitted to South Shore |
|---|---|---|
| **Calendar Year 2000** | | |
| Service Revenue | $1,359,472 | $1,632,405 |
| Cost of Services | $941,325 | $794,448 |
| Gross Margin | $418,147 | $837,957 |
| | | |
| Net Operating Income/(Loss) Before Income Tax | ($172,697) | $32,436 |
| | | |
| **Calendar Year 2001** | | |
| Service Revenue | $1,214,367 | $5,019,916 |
| Cost of Services | $858,403 | $2,775,172 |
| Gross Margin | $355,964 | $2,244,744 |
| | | |
| Net Operating Income/(Loss) Before Income Tax | ($714,315) | $111,976 |

9.   Based upon the false and fraudulent financial information ALCOTT provided, South Shore increased ARK Associates' borrowing limits under the Line of Credit on at least three occasions. On or about June 26, 2001, South Shore increased ARK Associates' borrowing limit to $1 million. On or about January 10, 2002, South Shore again increased ARK Associates' borrowing limit to $1.5 million. On or about August 21, 2002, South Shore increased ARK

Associates' borrowing limit to $2.5 million. From August 2002 to approximately June 2003, ARK Associates drew down nearly the entire Line of Credit and spent the funds.

10.  In connection with the August 21, 2002 increase in ARK Associates' borrowing limit to $2.5 million, South Shore required that ARK Associates submit an "audit quality" financial statement (as opposed to a "review quality" financial statement). An audit is a higher level of scrutiny than a review. As part of an audit, the auditor provides verification of the financial statements' claims and assertions and expresses an opinion on the entity's financials taken as a whole.

11.  ALCOTT, however, was unable to secure an audited financial statement for 2002 that would show that ARK Associates was profitable. When ALCOTT asked Kevin P. Martin ("Martin"), a certified public accountant and owner of KPM, for details about KPM possibly performing an audit of ARK Associates' financial statement for 2002, Martin observed that ARK Associates had suffered substantial losses. Martin communicated to ALCOTT that KPM would likely have trouble concluding that ARK Associates was a "going concern." ALCOTT then did not engage KPM to perform an audit of ARK Associates.

12.  ALCOTT nevertheless submitted in or about May 2003 a fraudulent financial statement for 2002 that purported to show that ARK Associates' 2002 revenue had increased by about 149% over its 2001 revenue. It also did not show the true losses ARK Associates had suffered. The fraudulent financial statement also was accompanied by a fraudulent "audit" opinion letter. The opinion letter, dated May 6, 2003, stated that KPM had conducted an audit of the 2002 financial statement and that the 2002 financial statement presented fairly the financial condition of ARK Associates. The opinion did not state that ARK Associates may have trouble

continuing as a "going concern." The opinion bore the name "David P. Kane, Partner-Audit Manager."

13. On or about June 13, 2003, Martin told South Shore that, not only was no one named "David Kane" employed at his firm, but that the financial statements which were submitted to South Shore and purportedly audited by KPM were not audited by KPM. In fact, KPM did not perform any work for ARK Associates on 2002 matters.

14. Upon its discovery of ALCOTT's conduct, South Shore exercised its rights under the Line of Credit and seized collateral of ARK Associates. At that time, ARK Associates had drawn down nearly the entire Line of Credit and had an outstanding balance owed to South Shore of $2,496,485.17.

## Boston Private Bank & Trust Company

15. During 2003, ALCOTT attempted to secure a line of credit from Boston Private Bank & Trust Company ("Boston Private Bank"), a federally insured financial institution. ALCOTT had applied to Boston Private Bank for a $3.5 million line of credit for ARK Associates. On or about June 3, 2003, Boston Private Bank received an e-mail signed "Michael W. Alcott," saying "I am fed-exing information at this time . . . . . . I have enclosed my 2002 audit, with 3 years results . . . ." ALCOTT submitted to Boston Private Bank the same false "audited" 2002 financial statement that ALCOTT had given to South Shore. The financial statement also was accompanied by a fraudulent audit opinion from "David Kane" similar to that ALCOTT supplied to South Shore.

16. On or about June 18, 2003, Martin notified Boston Private Bank that the copy of the "audited" financial statement attributed to KPM was not audited by KPM. Boston Private Bank then terminated its loan activity with ALCOTT and ARK Associates.

17. ARK Associates ceased operations on or about July 1, 2003.

### First Obstruction of Justice

18. ALCOTT willfully obstructed and impeded and attempted to obstruct and impede the administration of justice during the course of the prosecution of Counts One through Three herein. In addition, ALCOTT's obstructive conduct related to the prosecution of Counts One through Three herein.

19. Specifically, from at least June 2004 through May 2005, ALCOTT falsely claimed to be suffering from, and receiving treatment for, prostate cancer. In April 2005, shortly before a hearing at which he was scheduled to plead guilty to Counts One through Three of the indictment filed in this case, ALCOTT provided to his attorney a fabricated letter purporting to be from a radiologist/oncologist at Massachusetts General Hospital ("MGH") in Boston, Massachusetts. The letter stated that ALCOTT had been undergoing cancer treatments for the past year, that the results had not been good, and that he was beginning an aggressive treatment for the cancer. The letter further stated that ALCOTT had a 0% likelihood of survival over 2 years and that the treatment was, therefore, "palliative." ALCOTT's attorney forwarded the letter to the United States shortly before the plea hearing.

20. On April 28, 2005, shortly before the hearing at which ALCOTT was supposed to plead guilty to Counts One through Three of the indictment, the United States filed a motion

seeking to modify ALCOTT's release conditions based on evidence that ALCOTT had been extorting a California man while on pretrial release.

21.     At the plea hearing on April 28, 2005, ALCOTT's attorney represented to the Court that ALCOTT would not be pleading guilty. ALCOTT's attorney (who had previously represented to the court that ALCOTT was suffering from cancer) represented to the Court that ALCOTT "has now been diagnosed with advanced stage of prostate cancer where it has spread to his pelvic bone." He informed the Court that ALCOTT had begun treatment at MGH "that occurs almost on a daily basis." The attorney then provided the MGH letter to the Court, which the Court read. After reading the letter and following discussion about the potential disposition of the case, the Court stated: "I don't want to send someone to jail for the last six months of his life" and, later, "[t]his is going to be messy, because there is a widow and two babies." The Court requested the parties to discuss a possible disposition and report back on May 24, 2005. The Court then told ALCOTT, who was present throughout the hearing, "if you weren't sick, I would be revoking your bail."

22.     Following the hearing, the United States contacted ALCOTT's attorney to set up a meeting with the MGH doctor who purportedly authored the letter provided to the Court. Shortly after that inquiry, ALCOTT's attorney informed the United States that he was withdrawing from representation of ALCOTT. He then filed a motion to withdraw. A hearing was set for May 9, 2005 at 10:00 a.m. At the hearing on May 9, 2005, the Court's pretrial services officer reported that, shortly before the hearing, ALCOTT came into his office and told the officer that "he had been lying about having cancer." In fact, ALCOTT did not have cancer at all and the MGH letter was a complete fabrication. The Court then revoked his release status.

## Second Obstruction of Justice

23. On May 8, 2005, the evening before coming to Court on May 9, 2005, ALCOTT engaged in a second act willfully intended to obstruct and impede the administration of justice. More specifically, ALCOTT collected and placed into a trash bag documents and other evidence that implicated him in the fabricated letter scheme and in efforts to obtain a false identity. The documents and other evidence included, without limitation: (a) a BOSS voice transformer, Model VT-1; (b) an unsigned confession letter; (c) other fabricated letters meant to deceive his attorney; (d) confession letters relating to credit card misuse; (e) documents related to applications for identification papers under the name of a former employee of ALCOTT's; (f) an e-mail from "fakeidguru.com" directing ALCOTT to send money via Western Union to Denmark; and (g) evidence that ALCOTT sent the money.

24. On the evening of May 8, 2005, ALCOTT met with his 17-year-old son at ALCOTT's house. ALCOTT gave the trash bag to his 17-year-old son and asked the son to throw it away. The son placed the bag in a vehicle that ALCOTT allowed his son to drive. The son then drove the vehicle from the premises. The son, however, did not discard the bag. Following the May 9, 2005 hearing at which ALCOTT was taken into custody, ALCOTT's wife asked the son whether ALCOTT had asked him to put anything in the vehicle that ALCOTT's son was driving. The son told ALCOTT's wife about the trash bag. He then returned the bag to ALCOTT's wife, telling her, in words or substance, that he had simply not "gotten around to" throwing away the trash bag.

## COUNT ONE
## Bank Fraud
## 18 U.S.C. § 1344

25.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-24 of this Information and further charges that:

26.     From at least on or about July 13, 2000 through on or about July 1, 2003, the precise dates being unknown to the United States Attorney, the defendant MICHAEL W. ALCOTT, in the District of Massachusetts and elsewhere, knowingly executed, and attempted to execute, a scheme and artifice to defraud South Shore Savings Bank, a financial institution, in violation of 18 U.S.C. § 1344(1).

## COUNT TWO
### False Statements
### 18 U.S.C. § 1014

27.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-24 of this Information and further charges that:

28.     In or about May 2003, the defendant MICHAEL W. ALCOTT, in the District of Massachusetts, knowingly made a false statement for the purpose of influencing South Shore Savings Bank, an institution the accounts of which are insured by the Federal Deposit Insurance Corporation, upon a loan and any change and extension of a loan by renewal, deferment of action and otherwise and the acceptance, release and substitution of security therefor, in violation of 18 U.S.C. § 1014.

## COUNT THREE
**False Statements**
**18 U.S.C. § 1014**

29. The United States Attorney re-alleges and incorporates by reference paragraphs 1-24 of this Information and further charges that:

30. On or about June 3, 2003, the defendant MICHAEL W. ALCOTT, in the District of Massachusetts, knowingly made a false statement for the purpose of influencing Boston Private Bank & Trust Company, an institution the accounts of which are insured by the Federal Deposit Insurance Corporation, upon an application for credit, in violation of 18 U.S.C. § 1014.

## COUNT FOUR
### Travel Act
### 18 U.S.C. § 1952

The United States Attorney further charges:

31. In or about February 2005, ALCOTT engaged in a scheme to extort $150,000 from a California man ("K.S."), who works as a doctor. More particularly, ALCOTT threatened to disclose K.S.'s sexual relationship with a woman ("T.S."), who had been a prostitute, if K.S. did not pay him $150,000.

32. While ALCOTT and K.S. did not personally know one another, they both knew T.S., formerly of Quincy, Massachusetts. Both ALCOTT and K.S. had a relationship with T.S. through an escort service for which she was employed in Massachusetts. T.S. saw ALCOTT as a "client" in or about 2004. K.S. met T.S. as a "client" in or about 2004. Later, after having vacationed together on at least two occasions, T.S. moved in with K.S. in California around June of 2004. ALCOTT, however, continued to call T.S. periodically, including while she was living with K.S. in California.

33. On February 8, 2005, ALCOTT sent K.S. a letter via Federal Express to K.S.'s work address in California. The sender information on the shipping label was listed as Philip Edwards, DDS, 60 Federal St., Boston, Massachusetts. The letter states that the writer had been hired as a private investigator and had come to the realization that the "client" "is probably going to use the information that I have gathered to attempt to ruin [K.S.] and [T.S.]." It goes on to state, among other things:

> I have reviews and pictures from adult websites showing [T.S.]

12

> I have proof that you met [T.S.] by hiring her as a "GFE Escort" while visiting your daughter, wouldn't do a whole lot for the Father/Daughter relationship.
>
> * * *
>
> Suffice it to say that the information that I have could bring you down. Think about the humiliation with your parents [named], your children and especially your colleagues and patients if this seedy side of your life comes out, and trust me when I tell you that the above is just a sampling of what I have gathered.
>
> * * *
>
> The bottom line is that I spend a lot of time tracking down the "dirt" in people's lives and then see it used to destroy them. . . . You pay me more than my client and not only do I make this information disappear, I share some useful information with you. Please think long and hard about how long you have worked to establish your reputation and just how quickly it could be destroyed.

ALCOTT signed the letter "PE" and then gave an e-mail address of Pe343@hotmail.com, an account ALCOTT set up and used.

34. Between Tuesday, February 8, 2005 and Wednesday, February 16, 2005, ALCOTT sent a series of e-mails to K.S. originating from the Pe343@hotmail.com address. In those e-mails, ALCOTT repeatedly asked for a $150,000 "retainer" from K.S., threatening to disclose his relationship with T.S. if he did not pay. In an e-mail dated February 14, 2005, ALCOTT told K.S. to wire the money into an account ALCOTT had set up at the Bank of America in Atlanta, Georgia.

35. In addition to the series of threatening e-mails, ALCOTT also made a series of calls to K.S. in February 2005. On certain of those calls, ALCOTT left voice mail messages. T.S. listened to a telephone message left on the cellular telephone of K.S. and told K.S. that she recognized the voice as that of ALCOTT.

36. Later in February 2005, K.S. informed T.S. that he was going to report the extortionate scheme to law enforcement. The communications then ceased.

37. On Tuesday, March 22, 2005, K.S. received an e-mail from T.S. in which she attached an e-mail ALCOTT sent from Pe343@hotmail.com to her. It is signed "GOD bless and fondly, Me." In the e-mail, ALCOTT stated that he was in love with T.S. and hoped to start a life together. ALCOTT also explained the extortionate scheme, reported being under federal indictment, and admitted to being a criminal. ALCOTT attached to the e-mail a copy of a press release dated June 18, 2004 announcing bank fraud charges being filed against him.

38. In or about February 2005, the precise dates being unknown to the United States Attorney, the defendant, MICHAEL W. ALCOTT, did knowingly travel in interstate commerce and use the mails and a facility in interstate commerce with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment, or carrying on, of an unlawful activity, to wit, extortion in violation of Mass. Gen. L. c. 265, § 25, all in violation of 18 U.S.C. § 1952.

## PENALTY ENHANCEMENT
### 18 U.S.C. § 3147

39. The United States Attorney further charges that ALCOTT committed the offense set forth in Count Four while on pretrial release requiring a consecutive term of imprisonment of not more than ten years, as required by 18 U.S.C. § 3147.

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

_____
Jack W. Pirozzolo
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS, July 19, 2005

✎JS 45 (5/97) - (Revised USAO MA 1/15/04)

| **Criminal Case Cover Sheet** | **U.S. District Court - District of Massachusetts** |

**Place of Offense:** Massachusetts    **Category No.** III    **Investigating Agency** FBI

**City** Quincy    **Related Case Information:**

**County** Norfolk    Superseding Ind.(Inf.) Yes    Case No. 04-cr-10286
Same Defendant   Yes    New Defendant   No
Magistrate Judge Case Number   03M-1160-JGD
Search Warrant Case Number    03-1160-JGD/05-830-MBB
R 20/R 40 from District of

**Defendant Information:**

Defendant Name   Michael W. Alcott    Juvenile   ☐ Yes   ☒ No

Alias Name

Address   4 Jason Lane, Scituate MA 02066

Birth date (Year only): 1961    SSN (last 4 #): 1704    Sex M    Race: Caucasian    Nationality: USA

Defense Counsel if known:   Kevin Barron    Address: 453 Washington Street, 5B
Boston, MA 02111

Bar Number:

**U.S. Attorney Information:**

AUSA   Jack W. Pirozzolo    Bar Number if applicable   564879

Interpreter:   ☐ Yes  ☒ No    List language and/or dialect:

Matter to be SEALED:   ☐ Yes   ☒ No

☐ Warrant Requested    ☐ Regular Process    ☒ In Custody

**Location Status:**

**Arrest Date:** 5/9/05

☒ Already in Federal Custody as   Pretrial Detention   in   Plymouth County Correctional   .
☐ Already in State Custody _____ ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:  Ordered by _____ on _____

Charging Document:   ☐ Complaint   ☒ Information   ☐ Indictment
Total # of Counts:   ☐ Petty _____ ☐ Misdemeanor _____ ☒ Felony   4

Continue on Page 2 for Entry of U.S.C. Citations

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: 7/19/05    Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

District Court Case Number (To be filled in by deputy clerk): _____

Name of Defendant    Michael W. Alcott

## U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 U.S.C. § 1344 | Bank Fraud | 1 |
| Set 2 | 18 U.S.C. § 1014 | False Statements to Financial Institution | 2-3 |
| Set 3 | 18 U.S.C. § 1952 | Travel Act | 4 |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

ADDITIONAL INFORMATION: _____

js45.superseding.information.wpd - 1/15/04 (USAO-MA)