UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 04-10286-PBS |
| v. | ) | |
| MICHAEL W. ALCOTT, Defendant | ) | |

**SENTENCING MEMORANDUM
OF THE UNITED STATES**

On July 20, 2005, Michael W. Alcott ("Alcott" or the "defendant") pled guilty, pursuant to a plea agreement, to a Superseding Information for one count of bank fraud, in violation of 18 U.S.C. § 1344, two counts of making false statements to bank in connection with loans and applications for loans, in violation of 18 U.S.C. § 1014, and one count of extortion in violation of the Travel Act, 18 U.S.C. § 1952.

**Overview and Procedural Background**

The procedural history of this matter is somewhat tortured. In June 2004, Alcott agreed to plead to an Information charging him with a $2.0 million bank fraud. Just before his plea, which was scheduled for late June 2004, Alcott notified the government that, in light of the Supreme Court's then-recent decision in Blakely v. Washington, he would not plead guilty to the Information. In September 2004, the government dismissed the Information and indicted Alcott on the bank fraud. Following his indictment, Alcott was placed on pre-trial release, with few restrictions. Alcott was permitted to travel throughout the country. In February 2005 and March 2005, as the government later learned, Alcott engaged in a scheme to extort $150,000 from a doctor in California. Meanwhile, Alcott was scheduled to plead to the bank fraud

indictment in early April 2005.  Alcott then moved the date for his plea hearing to April 28, 2005.  At the hearing, at which he did not plead guilty, Alcott's attorney submitted to the Court a fabricated letter purporting to be from a Massachusetts General Hospital (MGH) radiologist/oncologist stating, among other things, that Alcott had terminal cancer.  Following the hearing, the government contacted Alcott's attorney to set up an interview with the doctor.  Alcott's attorney then moved to withdraw.  Shortly before the hearing on the motion to withdraw, Alcott confessed to pretrial services that his claims that he had cancer were false and that the letter from the doctor was a fabrication.  Alcott was then taken into custody.

Subsequently, the government executed a search on Alcott's home and interviewed Alcott's wife.  When executing that search, the government learned that, the night before the hearing on the motion to withdraw, Alcott had given his seventeen year old son a trash bag to discard.  The son had not yet discarded the bag and the government was able to retrieve it.  In the bag was a voice scrambler, an unsigned confession letter and other fabricated letters Alcott apparently sent to his attorney purporting to be from the MGH doctor.

The plea agreement and the Superseding Information sought to resolve all issues raised by Alcott's conduct, including the original bank fraud, the extortion and the obstruction of justice.  While the parties reached agreement on certain issues, the parties were unable to reach agreement as to a number of others.  On July 20, 2005, Alcott pleaded guilty to the Superseding Information.

The United States supplied its statement of offense conduct to the Probation Department on July 27, 2005.  On December 13, 2005, the Probation Department issued its final PSR.  The PSR recommended a total offense level under the United States Sentencing Guidelines

("U.S.S.G." or "guidelines") of 30, with a Criminal History Category of VI. The PSR also noted that the Court may wish to consider an upward departure based on Alcott's attempt to have his teenage son dispose of the trash bag.

In making its guideline calculations, the PSR departed in certain respects from the agreements made by the parties in the plea agreement. Most notably, the PSR concluded that the loss amount should be in excess of $2.5 million, which according to the PSR represented the "intended loss" of Alcott's conduct with respect to the false statement made to a bank in connection with an application for a line of credit. The plea agreement focused on the actual loss caused by Alcott's conduct, which all agree is between $1 million and $2.5 million. In addition, the PSR recommended that Alcott be given no deduction for acceptance of responsibility. Under the terms of the plea agreement, the United States agreed to make a recommendation of a three-level reduction for acceptance of responsibility.[1]

On December 23, 2005, the Court held a status conference in which various issues related to the Sentencing Guidelines calculation were discussed. The Court ordered that the parties submit a sentencing memorandum on or before February 22, 2006. The Court then extended the date for the parties' sentencing memorandum to March 16, 2006, with sentencing to occur on March 23, 2006.

---

[1] The PSR also notes that the base offense level for the bank fraud charges should be set at level 7, based on the PSR's conclusion that the November 1, 2005 U.S.S.G. manual (the "2005 Manual") should apply. See PSR at ¶ 146. As is discussed elsewhere in this memorandum, in the plea agreement, the parties anticipated a base offense level of 6 based on the application of the November 1, 2002 U.S.S.G. manual (the "2002 Manual") to the bank fraud charges, but explicitly reserved the right to argue that a different manual may apply. As is also discussed further below, however, the grouping rules of the guidelines, see § 3D1.4, may render it immaterial that the base offense level for the bank fraud charges is set at 6 or 7.

**Sentencing Issues**

    A.    **Applicable Guidelines**

The PSR applies the 2005 Manual. Application of this manual will result in a one-level increase in the base offense level for the bank fraud charges as compared to the offense level applicable to those charges under the 2002 Manual, which would be the applicable guidelines manual for the originally charged bank fraud offenses. The Travel Act violation, however, occurred in 2005, making the 2005 Manual applicable to that charge.[2] By including the Travel Act charge as part of the Superseding Indictment, the "one book rule" of the U.S.S.G. potentially creates a situation in which the 2005 Manual of the guidelines now applies to the bank fraud charges.[3] For the following reasons, the United States suggests that the Court defer addressing this issue until after it has decided on the other components of the guidelines calculation.

Although application of the 2005 Manual will make a difference to the offense level computation for the bank fraud charges, it may make no difference to the combined (or total) offense level computation in this case. This case involves two groups of charges: (a) bank fraud

---

[2] This is so because there is no material difference between the November 1, 2004 guidelines manual and the 2005 Manual, making the later manual apply.

[3] In negotiating the plea agreement, the parties anticipated that there might be an issue as to which version of the U.S.S.G. might apply to the bank fraud charges. The parties were concerned with the fairness of possibly increasing a penalty for the bank fraud conduct based solely on the decision to consolidate charges for a completely separate crime into one charging document; but the parties were also aware of the "one book rule." Accordingly, the parties reached a compromise position in which they agreed to a level 6, but incorporated an explicit reservation of rights for both parties on the issue of what manual of the U.S.S.G. applies: "[t]he parties each reserve the right to take a position as to which version of the guidelines applies to the offense conduct." The Defendant also reserved the right to argue that the Ex Post Facto Clause of the U.S. Constitution should require application of a manual other than the 2005 Manual.

charges ("Group 1") and (b) the Travel Act charge ("Group 2"). The Guidelines grouping rules provide for different increases in combined offense levels depending upon the degree of difference between the offense levels of the separate groups. Thus, a group that is equal to or 1-4 levels less serious than the group with the higher offense level results in a 2 level increase. See U.S.S.G. § 3D1.4(a). A group that is 5-8 levels less serious than the other group results in just a 1 level increase. See U.S.S.G. § 3D1.4(b). This creates the possibility (which may be the case here) that an increase in the offense level for the more serious group may increase the difference in the groups and, thus, decrease the levels to be added to create the combined adjusted offense level. So, for example, under the guidelines calculation appearing in the PSR, it makes no difference that the base offense level for the Group 1 bank fraud charges is 7 or 6. See PSR ¶¶ 67-74. In either case, the combined adjusted offense level will be level 30. See U.S.S.G. § 3D1.4 (a) & (b).

Accordingly, should the Court accept the PSR's guidelines calculations, there is no difference between the result under the 2002 or 2005 Manuals, and the 2005 Manual should be applied. See U.S.S.G. § 1B1.11. Because there are so many open issues that may affect the ultimate guidelines calculations, the United States suggests that the Court defer addressing this issue until after it has ruled on the other components of the guidelines. If, based on the other rulings of the Court, there will be a difference in the combined adjusted offense level that disfavors the defendant based solely on a base offense level for the bank fraud charges of 7 (under the 2005 manual), then the Court can make a ruling as to whether the 2002 Manual should be applied to the bank fraud charges.

**B.     Loss**

Under the terms of the plea agreement, the United States has agreed that the loss amount is between $1 million and $2.5 million, resulting in an offense level adjustment on the bank fraud charges of 16 levels.  See U.S.S.G. § 2B1.1(b)(1)(I).  The United States does not take a different position here.  Similarly, the parties agreed that the loss amount for the Travel Act extortion scheme was between $120,000 and $200,000.  The United States does not take a different position here.

**C.     Financial Institution Enhancement**

The parties agreed in the plea agreement that a 2-level enhancement is appropriate on the ground that the defendant "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense."  See U.S.S.G. § 2B1.1(b)(13).[4]  The PSR also applies this enhancement.  See PSR at ¶ 55.  Although he agreed to this enhancement in the plea agreement, the defendant has recently notified the United States that he intends to argue that the enhancement does not apply.  The United States anticipates that Alcott will argue that since the loan proceeds went to his business (ARK Associates) he, personally, did not derive more than $1 million in gross receipts from the fraud and that, accordingly, the enhancement is inapplicable.  This is not a correct application of the enhancement.

The application notes to U.S.S.G. § 2B1.1(b)(13)(A) provide that, in applying the financial institution enhancement, the Court is to consider whether the gross receipts to the defendant "individually" exceeded $1,000,000.  The question raised here then is whether the

---

[4] In the 2002 Manual, the financial institution enhancement is at § 2B1.1(b)(12).  It is otherwise identical to the enhancement in the 2005 Manual in all respects relevant here.

term "individually" applies to a defendant who operated his fraud through a closely held corporation.  In United States v. Castellano, 349 F.3d 483, 486-487 (7th Cir. 2003), the Seventh Circuit observed that the application of this enhancement turns on whether, under state-law corporate "veil piercing" principles, the defendant is personally accountable for the receipts and obligations of the corporation.  Id.  In that case the court vacated a district court's finding that the enhancement applied and remanded the case to the district court to determine whether enough evidence existed to pierce the corporate veil under state law principles.  Id. at 47.  Assuming, without agreeing, that the Castellano approach correctly interprets the enhancement, there is ample basis to conclude that, under Massachusetts state law principles, piercing the corporate veil is appropriate.

Under Massachusetts law, corporate veil piercing is an equitable doctrine.  Basically, it allows a court to hold an individual liable for the acts of a corporation where the individual uses the corporation to inflict gross inequity, injury, or fraud.  See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748 (1968); see also Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir.1985) (listing twelve factors under Massachusetts law to consider in deciding whether to penetrate the corporate form: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity assets, or management;(4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders;  (10) non-functioning of officers and directors; (11) uses of the corporation for transactions of the dominant shareholders; (12) use of the corporation in promoting fraud).

In this case most of the My Bread factors weigh in favor of piercing the corporate veil. ARK Associates was owned and controlled by Michael Alcott. ARK Associates' assets were used for Alcott's personal expenses. ARK Associates was thinly capitalized and had no meaningful corporate form separate and apart from Alcott himself. There is no evidence of officers and directors other than Alcott controlling or directing the business. Moreover, ARK Associates was clearly insolvent at the time of the $2.5 million loan, a fact which Alcott concealed when he obtained the proceeds for the line of credit. Finally, and most importantly, Alcott used the corporate form to defraud the bank. More specifically, Alcott induced the bank to extend the line of credit to ARK Associates by misrepresenting to the bank the financial condition of the business. The bank extended the line of credit in large part because of the purported receivables ARK Associates was owed. It was the fake *corporate* receivables that allowed Alcott to perpetrate his fraud on the bank. Under these circumstances, Massachusetts state law would pierce the corporate veil, making the financial institution enhancement applicable.

> **D.     The Upward Departure Based On The Defendant's Use of His Seventeen Year Old Son To Dispose of a Trash Bag Full of Incriminating Evidence**

The parties have agreed that a two level increase for obstruction is appropriate based on the fabricated letter the defendant presented to the Court purporting to be from a doctor at MGH. The parties disagree on the question of whether an additional enhancement to his sentence is appropriate based on the defendant's attempted use of his seventeen year old son to dispose of evidence relating to his fabricated letter and other evidence of wrongdoing. The United States asserts that an additional enhancement to the defendant's sentence is appropriate as an upward departure from the guidelines.

### 1.    The Relevant Facts

On May 9, 2005 Alcott confessed to his pretrial services officer that he had been lying about having cancer and that the letter he provided to the Court purporting to be from a MGH doctor was a fabrication. What Alcott did not inform the Court on May 9, 2005, or at any time thereafter, was that on May 8, 2005 he had gathered evidence relating to his fabrication of the doctor's letter and other information related to a scheme to steal the identity of a former employee, placed the evidence in a trash bag, and given it to his then seventeen year old teenage son to discard.

Following Alcott's in-court revelation that he had been lying about his cancer, the United States obtained a search warrant for Alcott's home in Scituate. While very little was discovered in the search of the home, Alcott's wife informed an FBI agent conducting the search that, the day before he confessed, Alcott had met with his seventeen year old son, given him a trash bag, and asked him to discard it. After telling the FBI agent about this event, Alcott's wife then called Alcott's son and asked him whether Alcott had asked him to put anything in the vehicle that Alcott's son was driving. The son told Alcott's wife about the trash bag. Alcott's son then returned the bag to Alcott's wife, telling her, in words or substance, that he had simply not "gotten around to" throwing away the trash bag.

Within the trash bag was incriminating evidence related to the cancer hoax, to Alcott's efforts after April 28, 2005 to frustrate the government's efforts to verify some of the assertions in the letter provided to the Court, and to other criminal conduct, including credit card fraud and identity theft. The materials in the trash bag included, without limitation: (a) a BOSS voice transformer, Model VT-1; (b) an unsigned confession letter; (c) other fabricated letters meant to

deceive his then-attorney; (d) confession letters relating to credit card misuse; (e) documents related to applications for identification papers under the name of a former employee of Alcott's; (f) an e-mail from "fakeidguru.com" directing Alcott to send money via Western Union to Denmark; (g) evidence that Alcott sent the money; (h) casino gambling credit/debit cards; and (i) a cell phone box and cell phone accessories.

### 2.  Analysis

The PSR states that a second obstruction enhancement is not warranted under the applicable obstruction guideline for Alcott's conduct in disposing of the trash bag. See PSR ¶ 46; see also U.S.S.G. § 3C1.1. The PSR also does not apply U.S.S.G. § 3B1.4, which provides for a two level enhancement for the use or attempted use of a person less than eighteen years of age "to commit the offense or assist in avoiding detection of, or apprehension for, the offense." See U.S.S.G. § 3B1.4. The PSR does, however, note that the Court may want to consider an upward departure based on Alcott's use of his son in attempting to dispose of the trash bag.

Assuming that the PSR is correct that neither § 3C1.1 nor § 3B1.4 can be applied to the facts of this case to increase Alcott's offense level for this second act of obstruction, the Court should nevertheless impose some upward adjustment to Alcott's sentence to take into account Alcott's attempted disposal of the trash bag and his use of his seventeen year old son in making that attempt. An upward departure is warranted because Alcott's conduct here is an aggravating circumstance of a kind and to a degree not adequately taken into account in the guidelines. See, for example, United States v. Ventura, 146 F.3d 91, 96-97 (2d Cir. 1998) (multiple acts of obstruction of justice can provide the basis for an upward departure beyond the two-level enhancement set forth in U.S.S.G. § 3C1.1). In this case, Alcott's act of disposing of the trash

bag constitutes a second act of obstruction, one in which he potentially implicated his teenage son. By attempting to dispose of the evidence in the trash bag, Alcott committed at least three forms of conduct that ought to be taken into consideration at sentencing and will not otherwise be taken into consideration under the guidelines calculations.

First, Alcott attempted to obstruct the United States' efforts to investigate the cancer hoax. Second, even though Alcott confessed the next day that his cancer claims were false, Alcott failed to inform the Court or the United States that he had tried to dispose of evidence that would reveal more fully the depth and breadth of his deceptive scheming. It is a fair inference from the circumstances that Alcott, by both seeking to dispose of the trash bag and by omitting to inform others of what he had tried to throw away, hoped to truncate the information available to the Court and the United States in determining how to approach the prosecution of Alcott's criminal conduct. Third, and perhaps most importantly, Alcott showed utter disregard for the possible effect this conduct could have in implicating his own teenage son in an obstruction of justice. By providing the trash bag to his son and asking his son to dispose of it, Alcott potentially made his own son an accessory to his obstructive conduct.

The Court should not overlook this conduct in sentencing Alcott. And since nowhere in the guidelines calculations are there adjustments to take into account Alcott's obstructive conduct involving his son, a departure is appropriate. The United States recommends at least a one-level upward departure.

**E.    Criminal History**

The PSR's conclusion that Alcott is a career offender as defined in U.S.S.G. § 4B1.1 is correct. Alcott has a lengthy criminal history, including at least two prior convictions for crimes of violence. In addition, the extortion offense to which Alcott pleaded in this case qualifies as a crime of violence for purposes of the career offender guideline. This is true even if the extortion did not involve a threat of physical violence. See United States v. DeLuca, 17 F.3d 6, 9-10 (1st Cir. 1994). In DeLuca, the First Circuit held that a conviction for "extortion" under a Rhode Island extortion statute was a "crime of violence" for purposes of the guidelines even if the statute proscribed threats of reputational or economic harm in addition to threats of physical violence. Id. at 10. Because the extortion in this case is a crime of violence, Alcott meets the definition of career offender in light of his prior convictions for violent crime. His criminal history category is, therefore, Category VI.[5]

---

[5] Alcott otherwise falls within Category V. He has at least eleven criminal history points. See U.S.S.G. § 4A1.1.

Case 1:04-cr-10286-PBS    Document 48    Filed 03/16/2006    Page 13 of 16

**United States' Sentencing Recommendation**

Taking into account the foregoing sentencing issues, the United States' recommendation on the guidelines calculation is as follows:

|  | Level | Units |  |
|---|---|---|---|
| Group 1, Adjusted Base Offense Level: | 26 | 1 | |
| Group 2, Adjusted Base Offense Level: | 22 | 1 | |
| Total Units: |  | 2 | (§ 3D1.4) |
| Greatest of Group 1 or 2: | 26 | | |
| Increase per § 3D1.4: | 2 | | |
| Combined Adjusted offense Level: | 28 | | |
| Adjustment for Acceptance of Responsibility: | -3 | | |
| Total: | 25[6] | | |
| Criminal History VI | 110-137 Months | | |

In accordance with the plea agreement, the United States recommends a sentence of 120 months, which is within the guidelines range absent a departure. Should the Court depart upward one or more levels from level 25 based on the government's departure argument, then the United States recommends the low end of the resulting guidelines range.

The United States also recommends a fine of $10,000, unless the Court finds that the defendant is unable to pay the fine or is unlikely to be able to pay the fine with a reasonable

---

[6] This calculation assumes a BOL of 6, but the same result is reached if a BOL of 7 is used for the Group 1 calculation. This calculation also assumes no upward departure.

installment schedule. The United States recommends a restitution order be entered for the benefit of South Shore Savings Bank in the amount of $2,032,345.60. The United States also recommends that a restitution order in the amount of $149,113.72 be entered for the benefit of Clover Capital and Consulting LLP. The United States recommends a period of supervised release of 5 years. A mandatory special assessment of $400 is also due.

The United States' recommended sentence is reasonable in light of the various factors set forth in 18 U.S.C. 3553(a), including such factors as the need to reflect the seriousness of Alcott's offenses, to promote respect for the law, to adequately deter the conduct, and to protect the public from further crimes of the defendant. As the record developed in this case demonstrates, Alcott has shamelessly exploited and manipulated others for his own selfish purposes. In his foray into business, he exploited and manipulated well meaning people who were inclined to give a convicted felon a second chance at life by supporting his supposedly legitimate business venture. In perpetrating his cancer hoax, Alcott exploited and manipulated people's sense of decency and compassion to try to save himself from the consequences of his criminal conduct. In extorting the doctor in California, Alcott tried to exploit and manipulate the doctor's sexual history for Alcott's own selfish financial gain. He even tried to exploit and manipulate his own son, making his son an unwitting accomplice in an attempt to destroy evidence that would further implicate Alcott in criminal conduct. Ten years for this conduct is fair and reasonable.

**Conclusion**

For the reasons set forth above, the Court should sentence Alcott in accordance with the recommendation of the United States.

    Respectfully submitted,

    MICHAEL J. SULLIVAN
    United States Attorney


    **/s/ Jack W. Pirozzolo**
    Jack W. Pirozzolo
    Assistant U.S. Attorney
    U.S. Attorney's Office
    U.S. Courthouse, Suite 9200
    1 Courthouse Way
    Boston, MA 02210


Date: March 16, 2006

## **CERTIFICATE OF SERVICE**

      I, Jack W. Pirozzolo, hereby certify that on March 16, 2006, I served a copy of the foregoing document via electronic filing on counsel for the defendant.

                                      **/s/ Jack W. Pirozzolo**
                                      Jack W. Pirozzolo