UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA,

Action No. 1:04-cr-10286 PBS

v.

MICHAEL ALCOTT,
          Defendant.

DEFENDANT'S SENTENCING MEMORANDUM

Summary

After consideration of the relevant factors of the Sentencing Reform Act 18 USC 3553(a) and an accurate analysis of the sentence advised by US Sentencing Guidelines, Mr. Alcott's sentence should not exceed 48 months.  Under recent precedent, the Guidelines may be entitled to weight, but they are not presumptively correct; therefore, the 51 - 63-month or greater Guidelines sentence the government urges can no longer considered *per se* reasonable.  See, *United States v. Jiminez-Beltre*, No.  05-1268 (1 Cir., March 8, 2006)(Boudin, CJ, for the majority, concurrences with Lipez dissenting).  The average white-collar sentence is fifteen months and a sentence in this case at three times the average is reasonable under the law of this Circuit.  Mr. Alcott's criminal history is overstated and there are numerous grounds for a variance below the Guidelines sentence (such as age reduces recidivism, childhood sexual abuse, family responsibilities to three year-old twins, opportunity for restitution).

A summary of his offense and relevant conduct includes:  defrauding a bank of about two million dollars (to save his failing company and protect the

appearance of success); blackmailing a dentist by threatening to disclose his

relationship with and marriage to a prostitute (the non-violent Travel Act charge

committed on pre-trial release); lying to this Court that he was dying of cancer

(obstruction of justice to facilitate a plan of escape that he abandoned before

revocation of bail on May 9, 2005).

## REQUEST FOR JUDICIAL RECOMMENDATION TO FMC ROCHESTER

Mr. Alcott's residence has changed because his wife Mary and their three

year-old twins, have moved to Rochester, Minnesota. Mary Alcott urges in her

letter that the Court recommend Mr. Alcott to a nearby Minnesota facility, FMC

Rochester. Mary Alcott March 13, 2006 Letter, Ex. A.) As set forth in the medical

records submitted in connection with the PSR, Mr. Alcott takes a regimen of

mood stabilizers and anti-depressants and may benefit at least initially from

confinement at a Federal Medical Center. Mr. Alcott requests a judicial

recommendation to FMC Rochester, Minnesota. Minnesota has no fewer than

five federal facilities, including those with 500-hour program and community

corrections.

## FACTS

A.      Childhood

Mr. Alcott grew up in working-class Quincy, Massachusetts. His father

was a city inspector and his mother was a bank teller and home maker. (PSR ¶¶

93 & 94.) Mr. Alcott reports and family confirm that he suffered from his family's

heavy drinking and his mother's frequent emotional and physical abuse. (PSR

¶¶ 96 - 98.)  Mr. Alcott reported in his PSR interview that in home drinking began every day at "cocktail" hour, an hour that did not end until late at night. (It is understandable that not every detail of the interview could be included.) When hung over, his mother was abusive and cruel.  For example, Mr. Alcott described an instance in which his mother hung wetted bed sheets out the window for neighbors to see.  Mr. Alcott mentioned that his father "knew everyone" in Quincy and that the problems with alcohol and abuse went unreported for that and other reasons.[1]

Mr. Alcott's wife, Mary Alcott, summarizes the difficulties in her husband's early life as follows:

> Michael was raised by 2 alcoholic parents.  His grandfather committed suicide by hanging, leaving his wife in a psychiatric hospital and Michael's mother an only child. Although Michael excelled in sports as a child and did well academically in Junior High, things began to fall apart for him after he was molested by a catholic priest, and lost his  scholarship to BC high in his sophomore year of  High school. These events eventually led to drugs and alcohol and years of destructive behavior for Michael. March 13, 2006 letter, Ex. A.

B.    School & Sexual Abuse

Mr. Alcott was a good student before age thirteen.  (See attached middle school report cards, Ex. B.)  He went to BC High School in Dorchester in ninth grade.  It was there, at age 15, he fell victim to a noted pedophile, Fr. James

---

[1] The PSR at ¶97 mentioned that Mr. Alcott had described his father as "well connected".  The phrase in the context of the conversation was not intended to convey that the father was corrupt.  It indicated that Mr. Alcott's family was left alone and that outsiders would be unlikely to interfere because of establishment in the community and employment for the city.

Talbot; his grades suffered as a consequence.  (See attached transcripts from

North Quincy High School, Ex. C and Bently College, Ex. D.)   As the Court may

notice is typical of childhood victims of sexual abuse, the victim does not come

forward until years later.  Nonetheless, there are many good indicators that the

accusation of sexual abuse is truthful.  The Catholic Church paid a $300,000.00

settlement.  (See, December 5, 2002 settlement statement, Ex. E and March 7, 2002

Boston *Globe* article concerning hotline established by BC High in 2002 for

contacting students of Talbot & others, Ex. F.)  At the time of the abuse, Mr.

Alcott's behavior changed, including acts of fire setting, poor school performance

and other misbehavior.  (See March 9, 2006 letter of Anne Alcott, Ex. G.)  The

perpetrator had the opportunity to commit the abuse and is a known pedophile.

His transfer from BC High to Cheverus High School in Portland, Maine was the

subject of criminal and civil litigation, the Archdiocese even Fr. Talbot in a list of

80 names of suspected abusers.  (See Complaint, Ex. H, Letters concerning Fr.

Talbot's transfer from BC High to Cheverus, Maine news articles of confirmed

abuse, Ex. I)

    Counsel diverges from the chronological order:  In 2002, Mr. Alcott's

therapist, George Svajian, was called upon to opine about abuse and Mr. Alcott's

history.  (March 6, 2002 letter Dr. Svajian, provided to US Probation in December

2005 for inclusion the PSR, Ex. J; see, also, July 29, 2002 letter George Svajian, Ex.

K.)  The March 6 letter concludes:

The sexual molestation of Mr. Alcott by Father Talbot changes his clinical picture. Rather than diagnoses of conduct disorder and narcissistic personality disorder, Mr. Alcott is now clearly identified as a trauma survivor. Many of his behavior symptoms could be viewed as symptoms of post-traumatic stress disorder (PTSD). Mr. Alcott needs to continue his emotional growth by seeing someone who specializes in PTSD and survivors of sexual abuse.

C.      Maladjustment from Abuse & Criminal History

The effect of the abuse was debilitating. After leaving Boston College High, Mr. Alcott completed public high school with low grades and few prospects. (See North Quincy High School and Bently College grades, Ex's C & D).

Mr. Alcott's symptoms of psychological maladjustment are often seen in individuals who have been sexually abused. Mr. Alcott's unwillingness to call the molestation by Father Talbot as abuse is not atypical. Mr. Alcott no longer felt safe, was disrespectful of authority figures and engaged in relationships only superficially.... Mr. Alcott became a poly substance abuser as a way of numbing his feelings. He became lost and only wanted to look cool - no matter the personal cost. Within a year of his molestation, he was intoxicated every weekend.

See Svajian Letter, Ex. J. Mr. Alcott drifted in and out of employment as a bar tender (PSR ¶¶ 118c & 123) and fell into a pattern of ethanol abuse. His income for the period was correspondingly low. (See 2005 Social Security Earnings Statement, period 1979 to 1980, Ex. L.) His mental status is explained at length in the April 5, 1991 letter of Dr. Robert Beckhardt, MD, PSR ¶ 118c: "The patient goes on to describe longer term patterns of adaptation that include chronically lowered self-esteem, frequent feelings of rage, shame and humiliation." The PSR

uses this report and other psychiatric history to support a posture of doubt and condemnation; counsel, however, cannot conceive of better corroboration of childhood mental and sexual abuse.

Mr. Alcott's history between 1984 and 1992 represents a period of chaos and destructive behavior, to include marriage, divorce, remarriage and divorce again. View in the totality of the circumstances, there is no doubt that Mr. Alcott's adult conduct was a continuing reaction to abuse, These are the "...behavior symptoms [that] could be viewed as symptoms of post-traumatic stress disorder (PTSD)" described in the Svajian letter (Ex. J). Mr. Alcott accumulated the following convictions and dispositions:

- a conviction for "armed robbery" in 1987 with a twelve-year suspended sentence (three points, PSR ¶76). As Plymouth Police Department Records indicate, the "weapon" used was a toy gun, later retrieved from a trash barrel along with the bank's envelopes. $4,000.00 was stolen;

- operating under the influence in 1987 (no points, PSR ¶78),;

- operating under the influence in 1989 (no points, PSR 81);

- non-scoreable operating without a license and unpaid checks.

At this point, Mr. Alcott had never served an activated sentence of incarceration.

D.    Probation Revocation & the Over Represented Criminal History

Mr. Alcott marriage to Judee Stevens ended in divorce and in 1992 Mr. Alcott traveled to New Hampshire and stole the engagement ring from their marriage (scoring two points). This resulted in the revocation of probation and

incarceration.  The situation is typical of state-court defendants.  In exchange for a speedy disposition and to avoid the discomfort of corrections transportation to multiple appearances, the defendant agrees to a disproportionately long concurrent sentence.  Mr. Alcott quickly had himself "habed" in to District Courts in Brighton, Waltham and Quincy to obtain concurrent sentences.  What Mr. Alcott failed to observe was that the length of the sentences over represented the seriousness of the conduct.

- In Waltham District Court in November, 1992, Mr. Alcott agreed to a Guilty filed for "Larceny More", garnering only one point (PSR ¶83).  Counsel traveled to  the Waltham District Court and later contacted Mr. Alcott's CPCS attorney in an effort to determine whether the charges of "larceny more" were in fact supported.  There were no reports of the proceedings than the attached docket sheet and counsel had no records or independent recollection of the event.  See, Waltham District Court Docket, Ex. M.

- Next, Mr. Alcott received a one-year sentence in Brighton District Court for "larceny less" (and two points in this Court, PSR ¶84).  See Brighton District Court docket sheets, Ex. N.

- Finally, Mr. Alcott was "habed" in to Quincy District Court in January 1993 where he received a 2.5 year sentence (and garnered three points in this Court, PSR ¶83) for a property crime ("larceny more"), namely failing to discharge the UCC-1 before selling a boat to a third party.  Apparently,

Judee Stevens had retained the discharge money.  See, Quincy Docket, Ex.

O.

E.    A Period of Struggle & Reward

Between 1994 and the 2000, Mr. Alcott experienced a period marked by

stability and support for his family, sobriety and involvement with his four

children.  Counsel believes this period demonstrates Mr. Alcott's ability to

perform well on supervised release.  There can be little doubt concerning Mr.

Alcott's alcoholism or his work in recovery.[2]  As his first wife, Julie Alcott writes

in aid of sentencing:

>  Despite the time he spent in prison, he provided our children with
> an excellent education and, before he went away, made sure that
> both were set up for college.  He has always been involved in their
> lives and provided for them.  I have seen that same passion with
> his three year old twins, Emma and Harrison, who love him very
> much.  Ex. P

His wife Mary describes meeting Mr. Alcott in AA and his long standing

attendance and participation.

>  When I met Michael he was clean and sober and doing very well
> working for a recruiting firm. He wanted nothing more than to stay
> sober, support a family and raise children. He regularly attended
> AA meetings and belonged to a spiritual group.  Mary Alcott letter
> March 13, 2006, Ex. A.

---

[2] Counsel does not describe Mr. Alcott's work in 12-step recovery as a failure.  In counsel's experience, most substance abusers relapse at times but return to a daily recovery program.  If alcoholism is to be considered a progressive disease, the potential for relapse is always present.  Thus, as described in Mary Alcott's letter and the letter of Rick Lynch, Mr. Alcott's AA "sponsor", Mr. Alcott has worked on a program of recovery.

One of his AA "sponsors" (a person willing to guide and support the alcoholic in
sobriety) was willing to write a letter confirming his work with Mr. Alcott. (See,
March 3, 2006 letter of Rick Lynch, Ex. Q.) The sponsor describes attendance at
four to six meetings per week, regular contact with the sponsor every other day
by phone and every two weeks in person. "He worked his AA program
diligently during this time [1995 & 1996]".

Mr. Alcott also rose in the work place from a brick-layer's assistant to the
Vice-President of a professional staffing firm, "Accountants On Call". Mr.
Alcott's rise was often difficult.

> However his company found out about his criminal past and was
> ready to fire him so he moved to a competitor. After quickly
> moving up the ranks to Vice President in a very short time, he was
> fired when someone alerted the company of his criminal past.
> Michael was devastated because he so wanted to work and do well.
> We both felt his only hope for a future was if he worked for
> himself. Michael worked very hard to open his company and was
> desperate for it to thrive because in his eyes it was his only option
> of making a living and supporting a family.   Mary Alcott letter
> March 13, 2006, Ex. A.

He recalled in his US Probation interview that he was a staffing manager for
Account Temps in 1998, earning up to $80,000.00 per year. PSR ¶132. His Social
Security Income Statement corroborates this income level. (See Ex. L.) Fearing
termination based on his robbery conviction, Mr. Alcott left Account Temps for
employment at Accountants On Call. PSR ¶131. There he worked long hours
and rose through the company structure until he was promoted to Vice
President. PSR 131. (See, December 7, 2005 letter of Shelly Johnson, SVP

"Ajilon", formerly Accountants On Call ("AOC"), Ex. R.  Counsel contacted Ms.

Johnson about the reasons for termination.  She confirmed it was Mr. Alcott's

failure to mention his felony conviction on his employment application.  Ms.

Johnson would not answer counsel's question whether AOC would have hired

Mr. Alcott if he had disclosed his convictions.)

F.      The Loan from South Shore Savings Bank

       Mr. Alcott's initial successes in self-employment are not in dispute.  He

founded a company named ARK Associates following the model he learned at

his former employer AOC.  Mr. Alcott observed the formalities of incorporation

and capitalized the company.  (See, Massachusetts Articles of Incorporation for

ARK Associates and amendment appointing three board members including Mr.

Alcott, his wife Mary, By Laws and other incorporation documents omitted to

save electronic filing space, Ex. S.)   Mr. Alcott's company paid taxes every year

of its existence until the 2003 litigation, as the Social Security Income Statement at

Ex. L. indicates.  At one time or another, ARK Associates employed as many as

30 people.

       Despite initial successes, ARK encountered continuing losses upon

opening a new branch office.  Mr. Alcott created sham financials to support a

two million-dollar increase in his line of credit with South Shore Savings Bank

("SSSB").  PSR ¶¶13 -21.  Unable to cover the losses, he explored and initiated

contact with Boston Private Bank ("BPB") for a larger, $3.5M loan, although Mr.

Alcott never filled out or submitted a formal application.   PSR ¶¶24 - 25.  Mr.

Alcott had used the name of KPM Associates (CPA's) in connection with the sham accounting statements. The company's owner, Kevin Martin discovered the fraud and alerted SSSB and BPB.

G.      Cooperation with Creditors & Assessment of Personal Gain

Mr. Alcott cooperated with creditors after his fraud was discovered. This period also revealed how much Mr. Alcott had derrived individually from the SSSB loan. SSSB instituted a civil suit against Mr. Alcott, his wife and ARK Associates. Mr. Alcott essentially made a confession of judgment and submitted to discovery and execution proceedings. Despite the defendants' cooperation with the creditor, the creditor's counsel managed to incur more than $180,000.00 in attorneys' fees. (See, November 17, 2005 letter of Kevin Burke, Esq., for a description of cooperation in litigation, expenses and the assets recovered and the liquidated amounts, Ex. T.) The litigation and audit revealed approximately $455,000.00 recovered for the creditor. Among the assets applied to the judgment were the family home and the Black Rock golf club membership. The golf club membership (worth $120,000.00 and home improvements were taxed individually to Mr. Alcott). Based on the social security wage statements, the amounts Mr. Alcott derrived totaled about $500,000.00. This amount is derrived by adding 2000, 2001 & 2002 Medicare Earning of $475,000.00 together with another $29,600.00 for 37 car lease payments of $800.00 for Mr. Alcott's E-Class Mercedes.

H.      Blackmail

While on pre-trial release, Mr. Alcott attempted to blackmail a dentist named "KS" for his involvement with and marriage to Toni Spain, a local prostitute with ties to Las Vegas. PSR ¶¶30 - 32. It is important to note counsel's objections to the PSR in this regard:

> ¶¶30. -32. This paragraph should include some information about Mr. Alcott's voluntary abandonment of the offense. The information provided in discovery tends to show (even if it does not explain why) Mr. Alcott abandoned his extortion of Dr. [S]. The discovery in this matter does not indicate that Mr. Alcott broke off communications with [S] because Mr. Alcott thought he would be caught. (See ¶32, first sentence.) To the contrary, Mr. Alcott deliberately revealed his identity to Toni Spain. According to email traffic, Mr. Alcott first approached Dr. [S] on February 8, 2005. Dr. [S] threatened to bring the matter to the FBI in an e-mail dated February 9, 2005: "I have contacted agent Sam Medigocich in the San Diego Office of the Federal Bureau of Investigation…". Dr. [S] aggressive response to the blackmail attempt comes the day after the attempt was made. The March 18, 2005 email with attachments to Toni Spain does not appear connected with an imminent fear or threat of detection. Mr. Alcott identifies himself clearly in the email. It is after Mr. Alcott's disclosure of his own identity, and only then, that Dr. [S] communicated Mr. Alcott's identity to agent Frank Texeira by facsimile dated March 23, 2005.

The foregoing is to say that Mr. Alcott's identity was not known to the doctor until Mr. Alcott disclosed it. By the time of that disclosure, Mr. Alcott had already abandoned the offense. It was after that when the doctor contacted the FBI.

Significant to the offense level calculation and any career offender treatment is that no communication involves a threat of violence. The offense only involves sexual blackmail. As the email traffic reveals, Mr. Alcott met Ms.

Spain and had contact with her for some.  When Ms. Spain took up with the doctor, Mr. Alcott threatened blackmail.

I.      Lying to Court About Cancer

Mr. Alcott lied to the Court and his attorney by fabricating a letter from Massachusetts General Hospital's Oncology Department.  PSR ¶¶ 33 - 36.  He fabricated a letter using a facsimile of MGH letterhead and programming the MGH facsimile number into his machine.  The letter was given to his attorney who gave it to the AUSA.  When a meeting was arranged to speak to Mr. Alcott's oncologist in person, Mr. Alcott's attorney, Peter Muse, Esq., withdrew.  Mr. Alcott was detained and the Court appointed present counsel.

J.      Garbage Bag Not Evidence of Obstruction

The government pursues a theory that Mr. Alcott was guilty of another obstruction of justice.  It maintains that Mr. Alcott's placement of false ID applications, a voice scrambler and other things connected with the above obstruction by false doctor's letter constitutes further obstruction.  US Probation does not agree:  "these acts appear to be related to Alcott having falsified information to the Court and these acts did not further impede the court proceedings or prosecution of the case."  PSR ¶46.

The government's position ignores significant facts:  Mr. Alcott reported to Probation that the letter was false and that he had lied to stay out of jail, thereby creating further no impediment to investigation or prosecution.  The bag of items was in the Alcott house when the FBI executed its search warrant.  The reason

Mr. Alcott put the items in the trash was to conceal them from his wife, not from

authorities.  The items were not given to the son as asserted and, in fact, did not

leave the Alcott house.  In fact, according to Mr. Alcott's daughter Kerri, she

showed the items to Mary Alcott and Mary called this counsel.  Mrs. Alcott then

promptly called the FBI.  The FBI then took several weeks to pick up the bag.


ARGUMENT

POINT I:
Guidelines Calculations

A.     Offense Level

Mr. Alcott estimates a 51 to 63 month Guidelines sentence based on a 22

point offense level and Criminal History category adjustment to Category III.[3]

After hearing on December 20, 2005, the Court made rulings concerning

calculation of Mr. Alcott's Guidelines Sentence.  First, that the 2002 Guidelines

would apply to Mr. Alcott because sentencing at the higher base offense level of

the 2004 USSG §2B1.1 would offend the ex post facto clause of the Fifth

Amendment.  Secondly, Mr. Alcott would receive credit for acceptance of

responsibility because the circumstances of the uncharged obstruction of justice

sufficiently unique not to warrant a denial of acceptance points.  Third, the Court

opined that Career Offender treatment was not likely to apply.  As the defense

maintains, departures from Criminal History Category and Career Offender

---

[3] The plea agreement is silent on the subject of Criminal History Category.  Counsel had agreed that their
estimate was CH Category IV, but they were uncertain.  Based on the nature of the 1992 revocation
proceedings and related offenses, counsel now believes a category III is appropriate.

treatment are encouraged where actual criminal history is under or over represented.  Mr. Alcott should not be treated as a career offender because: (1) the Travel Act offense is in the nature of sexual blackmail and should not be considered a violent offense; (2) Mr. Alcott has served only one prison sentence upon the revocation of his armed robbery probation in 1992 and it appears his criminal history is overstated; defendant is now 43 years old and is not statistically likely to be recidivist; his violent crime predicate involved a toy gun).

The 2002 United States Sentencing Guidelines apply, despite conduct in 2005.  The "One-Book" rule is insufficient to overcome an *ex post facto* claim.[4]


OFFENSE GROUP I

Bank Fraud 18 USC §1344 (count I), False Statement (count II) 18 USC §1014, False Statement (Count III)

Base Offense Level  §2B1.1 (a)

6

Amount of loss, §2B1.1 (b)(1)(I) ($1M - 2.5M).  US Probation calculates the relevant conduct at $3.5M because count III involved a communication about applying for a $3.5M loan Boston Private Bank.  However, no loan was applied for and the attribution of a $3.5M loss is speculative.

16

Individually derived > $1M, §2B1.1(b)(12).  The defense assented to this enhancement in the Plea Agreement.  However, at the time of said agreement, counsel was not aware of Justice Easterbrook's

---

[4] The 2002 Guidelines concede the point:  "Although aware of possible ex post facto clause challenges to application of the guidelines in effect at the time of sentencing, Congress did not believe that the ex post facto clause would apply to amended sentencing guidelines. S. Rep. No. 225, 98th Cong., 1st Sess. 77-78 (1983). While the Commission concurs in the policy expressed by Congress, courts to date generally have held that the ex post facto clause does apply to sentencing guideline amendments that subject the defendant to increased punishment."  §1B1.11 Application Note 2.

decision in *US v. Castellano*, 349 F.3d 482 (7 Cir. 2003)(that the corporate entity should be respected unless state law allowed piercing the corporate veil). Even if Mr. Alcott were to be held to the agreement, the records indicate that Mr. Alcott used most of the proceeds to meet operating expenses, chiefly employee payroll. Those items Mr. Alcott took personally, a country club membership and improvements to his home were available to satisfy the victim's civil judgment.

0

Obstruction of Justice (by lying to the Court to delay revocation of pre-trial release).

2

Adjusted Offense Level

24

OFFENSE GROUP II 18 USC § 1952 (count IV) Travel Act - Extortion/Blackmail[5]

Base Offense Level for Blackmail USSG §2B3.3(a)[6] (Probation's agreed reliance on this section undercuts its position that Mr. Alcott is a career offender. Blackmail is not a violent offense predicate for Career Offender purposes.)

9

Amount of "Loss" ($120,000.00 to 200,000.00)

10

The crime was an attempted crime, as discussed, supra.  USSG §2X1.1 applies to decrease 3 levels the amount of loss calculation with respect to this count. The attempt was abandoned.

---

[5] **Section 873. Blackmail**
"Whoever, under a threat of informing, or as a consideration for not informing, against any violation of any law of the United States, demands or receives any money or other valuable thing, shall be fined under this title or imprisoned not more than one year, or both." In this instance, the threat is disclosure of an "illicit" sexual relationship, not a crime; nonetheless, for the purposes of this analysis, blackmail is the appropriate guideline.

[6] Application Note 1.: "This section applies only to blackmail and similar forms of extortion where there clearly is no threat of violence to person or property. "Blackmail" (18 U.S.C. § 873) is defined as a threat to disclose a violation of United States law unless money or some other item of value is given. "

-3

Pre-Trial Release 18 USC §3147/USSG §2J1.7 "Enhancement"

3

Obstruction of Justice.  Counsel disagrees that the obstruction of justice should apply to both groups.  See, PSR ¶¶ 58 &  65. It may make no difference however, to the Combined Offense Level.  If the obstruction count were taken from one group and added to the other, the groups would still be less than four levels apart.  In either event, counsel believes the Combined Offense Level should be 26.

0

Adjusted Offense Level

19

| COMBINED OFFENSE LEVEL | Units | Level |
|---|---|---|
| Group I Adjusted Offense Level | 1 | 24 |
| Group II Adjusted Offense Level | .5 | 19 |

Increase
USSG §3D1.4(a) attributes one unit for the highest offense level and requires the addition of another unit for the group "one to four levels less serious", a half a unit for "five to nine levels less serious".

+1

Greatest Adjusted Offense Level                                    25[7]

Career Offender (PSR ¶¶74a-b), discuss, *infra*, does not apply to Mr. Alcott.  For USSG 4B1.1(a)(2) to apply, the Court must find that "the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense".  The operant definition of "crime of violence" is contained at USSG §4B1.2 and read as follows:  "(a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term

---

[7] Without the application of 2X1.1 for attempted Blackmail, the Greatest Adjusted Offense level rises one point to 26.

exceeding one year, that -- *has as an element the use, attempted use, or threatened use of physical force against the person of another*, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

0

Acceptance of Responsibility.  The Court indicated at the December 20, 2005 conference that it would grant acceptance of responsibility points.  See, defendant's December 13, 2005 objections (attached to PSR as an addendum, pp. 48 - 51) explaining why Mr. Alcott accepted responsibility within the meaning of USSG §3E1.1.

-3

Total Offense Level

22

B.      USSG §4B1.1 Career Offender Does Not Apply;
        Criminal History Over Represented

The offense charged is an offense in the nature of blackmail.  It is a non-

violent offense.  Paragraph 31 of the superceding information shows that the

offense does not involve violent conduct:

> In or about February 2005, ALCOTT engaged in a scheme to extort $150,000 from a California man ("K.S."), who works as a doctor. More particularly, ALCOTT threatened to disclose K.S.'s sexual relationship with a woman ("T.S.") who had been a prostitute if K.S.did not pay him $150,000.

Likewise, the generic Massachusetts Travel Act crime with which Mr. Alcott could have

been charged (Superceding Information, ¶ 39), is entitled "attempted extortion" and

includes no reference to a threat of violence, merely to "injury":

> Section 25. Whoever, verbally or by a written or printed communication, maliciously threatens to accuse another of a crime

18

or offence, or by a verbal or written or printed communication maliciously threatens an injury to the person or property of another, or any police officer or person having the powers of a police officer, or any officer, or employee of any licensing authority who verbally or by written or printed communication maliciously and unlawfully uses or threatens to use against another the power or authority vested in him, with intent thereby to extort money or any pecuniary advantage, or with intent to compel any person to do any act against his will, shall be punished by imprisonment in the state prison for not more than fifteen years, or in the house of correction for not more than two and one half years, or by a fine of not more than five thousand dollars, or both.

The applicable cross references to Guidelines indicate that Black Mail, 18 USC §873 is an offense connected with this guideline. Blackmail, inarguably, does not include violence as an element of the offense: "*under a threat of informing, or as a consideration for not informing*". (See, footnote 2, *supra*.)

Assuming for the sake of argument that the foregoing were not dispositive of the Career Offender issue, the law of this Circuit and District nonetheless favors Mr. Alcott's position. The career offender guideline often produces a sentence that is greater than necessary to achieve the purposes of sentencing. See *United States v. MacKinnon*, 401 F.3d 8 (1st Cir. 2005) (remanding for re-sentencing where the district court, before *Booker*, found that the career offender guideline produced a sentence that was "obscene" and "unwarranted by the conduct."); *United States v. Hubbard*, 369 F. Supp.2d 146, 148 (D. Mass. 2005) (imposing sentence of 108 months rather than 188-235 month career offender range based on diminished capacity from appallingly traumatic

childhood which "directly precipitated his life on the streets and his conduct as a career offender"); *United States v. Person*, 377 F. Supp.2d 308 (D. Mass. 2005) (departing downward from 262 to 84 months where career offender status based on one drug distribution and resisting arrest "grossly overstated" seriousness of defendant's criminal history); *United States v. Carvajal*, 2005 WL 476125, **5-6 (S.D.N.Y. Feb. 22, 2005) (imposing sentence of 168 months simply because career offender guideline of 262 months was "excessive," and would be "greater than necessary, to comply with the purposes" set forth in the statute, including rehabilitation, which cannot be achieved without hope).   In a recent sentencing in *United States v. Burhoe*, No. 1:01-cr-10464-RCL (D. Mass.), Judge Lindsay resorted to plain English, imposing 77 months instead of a career offender sentence of 151 months, in part because the defendant was not in his personal profile a "career offender."   While a court's post-*Booker* authority to grant variance on Criminal History Category may be far greater than it was pre-Booker, the practice was common under the old regime.   See, *e.g.*, *United States v. Collins*, 122 F.3d 1297 (10 Cir. 1997)(upholding downward departure based (1) age,  (2) ill health, and (3) predicate conviction almost ten years prior to the instant offense resulting in a relatively lenient sentence; finding categorization significantly over represents the likelihood that the defendant will commit future crimes).

The Booker interpretation of the Sentencing Reform Act and other applicable §3553(a) factors indicate that Mr. Alcott should not suffer career offender treatment:

- Career Offender guideline, USSG 4B1.1, pegs offense level to statutory maximum for the offense of conviction and automatic CHC VI, requires only two prior felony convictions of either a "crime of violence" or a "controlled substance offense."

- Inherent disparity: The Career Offender provision provides no mechanism for evaluating the relative seriousness of the underlying prior conviction. Instead of reducing unwarranted sentencing disparities, such a mechanical approach ends up creating additional disparities because this Guideline instructs the court to substitute an artificial offense level and criminal history in place of each individual defendant's precise characteristics. This substitution has been held to ignore the severity and character of the predicate offenses and, for example, equates relatively minor distribution convictions with violent and egregious drug trafficking crimes for sentencing purposes. *United States v. Moreland*, 366 F.Supp.2d 416, 424 (S.D. W. Va. April 27, 2005) (defendant with career offender range of 30 years to life received 10 years because [t]wo relatively minor and non-violent prior drug offenses, cumulatively penalized by much less than a year in prison); *United States v. Carvajal*, 2005 WL 476125, **5-6 (S.D.N.Y. Feb. 22, 2005) (career offender guidelines are "the same regardless of the severity of the crimes, the dangers posed to victims' and bystanders' lives, and other appropriate criteria").

The circumstances of Mr. Alcott's guilty pleas and concurrent sentences in the 1992 and 1993 property crimes show that his Criminal History Score is over represented. The sentences for the 1992 property crimes appear unduly long in exchange for concurrent time. They also appear to stand a high state-court offense level as crimes of conviction than a defendant "on the outside" would normally experience. In other words, the plea AND the sentence are more severe

than they otherwise would be to a defendant at liberty with the time and resources to defend an action.

Criminal History Category III is the appropriate criminal history category. The Quincy conviction in 1993 is for "larceny over" arising out of the sale of a boat. Mr. Alcott and his then wife Judee had failed to discharge the UCC-1 lien on a boat before selling it. Ordinarily, this kind of conduct results in a Civil complaint. It should be noted that the complainant is the aggrieved purchaser, a private party. Accordingly, had Mr. Alcott been at liberty, t is doubtful he would have plead guilty to the offense of conviction, let alone agreed to a two-and-a-half-year sentence. Accordingly, all three points could be removed. Likewise, the one-year sentence for "larceny more" in Brighton District Court is excessive in counsel's ordinary experience for a property crime. Counsel is unaware of the actual circumstances of the Waltham conviction and no records are available to any party. A "guilty filed", however, does not indicate that the case should have been a one-point felony conviction.

POINT II:
VARIANCES[8]

The Parsimony Provision

Mr. Alcott's sentence should be lower than the Guidelines indicate; this is necessary to provide *just (not harsh)* punishment for the offense, to afford *adequate (not excessive)* deterrence to criminal conduct; to *protect* the public *from a non-*

---

[8] Counsel borrows freely from an October 15 memorandum to the defense bar by Amy Baron-Evans.

*violent offender* and to reeducate and rehabilitate the offender.  See 18 U.S.C. §

3553(a)(2).  Any straight Guidelines sentence the government urges can no longer

considered  *per se* reasonable.  This Circuit has recently conceded that a

Guidelines sentence, while a starting point, is no longer *per se* reasonable.  See,

*United States v. Jiminez-Beltre*, No.  05-1268 (1 Cir., March 8, 2006)(Boudin, CJ, for

the majority, concurrences with Lipez dissenting).  As discussed below, the

average white-collar sentence is eighteen months and a sentence at two and a

half times the average is reasonable under the law of this Circuit accounting for

criminal history and other aggravating factors like obstruction and conduct on

release.  Moreover, Mr. Alcott's criminal history is overstated and his computed

Criminal History Category over represents the seriousness of past conduct.

       In a post-*Booker* sentencing regime, it is not adequate simply to impose a

guidelines sentence without addressing all-important statutory factors under the

Sentencing Reform Act of 1984 (as amended).  The factors this Court out to

consider as grounds for a variance are:

- Mr. Alcott's age reduces the chances of recidivism
- His conduct and Alcoholism are connected with demonstrated childhood
  sexual abuse
- He has family responsibilities to three year-old twins and two college-age
  children
- Earlier release will create an opportunity for restitution
- Assignment to the 500 hour program and halfway house eligibility will
  assist compulsive gambling and alcoholism disorders

       Consideration of a sentencing variance is bound up with an analysis of *US*

*v. Booker, supra,* a case perhaps overly familiar to the Court.  The merits majority

held that sentencing under the Guidelines violates the Sixth Amendment right to jury trial as interpreted in cases from *Jones v. United States*, 526 U.S. 227 (1999), to *Apprendi v. New Jersey,* 530 U.S. 466 (2000), to *Ring v. Arizona*, 536 U.S. 584 (2002), to *Blakely v. Washington,* 542 U.S. _, 124 S. Ct. 2531 (2004).  See *United States v. Booker*, 125 S. Ct. 738, 748-50 (2005).   The result of this ruling for the US Sentencing Guidelines was that

> "So modified, the Federal Sentencing Act . . . makes the Guidelines effectively advisory.  It requires a sentencing court to consider Guidelines ranges, see 18 U.S.C. § 3553(a)(4), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a)."  Id. at 757.

Sentencing courts must now consider all of the goals and factors set forth in 18 U.S.C. § 3553(a), not just the guidelines and policy statements in the Guidelines Manual.  See *Booker*, 125 S. Ct. at 757, 764, 766, 767, 768.  See also, e.g., *United States v. Crosby*, 397 F.3d 103, 111-12 (2d Cir. Feb. 2, 2005); *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. Mar. 16, 2005).

Central to any Booker analysis is the "Parsimony Provision".  The new mandatory principle is a limiting one:  The sentence must be "**sufficient, but not greater than necessary**," to fulfill "(2) the need for the sentence imposed –"

a)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

b)  to afford adequate deterrence to criminal conduct;

c)  to protect the public from further crimes of the defendant;

    d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2) (emphasis supplied).

Courts across the spectrum have recognized that they must honor the parsimony provision.  See, e.g., *United States v. Spigner*, 416 F.3d 708, 711 (8th Cir. 2005); *United States v. Gray*, 362 F.Supp.2d 714, 717 (S.D. W. Va. 2005) (Goodwin, J.); *United States v. Angelos*, 345 F.Supp.2d 1227, 1240 (D. Utah Nov. 16, 2004) (Cassell, J.)(whose opinion the day after Booker warned that the Guidelines remained as before the measure of a reasonable sentence.

Weight of Various Factors

With the Guidelines themselves advisory, there are factors the court "shall consider" in determining a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing:

1.   "the nature and circumstances of the offense" and "the history and characteristics of the defendant"
2.   "the kinds of sentences available"
3.   the advisory guidelines
4.   "any pertinent policy statement" in the Guidelines Manual, which includes departures
5.   "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"
6.   "the need to provide restitution to any victims of the offense"

A failure to consider 3553(a) factors in the case,[9] is a mandatory guidelines sentence and thus violates both the Sixth Amendment and Booker's remedial interpretation of the sentencing statute.  See *United States v. Crosby*, 397 F.3d 103, 114-15 (2d Cir. 2005) (mandatory application of the guidelines is error if based on judge found facts, or if based on jury-found facts); *United States v. Williams*, 372 F. Supp.2d 1335 (M.D. Fla. May 5, 2005) (government shows disrespect for law in continuing to advocate that the guideline sentence is the only reasonable sentence, contrary to Booker and separation of powers); *United States v. Hoskins*, 364 F.Supp.2d 1214 (D. Mont. Apr. 8, 2005) (government's argument for a life sentence simply because that is the Guidelines sentence assumes that *Booker*'s abandonment of mandatory guidelines is illusory).

While all of the courts are giving the guidelines and policy statements at least serious consideration, many have expressed the view that giving the guidelines "presumptive" or "heavy" weight amounts to imposition of a mandatory guideline sentence.[10]  Our Circuit can now be added to that list.  See, *Jiminez-Beltre, supra.*

---

[9] *United States v. Dean*, 414 F.3d 725, 728-29 (7th Cir. 2005) (court is required to consider the 3553(a) factors, but is not required to write a comprehensive essay on all of the factors even when not invoked by counsel).

[10] See, e.g., *United States v. Moreland*, 366 F.Supp.2d 416, 423 (S.D. W. Va. 2005); United States v. Jaber, 362 F. Supp.2d 365 (D. Mass. 2005); *Simon v. United States*, 361 F.Supp.2d 35, 40-49 (E.D.N.Y. 2005); *United States v. Biheiri*, 356 F. Supp.2d 589 (E.D. Va. 2005); *United States v. Huerta-Rodriguez*, 355 F. Supp.2d 1019 (D. Neb. Feb. 1, 2005); *United States v. Myers*, 353 F. Supp.2d 1026 (S.D. Iowa Jan. 26, 2005); *United States v. Ranum*, 353 F. Supp.2d 984, 986-87 (E.D. Wis. Jan. 19, 2005).

The *Booker* remedial opinion should be read as a repudiation and reconceptualization of that restrictive departure jurisprudence. *Booker*, 125 S. Ct. at 765 ("In 2003, Congress modified the pre-existing text, adding a *de novo* standard of review for departures and inserting cross-references to § 3553(b)(1). . . . In light of today's holding, the reasons for these revisions-- to make Guidelines sentencing even more mandatory than it had been--have ceased to be relevant.").

Mitigating Factors

This Court should consider Mr. Alcott's sexual abuse as a child, his alcoholism, his family responsibilities, his age and lower statistical risk of reoffense and the non-violent nature of his crimes in fashioning a sentence. It is entirely possible that none of these would have been grounds for a departure under the regime of the Feeney Amendment (a.k.a. "Protect Act").  Now, however, mitigating factors that were previously discouraged except under certain circumstances or for certain purposes can now be considered more broadly to the extent they bear on the sentencing considerations found in section 3553(a).  Those are age, education and vocational skills, mental and emotional conditions not meeting the diminished capacity standard, physical condition or appearance, employment record, family ties and responsibilities, military, civic, charitable or public service.  See U.S.S.G. §§ 5H1.1-6, 11.  Likewise, the limitations on each of the generally encouraged mitigating factors in U.S.S.G. §§ 5K2.10 (victim's conduct), 5K2.11 (lesser harms), 5K2.12 (coercion and duress),

5K2.13 (diminished capacity), 5K2.16 (voluntary disclosure), 5K2.19 (post-sentencing rehabilitation efforts), 5K2.20 (aberrant behavior), and 5K2.23 (discharged terms of imprisonment) should no longer bar consideration of these factors to the extent they are relevant under section 3553(a).

Post-Booker cases illustrate that the Court may consider formerly discouraged factors, or facts that would not have met pre-Booker standards for departure, to impose a lower sentence. See, e.g., *United States v. Spigner*, 416 F.3d 708, 711-13 & n.1 (8th Cir. 2005) (health problems); *United States v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005) (that defendant was caretaker for brain damaged son may be considered under 3553(a) though there were alternative means of care and thus not ground for departure); *United States v. Haidley*, 400 F.3d 642, 645 (8th Cir. Mar. 16, 2005) (that defendant used embezzled money for her child's high medical expenses, and her "family situation, which included two young children at home" (neither of which rose to the level of departure) were both "factors which can be considered under 3553(a)(1) ('the nature and circumstances of the offense and the history and characteristics of the defendant').").

## Defendant's Age

Mr. Alcott's age at 44 is one reason to mitigate his sentence. For example, U.S.S.G. 5H1.1 states: "Age (including youth) is not ordinarily relevant in determining whether a departure is warranted. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a

form of punishment such as home confinement might be equally efficient and less costly than incarceration.  Physical condition, which may be related to age, is addressed at § 5H1.4."  Section 5H1.4 states, in part: "Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted.  As to defendants over forty, however, the risk of recidivism drops dramatically, lessening the need to protect the public from further crimes of the defendant under 3553(a)(2)(C).  See United States Sentencing Commission, Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines at 12 ("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.), available at http://www.ussc.gov/publicat/Recidivism_General.pdf.  While age and infirmity were discouraged bases for departure, they should be considered under 3553(a).  *United States v. Ryder*, 414 F.3d 908, 920 (8th Cir. 2005); *United States v. Lata*, __ F.3d __, 2005 WL 1491483 at *5 (1st Cir. June 24, 2005); *United States v. Thomas*, 360 F.Supp.2d 238, 243 (D. Mass. Mar. 14, 2005); *Simon v. United States*, 361 F.Supp.2d 35 (E.D.N.Y. Mar. 17, 2005); *United States v. Nellum*, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005).

Sexual Abuse as A Minor

Mr. Alcott's sexual abuse as a minor and his related alcoholism are further grounds to vary from the guidelines sentence.  See, e.g., *United States v. Sadolsky*, 234 F.3d 938, 234 F.3d 938 (6 Cir. 2000).  Where the Commission had prohibited as

29

grounds for downward departure drug or alcohol dependence and gambling addiction, U.S.S.G. § 5H1.4, lack of guidance as a youth and similar circumstances indicating a disadvantaged background, U.S.S.G. § 5H1.12, and post-sentencing rehabilitation on re-sentencing.  U.S.S.G. § 5K2.19.  Courts may now consider such factors to the extent they bear on the sentencing considerations found in section 3553(a).  See, e.g., *United States v. Wilkerson*, 401 F.3d 1 (1 Cir. June 9, 2005) (judge may impose lower sentence based on "the most horrible young life he had seen in 17 years on the bench"); *United States v. Murray*, 2005 WL 1200185 (S.D.N.Y. May 20, 2005) (court may consider post-sentence conduct).

Notably, Judge Cassell, who contended (the day after *Booker*) that the Guidelines already take into account the 3553(a) factors in all but the most extraordinary case, ruled in *United States v. Croxford*, 324 F.Supp.2d 1230 (D. Utah 2005) that advisory Guidelines allowed him to consider "facts the Guidelines would make irrelevant," and therefore relied in part on the defendant's sexual abuse as a child to impose a sentence below the guideline range.  Id. at 1247-29.

Average "White Collar" Sentences

Uniformity in sentencing and the avoidance of disparities are statutory directives in sentencing.  There can be no question on this point.  See 18 USC §3553(a)(6)("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").  Counsel notes the difficulty in explaining the disparities in sentencing

of "white collar" defendant, so-called.  The highest-level offenders obtain

sentences lower than those of more garden-variety offenders.  It can be difficult

to explain many sentences, for example Michael Milken's 20 months served

compared to an ordinary secondary-market mortgage fraud.  According to the

report of the United States Sentencing Commission, however, the mean white-

collar sentence is far lower than the government seeks in this case:

> White collar sentences.  The mean white collar sentence has beeen about fifteen months since the guidelines were implemented in 1987.  Fifteen-Year Report of the United States Sentencing Commission, p 59.  See table, *infra*.

> A large proportion of fraud, embezzlement, and tax evasion offenders received simple probation. In response, the guidelines were written to reduce the availability of probation and to ensure "a short but definite period of confinement" for a larger proportion of these "white collar" cases, both to ensure proportionate punishment and to achieve adequate deterrence (Steer, 2003).

> Over the years, additional aggravating adjustments were added to the theft and fraud guidelines, often in response to congressional directives (*see* Appendix B.) The appearance early in the guidelines era of these mandated sentence increases for economic crimes, and the perceived absence of empirical research establishing the need for them, led one former Commissioner to warn that the SRA's promise of policy development through expert research was being supplanted by symbolic "signal sending" by Congress (Parker & Block, 1989).

> In 2001, following a six-year process of deliberation, collaboration with the Judicial Conference and DOJ, and field testing, the guidelines governing economic crimes were comprehensively amended as part of an "Economic Crime Package" (*see* Bowman, 2001, for a history of the efforts leading to this package). This amendment sought to further refine and simplify the guidelines, focus the most severe sentences on the most serious offenders, and clarify the definition of pecuniary loss. In the wake of the corporate scandals of 2002, the guidelines again were amended at the direction of Congress to further increase sentence severity (Steer, 2003). The data reported in this section reflect only the initial effects of the Economic Crime Package and none of the effects of the 2002 Sarbanes-Oxley amendments because these changes had not taken effect for cases sentenced by fiscal year 2002.

> ***Use of imprisonment.*** .... The most striking trend is a shift away from simple probation and toward intermediate sentences that occurred as more economic offenders became subject to the guidelines in the early 1990s. These trends among economic offenders drive the overall trends for all felons ... because economic offenders comprise the largest share of offenders receiving intermediate sanctions in the federal system. The use of imprisonment for economic offenders also has increased steadily throughout the guidelines era.... The rate of imprisonment for fraud offenders rose from about 50 percent in the preguidelines era to almost 70 percent by 2001. For embezzlers, the increase over the same time period was from about 35 to 60 percent. The one unexpected

finding is that while use of intermediate sanctions for tax offenders increased from virtually nothing to nearly 30 percent of all cases, the use of imprisonment for tax evaders actually fell slightly after guidelines implementation until returning to historic levels in 2000.....

These data raise the question of whether the Commission's goal of assuring a "short but definite period of confinement" for white collar offenders has been achieved. The answer depends both on whether intermediate sanctions satisfy the goal and which offenses count as "white collar."



*Length of time served.* As shown in Figure 2.10, the amount of prison time imposed on economic offenders declined significantly upon implementation of the guidelines, but with the abolition of parole the length of time actually served remained fairly constant at about 15 months. Fraud offenders again dominate the trends, with their average sentence hovering close to 15 months..... The relatively stable time served by economic offenders, as well as the decreases for some types of offenses, was noted early in the guidelines era (Block, 1989). These trends were caused by the Commission's decision to increase the use of imprisonment. As one Commissioner stated, "[T]he flip side of the Commission's dramatic increase in the likelihood of confinement is an equally dramatic *decrease* in the projected time served by defendants who serve time" (Block, 1989,    emphasis supplied).
pp. 55 - 59

November 2004 Fifteen-Year Report of the US Sentencing Commission.

## Drug Program/Halfway House

Mr. Alcott requests a finding that he would benefit from the 500-Hour program and that he be admitted to pre-lease and a halfway house. The "court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, the length of the term, shall consider the factors

set forth in section 3553(a) to the extent that they are applicable, recognizing that

*imprisonment is not an appropriate means of promoting correction and rehabilitation*."

18 U.S.C. § 3582(a) (emphasis supplied).

The Bureau of Prisons has recently made numerous changes that make

punishment harsher and eliminate treatment and rehabilitation opportunities

that judges have recommended or assumed were available in the past, for

reasons that have nothing to do with the purposes of punishment:[11]

- Change in availability of Community Confinement Centers (CCCs), both for initial designation and pre-release placement
- Elimination of ICC (Boot Camp) programs
- Closure of stand alone camps
- Limitations on RDAP participation and benefit (Residential Drug Abuse Treatment Program with up to 12 month sentence reduction and up to 6 months in halfway house at end of sentence)
- Limitations on camp placement because of certain offenses of conviction
- Lack of recreation (particularly weight training) facilities and/or directive not to repair or replace
- Curtailment of many educational programs facilitated by local community colleges
- Calculating good time credit at only 47 days per year rather than 54 days per year
- Cuts in quality and regularity of medical and mental health care

The court can now fashion a sentence that recreates what the BOP has

eliminated or that otherwise accomplishes treatment or rehabilitation in the most

effective manner, e.g., order that the defendant spend all of his sentence or the

---

[11] Some of the BOP's changes are discussed in Bussert & Sickler, <u>Bureau of Prisons Update: More Beds, Less Rehabilitation</u>, The Champion (Mar. 2005). To keep abreast of changes in BOP policy and complaints about particular policies and institutions, join BOP Watch. http://groups.yahoo.com/group/bopwatch/.

last six months in a halfway house (as a condition of probation or supervised release) while working to repay the victim; order all or part of the sentence to be served in residential drug treatment while working to support his family; impose probation, with or without electronic monitoring, so that the defendant can receive medical or mental health treatment or educational or vocational training "in the most effective manner," etc.

*US v. Castellano*; "Individually Derrived" Enhancement

Counsel believes the two-point enhancement for Mr. Alcott individually deriving more than $1M should not apply to Mr. Alcott. Some courts have taken the view that the enhancement of §2F1.1(b)(12)(a) (2002) applies on an agency theory where, as here, the defendant controls the closely held corporation. See, *United States v. Pendergraph*, No. 01-4633 (4 Cir. 2004). The better view, however, has been expressed by Judge Easterbrook in an opinion that reasoned the government is obliged to prove that it could pierce the corporate veil as a matter of applicable state law. United States v. Castellano, 349 F.3d 483 (7th Cir. 2003). Indeed, the facts of this case indicate that Mr. Alcott observed corporate formalities and, in any event, did not derive $1M of personal gain. (See, Corporate Records indicating observance of formalities, Ex S; Social Security Income Statement showing income for period of about $500,000.00, Ex. L; letter of Kevin Burke indicating regularity in disposition of assets, no proceeds hidden.)

CONCLUSION

For the reasons set forth above, this Court should grant relief in the form

requested.

Dated this 16th day of March, 2006 at Boston, Massachusetts.

/s./    *Kevin L. Barron*

Kevin Lawrence Barron, Mass BBO 550712
Counsel to MICHAEL ALCOTT, Defendant
453 Washington Street - 5th Floor
Boston, Massachusetts 02111-1325
Telephone No. 617-482-6368
Facsimile No. 617-517-7711
Cellular No. 617-407-6837
Electronic Mail:  k@lawyerbarron.com

CERTIFICATE OF SERVICE

Counsel certifies that he has served AUSA Jack Pirozzolo, Esq., electronically
with a true copy of this motion by the CM/ECF of this District today on March
16, 2006.  No party requires service by mail.

/s./ *Kevin L. Barron*

Kevin Lawrence Barron BBO550712