UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 04-10286-PBS |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| MICHAEL W. ALCOTT, | ) | |
| Defendant | ) | |
| | ) | |

### UNITED STATES' RESPONSE TO
### MICHAEL ALCOTT'S PETITION UNDER
### 28 U.S.C. § 2255

The United States submits this response to the petition of Michael W. Alcott ("Alcott")

under 28 U.S.C. § 2255 (the "Petition"). For the reasons that follow, Alcott is not entitled to be

re-sentenced to a term of 70 months from the 92 months this Court imposed on March 30, 2006.

### Relevant Facts And Procedural History

**A.    Alcott's Bank Fraud**

Alcott was the founder and president of ARK Associates, Inc. d/b/a Accounting

Recruiters International ("ARK Associates"), based in Quincy, Massachusetts. [Presentence

Report ("PSR") ¶13].[1] ARK Associates was a temporary and permanent employment placement

firm specializing in employees with business finance backgrounds. [Id.]. During 2000, Alcott

opened a line of credit for ARK Associates at South Shore Savings Bank ("South Shore"). [PSR

¶14]. As a condition of the line of credit, Alcott was required to submit financial information to

South Shore, including account receivable information and financial statements for ARK

---

[1] The PSR is cited by paragraph number as "[PSR ¶_]." Docket entries are cited as
"[D._]." Documents attached to this filing are cited as "[Tab [#] [page]]." The Petition is cited as
"[Petition [page]]."

Associates.  [PSR ¶15].  Alcott submitted both false account receivable information and false financial statements to South Shore.  [Id.].

From 2000 to 2002, based on the false and fraudulent financial information Alcott submitted, South Shore increased ARK Associates' line of credit, eventually extending the borrowing limit to $2.5 million.  [PSR ¶¶17-18].  In June 2003, South Shore discovered Alcott's fraud.  [PSR ¶22].  South Shore then exercised its rights under the line of credit and seized collateral of ARK Associates.  [PSR ¶23].  At that time, ARK Associates had drawn down nearly the entire line of credit and had an outstanding balance owed to South Shore of $2,496,485.17. [Id.].  ARK Associates ceased operations in July 2003.  [PSR ¶25].  Although the collateral South Shore seized from Alcott mitigated some of the bank's losses, South Shore still suffered a loss of $2,032,345.60.  [PSR ¶40].

### B.    The Indictment

On September 16, 2004, a federal grand jury in the District of Massachusetts returned a three-count indictment against Alcott.  [D.1].  Alcott's conduct with respect to South Shore was the basis of the first two counts of the indictment:  Count One charged Alcott with bank fraud, in violation of 18 U.S.C. §1344, and Count Two charged him with making false statements to South Shore, a federally insured financial institution, in violation of 18 U.S.C. §1014.  [Id.]. Count Three of the indictment, which also charged Alcott with making false statements to a federally insured financial institution, was based on false information Alcott supplied to Boston Private Bank & Trust Company ("Boston Private Bank") in June 2003, shortly before South Shore discovered Alcott's fraud.  [D.1; see PSR ¶24].  In seeking a line of credit from Boston

Private Bank, Alcott submitted a false financial statement. [PSR ¶24]. Boston Private Bank learned of the fraud before it had given Alcott any funds. [Id.].

### C.    Alcott's Extortion Scheme

In or about February 2005, while on pretrial release on the bank fraud indictment, Alcott engaged in a scheme to extort $150,000 from a California doctor, K.S. [PSR ¶26]. Alcott threatened to disclose K.S.'s sexual relationship with T.S., a woman who had been a prostitute, if K.S. did not pay him $150,000.[2] [Id.].

On February 8, 2005, Alcott sent K.S. a letter via Federal Express. [PSR ¶28]. The shipping label identified the sender as Philip Edwards, DDS, 60 Federal St., Boston, Massachusetts. [Id.]. The letter stated that the writer had been hired as a private investigator and had come to the realization that his "client" was "probably going to use the information that I have gathered to attempt to ruin [K.S.] and [T.S.]." [Id.]. The letter further stated, among other things:

> I have reviews and pictures from adult websites showing [T.S.]
> I have proof that you met [T.S.] by hiring her as a "GFE Escort"
> while visiting your daughter, wouldn't do a whole lot for the
> Father/Daughter relationship.
>
> * * *
>
> Suffice it to say that the information that I have could bring you
> down. Think about the humiliation with your parents [named],
> your children and especially your colleagues and patients if this
> seedy side of your life comes out, and trust me when I tell you that
> the above is just a sampling of what I have gathered.
>
> * * *

---

[2] Both Alcott and K.S. had a relationship with T.S. through an escort service for which she was employed in Massachusetts. [PSR ¶27]. T.S. saw Alcott as a "client" in or about 2004; K.S. met T.S. as a "client" in or about 2004. [Id.].

3

> . . . . You pay me more than my client and not only do I make this
> information disappear, I share some useful information with you.
> Please think long and hard about how long you have worked to
> establish your reputation and just how quickly it could be
> destroyed.

[PSR ¶28].   Alcott signed the letter "PE" and gave an e-mail address of "Pe343@hotmail.com,"

an account Alcott set up and used.  [PSR ¶29].

Between February 8 and 16, 2005, Alcott sent a series of e-mails to K.S. from the

Pe343@hotmail.com address.  [PSR ¶30].  Referring to himself as "Phil," Alcott repeatedly

asked for a $150,000 "retainer" from K.S. and threatened to disclose K.S.'s relationship with

T.S. to Phil's (Alcott's) "client" if K.S. did not pay.  [PSR ¶30].  The e-mails included the

following:

**February 8, 2005 (9:08 p.m.):**
> You are well aware that you make a great deal of money and travel
> in well-respected circles because of your reputation, which is that
> of the all-american boy.  Yet, we both know that there is enough
> info to destroy that reputation . . . So make no mistake, You and
> your reputation are in trouble . . . unless you hire me to destroy all
> information and traces thereof.

[D.18, Tab 2 at 1].

**February 9, 2005 (10:44 a.m.):**
> . . .  Today is Ash Wednesday, and believe it or not I am a holy
> man and I would like to start out my lenten season by doing
> something good for you.  As for an amount, . . . my retainer won't
> be cheap . . . my travel expenses alone have been exorbitant.

[D.18, Tab 2 at 4].

**February 9, 2005 (9:41 p.m.):**
> . . .  If the information that I possess comes out:  you lose [T.S.],
> you risk losing your kids, especially your daughter, you hurt your
> parents, you suffer embarrassment from your colleagues.

[D.18, Tab 2 at 6].[3]

> **February 14, 2005 (4:16 a.m.):**
>> 1) Is it your intention to retain me?
>> 2) are you going to wire the $150,000 retainer by tomorrow at the latest.
>> I NEED DIRECT ANSWERS TO THE ABOVE QUESTIONS!!!!
>> Below are the wiring instructions: . . . .

[D.18, Tab 2 at 19-20]. In addition to the threatening e-mails, Alcott also made a series of calls to K.S. in February 2005. [PSR ¶31]. The United States informed the district court of this conduct during a hearing on April 28, 2005. [PSR ¶34; see D.18, 32].

### D.     Alcott's Cancer Scheme

From June 2004 through May 2005, Alcott falsely claimed to be suffering from, and receiving treatment for, prostate cancer. In April 2005, shortly before he was to plead guilty to the bank fraud charges, Alcott gave his attorney a fabricated letter, dated April 21, 2005, purporting to be from Anthony L. Zietman, MD, Associate Director of Radiation Oncology at Massachusetts General Hospital ("MGH") in Boston, Massachusetts (the "Zietman Letter"). [D.19]. The Zietman Letter stated that Alcott had "Advanced Stage Prostate Cancer" and "Secondary Bone Cancer," and cautioned that Alcott's prognosis was "a 0% survival rate beyond 2 years." [Id.].

At a hearing on April 28, 2005, Alcott's attorney informed the district court that Alcott would not be pleading guilty at that time because of his diagnosis. [D.32]. The attorney gave the court the Zietman Letter and said that Alcott was under almost daily treatment at MGH.

---

[3] This e-mail responded to an e-mail from K.S. in which the doctor informed "Phil," among other things, that K.S. had contacted the FBI and that the threats were causing physical problems exacerbated by K.S.'s multiple sclerosis. [D.18, Tab 2 at 7].

[D.32]. The court asked the parties to discuss a possible disposition, because it did not "want to send someone to jail for the last six months of his life." [D.32 at 14]. It was later learned that Alcott did not have cancer and had fabricated the Zietman Letter. [See D.31].

### E.    The Superseding Information

On July 19, 2005, the United States filed a Superseding Information (the "Information") that added a fourth count to the three bank fraud-related counts in the indictment. [D.33]. This fourth count alleged that Alcott violated the Travel Act, 18 U.S.C. §1952, when he extorted K.S., and that he did so while on pretrial release on the pending indictment, triggering a penalty enhancement pursuant to 18 U.S.C. § 3147. [D.33]. The Information also alleged that Alcott had engaged in two separate obstructions of justice. [D.33]. The first involved his false claim that he suffered from cancer and his submission of the fabricated Zietman Letter. [D.33]. The second was his attempt to dispose of evidence implicating him in the fabricated letter scheme and in efforts to obtain a false identity, by asking his 17-year-old son to throw away a trash bag containing the evidence. [D.33].

### F.    Alcott's Change of Plea

On July 20, 2005, Alcott executed a plea agreement with the United States Attorney, pursuant to which he agreed to plead guilty to both the bank fraud charges and the extortion scheme. [Tab A]. The plea agreement set forth, inter alia, the parties' agreement with respect to the guidelines calculations. [Id. at ¶3]. One aspect of the plea agreement is particularly relevant here. In paragraph 7 of the plea agreement, Alcott waived his right to appeal or collaterally challenge "[t]he imposition by the District Court of a sentence which does not exceed that being recommended by the U.S. Attorney pursuant to this agreement." [Id. at 7-8]. The waiver

contained only two exceptions: (1) an appeal based on new legal principles in First Circuit or Supreme Court cases decided after the date of the agreement; and (2) an appeal based solely on the argument that the district court misunderstood the scope of its legal authority to depart from the applicable guidelines range where the district court stated both its desire to depart and the basis upon which it would depart. [Id. at 7-8]. On the issue of departure, Alcott reserved only a single ground upon which to seek a departure: his psychiatric condition. [Id. at 4, ¶3]. Alcott expressly agreed that no other grounds for departure were warranted. [Id.]. At sentencing, Alcott did not seek a departure based on his psychiatric condition. [Tab C, at 38-45, 50].

Alcott pleaded guilty to the Superseding Information pursuant to this plea agreement on July 20, 2005. [Tab B]. At the plea hearing, the district court specifically questioned Alcott and his attorney about the waiver of appeal and collateral challenge. [Tab B at 8-9, 12-13]. After the United States read the waiver provision aloud, the district court addressed defense counsel about the provision:

> THE COURT: . . . [H]ave you read it to him?
>
> MR. BARRON: Yes, I have, and the significant thing in this actual provision, the bargained for provision, is that the competency of counsel has been specifically excluded. I will not have a defendant sign a waiver right that – where he waives his right to challenge the competency of his attorney.
>
> THE COURT: You don't mean competent. You mean effective.
>
> MR. BARRON: Effective assistance of counsel.
>
> THE COURT: I am assuming you are competent.
>
> MR. BARRON: He has a Sixth Amendment challenge–
>
> THE COURT: Fair enough.

[Tab B at 9].

The United States then informed the district court that there were a number of open sentencing issues that could affect the actual guidelines calculation.  [Tab B at 10].  The United States told the district court that depending upon how those sentencing issues were resolved, the sentencing range would be between 77 and 137 months.  [Id.].  After a further colloquy, the district court addressed Alcott directly:

> THE COURT:  You have waived most of your rights to appeal but there are some residual rights permitted under paragraph 7.  Have you had a chance to discuss that with your attorney?
>
> THE DEFENDANT: Yes.
>
> THE COURT: All right.  I think it would be better than my trying to synopsize it at this point.  Now what I am going to tell you is that apart from whatever you've waived, you will have the right to appeal certain sentencing issues if you think I am in error, but you cannot withdraw your guilty plea.  Do you understand that?
>
> THE DEFENDANT: Yes.

[Tab B at 12-13].[4]  The district court continued with the plea colloquy and accepted Alcott's guilty plea.  [Id. at 24].

### G.    The Final Presentence Report

In its final PSR, dated March 16, 2006, the Probation Office calculated separate adjusted offense levels for the bank fraud counts and the Travel Act violation, applied the grouping rules, adjusted for acceptance of responsibility, and concluded that Alcott's total offense level ("TOL")

---

[4] The district court's reference to "certain sentencing issues" related to the exceptions to the waiver set forth in the plea agreement.

was 25.[5]  [PSR ¶¶49-74].  The Probation Office also determined that Alcott was a career offender

pursuant to USSG §4B1.1 because his Travel Act violation was a crime of violence; his TOL

under the career offender provisions was also 25, however.  [PSR ¶¶74a-74c].  Although Alcott

ordinarily would been within criminal history category ("CHC") V, his career offender

designation placed him within CHC VI.  [PSR ¶¶86-87a].  As a result, the PSR concluded that

Alcott's applicable Guidelines sentencing range ("GSR") was 110 to 137 months' imprisonment.

[PSR ¶143].

### H.    The Sentencing Hearing

Alcott was sentenced on March 30, 2006.  The district court, after finding that the

government had not established that the two-level financial institution enhancement under USSG

§2B1.1(b)(13)(A) applied to Alcott, concluded that Alcott's TOL was 23.  [Tab C at 35-36; see

id. at 8-14, 16-26].  In doing so, the court rejected Alcott's argument that the extortion scheme

was an "attempt."  [Id. at 7-8].  The court also rejected Alcott's position that his extortion of K.S.

was not a crime of violence and, relying on United States v. DeLuca, 17 F.3d 6 (1st Cir. 1994),

concluded that the Travel Act extortion scheme was a crime of violence for purposes of career

---

[5] Pursuant to the district court's orders at a hearing on December 20, 2005, the Probation
Office used the November 2002 Guidelines Manual to calculate the guidelines for the three
counts of bank fraud, and the November 2005 Manual to calculate the guidelines for the Travel
Act violation.  [PSR ¶48].  The PSR then determined that Alcott's adjusted offense level
("AOL") for bank fraud was 26, based upon a base offense level ("BOL") of 6; a 16-level
enhancement because the loss was between $1 and $2.5 million; an additional two levels because
Alcott derived more than $1 million in gross receipts from a financial institution; and a two-level
enhancement because Alcott obstructed justice by providing materially false information to the
court.  [PSR ¶¶53-59].  Alcott had an AOL of 22 for the Travel Act violation:  his BOL was 9;
10 levels were added because he demanded $150,000; and another three levels were added
because he committed the extortion while on pretrial release.  [PSR ¶¶60-66].  Application of the
grouping rules and the acceptance of responsibility adjustment yielded a TOL of 25.  [PSR ¶¶67-
74].

offender treatment, USSG §4B1.1. [Id. at 14-16, 36]. Given Alcott's prior state convictions for armed robbery in Massachusetts and burglary in New Hampshire, the court concluded that Alcott was a career offender and thus had a CHC of VI. [See id.]. As a result, Alcott's GSR was 92 to 115 months' imprisonment. [Id. at 36].

The United States recommended a sentence of 120 months' imprisonment, including an upward departure for Alcott's obstruction of justice by attempting to have his son dispose of evidence of his crimes.[6] [Id. at 6, 29-34, 45]. The government also opposed Alcott's request for a downward departure based upon overstatement of criminal history, in part because in the plea agreement, Alcott had reserved the right to seek a departure only on mental health grounds. [Id. at 33-34; see id. at 52-55]. Alcott recommended a 48-month sentence, based upon overstatement of criminal history, history of being sexually abused, and the unlikelihood that he would continue to commit crimes as he aged. [Id. at 44, 52-55]. The district court declined to depart, and imposed a sentence of 92 months' imprisonment, the bottom of the GSR. [Id. at 61].

## I.    The Appeal

Notwithstanding his waiver of appeal set forth in the plea agreement, Alcott appealed his sentence. On appeal, Alcott raised two issues: (1) whether the district court properly considered Alcott a career offender because the extortion underlying the Travel Act violation was a "crime of violence," and (2) whether he should have received a three-level reduction in his sentence under USSG § 2X1.1 because the extortion was an "attempt." On January 12, 2007, the United States moved for summary disposition of the appeal. The First Circuit granted the motion. [Tab

---

[6] The government noted that its recommended sentence represented the low end of the GSR it had anticipated based upon the plea agreement. [App. T12:45].

D].  The First Circuit held that Alcott had waived his right to challenge the sentence on the grounds he raised in his appeal.  The First Circuit went on to state that no manifest injustice would result from the enforcement of the waiver since the extortion that Alcott admitted he had committed was a "crime of violence" under United States v. DeLuca, 17 F.3d 6 (1st Cir. 1994). [Id.].  The First Circuit explicitly rejected Alcott's argument that Shepard v. United States, 544 U.S. 13 (2005), overruled DeLuca: "In light of defendant's admissions, [Shepard] is simply inapposite." [Id.]

### Issues Presented

1.    Whether Alcott suffered from ineffective assistance of counsel (a) in the negotiation of his plea agreement and the conduct of the plea hearing, (b) from the failure of counsel to make a discovery request for Brady material, and (c) from alleged mismanagement of a psychological evaluation and downward departure argument.


2.    Whether the United States committed a Brady violation for purportedly failing to disclose an e-mail that Alcott alleges was Brady material.


3.    Whether the Court erred in concluding that the extortion underlying the Travel Act violation was a crime of violence.


4.    Whether the Court erred in calculating Alcott's criminal history points.

11

## Argument

In his Petition, Alcott argues that the four issues he raises entitle him to be re-sentenced to 70 months, as opposed to the 92 months he received. [Petition at 8]. With one exception, all of Alcott's arguments seek to undermine the Court's finding that he was a career offender and subject to sentencing under CHC VI.[7] Although Alcott's arguments suffer from a variety of specific defects, Alcott's Petition also contains an overarching flaw that is fatal to the Petition: he can show no prejudice from the defects he alleges. As discussed below, even if Alcott were not considered a career offender, his criminal history score put him at CHC V, and the 92 months he received was within the range permitted at that CHC.

Even if that were not so, three of the issues Alcott raises (Issues 2, 3 and 4) are both procedurally and substantively barred. Alcott waived his right to raise these issues in his plea agreement. That waiver, as the First Circuit held on the direct appeal, is enforceable. The three issues are without merit anyway. As is discussed in more detail below, Alcott falls well short of making out a Brady violation (Issue 2) based on a purported e-mail he sent. Alcott's argument as to whether his Travel Act offense should be considered a "crime of violence" (Issue 3) under the career offender guideline was decided against him in the direct appeal and he cannot re-litigate the issue in a collateral attack. Alcott's argument about his criminal history points (Issue 4) was not raised on the direct appeal, is non-constitutional in nature, and cannot be a basis for relief under § 2255.

_____

[7] The one exception appears in his ineffective assistance of counsel claim, where he argues that counsel mishandled his psychiatric evaluation, which, he says, would have given him a basis to depart downward. [Petition at 17].

12

This Court should also reject Alcott's ineffective assistance of counsel claim (Issue 1). While Alcott is not barred from raising this issue under the terms of the plea agreement, Alcott cannot show prejudice under the Strickland v. Washington, 466 U.S. 668 (1984) standard. To the extent the Court is not inclined to rule on the ineffective assistance argument without addressing the allegations Alcott makes about his former counsel, the United States requests that the Court order that Alcott has waived both his attorney-client privilege as well as any doctor/patient privilege he may have. The United States will then submit an affidavit from counsel addressing communications between Alcott and him regarding the plea and sentencing issues, including the criminal history and psychiatric issues.

### A. Alcott Suffered No Prejudice From Being Sentenced As A Career Offender Under CHC VI

The Court in this case sentenced Alcott to 92 months after finding that Alcott was at offense level 23 and CHC VI. The PSR had concluded that, absent the career offender adjustment, Alcott was within CHC V because he had at least 11 criminal history points.[8] That put him in the middle of CHC V, which applies to defendants with 10-12 criminal history points. At level 23, CHC V, Alcott faced a sentencing range of 84-105 months. See USSG Ch. 5, Part A

---

[8] The PSR was clearly correct in concluding that Alcott had *at least* 11 points based on his prior record, which included various convictions for armed robbery, burglary, felony larceny and misdemeanor larceny. See PSR ¶¶ 76-87. Alcott also admits in his Petition that he was on parole for 8 years after his release in 1995 from his armed robbery imprisonment. Because he committed the bank fraud scheme beginning in 2000, he should have received an additional 2 points for committing the offense while on parole. See USSG § 4A1.1(d). Thus, Alcott should have had 13 points, making him CHC VI even without the career offender designation.

(Sentencing Table).  The 92 months given by the Court was within the range he would have

faced even if he had not been deemed a career offender.[9]

Furthermore, at the sentencing hearing, the Court made clear that it was imposing the 92

month sentence because it was fair and appropriate, *not* because it was required to impose the

sentence under the guidelines or that it was inclined to go lower.  As the Court stated in

imposing the sentence: "I am going to impose incarceration of 92 months, which is the absolute

lowest end and I think is fair and appropriate here, evaluating all the 3553(a) factors."  [Tab C at

61].  Under very similar circumstances, a district court has held relief under § 2255 is not

appropriate because there is no prejudice.  See Miceli v. United States, 2007 WL 57777

(W.D.N.Y. Jan 5. 2007) ("[W]hile the Court noted, at sentencing, that a sentence of 97 months

fell at the low end of the guideline range, the Court was not indicating that it would have

imposed a shorter sentence had the guideline range been lower.  Rather, the Court believed, and

continues to believe, that the 97-month term of imprisonment was appropriate given all of the

facts and circumstances of this case.  Consequently, the Court finds that petitioner suffered no

---

[9]    Alcott is wrong in arguing elsewhere in his Petition that he should have been CHC IV. [Petition at 24].  He asserts, wholly without support, that he should have received 0 points for his felony larceny conviction from 1992. [Petition at 24; see also PSR ¶ 82].  Because the conviction was for felony larceny, the PSR correctly scored it as 1 point.  Alcott is also incorrect in arguing that his burglary conviction should count 1 rather than 2 points. [Petition at 24].  He says it should only be scored as 1 point because it was "part of the same ongoing crime spree . . . in a desperate attempt to pay his gambling debts."  [Petition at 25].  Courts have squarely rejected such an argument.  See, for example, United States v. Brown, 209 F.3d 1020, 1024 (7th Cir. 2000) (citing cases) (holding that crimes as part of a crime spree are not "related" even if "they are committed to achieve a singular objective-such as support of a drug habit or debt collection").

prejudice as a result of the alleged ineffectiveness of his counsel, and his application must therefore be denied.").  This Court should take the same approach here.

### B.    Under The Terms Of His Plea Agreement, Alcott Cannot Raise Three Of His Four Arguments

Alcott's plea agreement contained an express waiver of a collateral challenge. [Tab A ¶ 7].  The waiver provision specifically stated that Alcott knowingly and voluntarily waived his right to appeal or "collaterally challenge" the district court's imposition of a sentence that "does not exceed" that being recommended by the United States pursuant to the plea agreement.  [Tab A ¶7(2)].  In this case, the district court imposed a sentence of 92 months' imprisonment, which was below the 120-month sentence recommended by the United States.[10]  Alcott's Brady claim, his arguments on DeLuca, and his arguments about the calculation of his career offender status are all challenges to his sentence that fall within the express terms of this waiver language.  Alcott, therefore, cannot raise them here.

Alcott's waiver is enforceable under United States v. Teeter, 257 F.3d 14 (1st Cir. 2001).  See also United States v. Ciampi, 419 F.3d 20 (1st Cir. 2005) (enforcing waiver of appeal and collateral attack).  Teeter set forth a three-part inquiry into whether an appeal waiver is enforceable: (a) whether the waiver is clear in the plea agreement, (b) whether the district court adequately informed the defendant during the plea colloquy of the ramifications of the waiver, and (c) whether enforcing the waiver would result in a miscarriage of justice.  Id. at 24-26 & n.7;

---

[10]  Alcott makes no argument that the United States acted in breach of any of its obligations under the plea agreement by recommending a sentence of 120 months, nor could he. In fact, the GSR determined by the district court was based upon a TOL that excluded one of the enhancements the parties had agreed to in the plea agreement – the financial institution enhancement.  [See Tab A ¶3(c)].

see also United States v. De-La-Cruz Castro, 299 F.3d 5, 10 (1st Cir. 2002) (citing Teeter, 257 F.3d at 25-26).  All three requirements are met on this record.

First, as discussed above, the waiver language in the plea agreement is clear, and Alcott's arguments on Issues 2, 3, and 4 fall well within the scope of that waiver language.  Second, the plea hearing transcript reveals that the district court adequately informed Alcott about the scope and ramifications of the waiver.  At the beginning of the colloquy on the waiver, the United States read aloud portions of the relevant waiver paragraph.  [Tab B at 8].  The court then confirmed with Alcott's attorney that he had read the paragraph to Alcott in advance of the plea hearing.  [Id. at 9].  The court also addressed Alcott directly and informed him, explicitly, that he had waived "most of his rights to appeal" with only some "residual rights."  [Id. at 12].

Third, no miscarriage of justice will result in this case if the collateral challenge waiver is enforced.  The miscarriage of justice exception "requires a strong showing of innocence, unfairness or the like."  United States v. Gil-Quezada, 445 F.3d 33, 37 (1st Cir. 2006).  Alcott is clearly guilty of the bank fraud and extortion charges.  He received a term of imprisonment that was lower than recommended by the United States in accordance with the plea agreement.  Furthermore, even if he had not been deemed a career offender, Alcott's criminal history put him in CHC V, one category lower than the CHC applicable to a career offender.  [PSR at ¶87].  Because the range he received was *within* the range otherwise applicable under CHC V, see USSG Ch. 5, Part A (Sentencing Table), there is no miscarriage of justice.

16

### C.    The Three Issues That Are Procedurally Barred Are Without Merit Anyway

#### 1.    There Was No __Brady__ Violation.

To establish a __Brady__ violation, Alcott has to demonstrate that the United States suppressed exculpatory or impeaching evidence valuable to him and that prejudice ensued. __Strickler v. Greene__, 527 U.S. 263 (1999); __Conley v. United States__, 415 F.3d 183, 188 (1st Cir. 2005).  The likelihood of a different result is the key issue in assessing prejudice.  __United States v. Bagley__, 473 U.S. 667, 682 (1985).  Alcott claims that the United States violated __Brady__ by withholding an e-mail he claims he sent to K.S. sometime between 2/16/05 and 3/22/05 that says something like "Forget it" or  "Have a nice life and do not worry.  I will not bother you ever again." [Petition at 18].  Alcott's assertion of a __Brady__ violation falls well short of the mark, for a variety of reasons.

Although irrelevant to the ultimate resolution of the __Brady__ issue, the United States addresses first Alcott's allegation that the United States suppressed an e-mail he sent abandoning the extortion.  The United States has been unable to locate any e-mail of the type Alcott claims he sent – other than a March 18, 2005 email that the United States did provide to Alcott. Whether deliberately or inadvertently, in accusing the United States of a __Brady__ violation, Alcott omits to note in his Petition that the United States provided a March 18, 2005 e-mail that Alcott sent to T.S., which, in turn, she sent to K.S. on March 22, 2005. [Dkt. 18, Tab 2, at 24-28].  In that e-mail, Alcott makes certain confessions about his extortion scheme, apologizes for his conduct, claims he did it in part because of his cancer, and then says that he backed off because he did not want to hurt T.S.  [__Id__.].  That e-mail was filed with Court when the United States moved to modify Alcott's release conditions on April 28, 2005. [Dkt. 18].  Other than that e-

mail, the United States has in its files no e-mail of the type Alcott describes. The FBI has also

confirmed that no such e-mail exists in the FBI files in either San Diego or Boston, the two

offices that had responsibility for the extortion investigation. [Tab E (Affidavit of SA Scott

Robbins, ¶11]. The FBI agents who handled the investigation have no recollection of ever

seeing such an e-mail. [Id. at ¶10, 12].[11]

Alcott's Brady argument also contains a factual assertion that is seriously undermined by

the undisputed evidence. Alcott asserts in the Petition that the purported e-mail "shows the

defendant's intention to end the Attempted Extortion before any involvement by authorities."

[Petition at 18]. Yet Alcott's e-mail exchange with K.S. shows that on February 9, 2005 – one

day after Alcott sent the Federal Express extortion letter – K.S. informed Alcott that he had

spoken with an FBI Agent. [Dkt. 18, Tab 2, at 7]. Alcott, however, continued to send several

threatening e-mails after that point in time, up to and including at least February 16, 2005. [Dkt.

18, Tab 2].[12]

Alcott also makes two significant legal errors. Alcott's first error is that he incorrectly

states the law of attempt. Alcott says that the e-mail would have caused the Court to conclude

that Alcott "should not have been sentenced for anything more than an ATTEMPT." [Petition at

18]. Regardless of when Alcott purportedly sent the e-mail (which Alcott asserts was "between

2/16/05 and 3/22/05"), Alcott had completed the crime before those dates. The elements of the

---

[11]  Both the United States and the FBI are somewhat hampered in proving conclusively
that no such e-mail ever was in the files because the files were closed in 2007 and, as part of the
regular closing process, not all documents collected during the course of an investigation are
kept.

[12]  The FBI opened its investigation on February 11, 2005, while Alcott was in the midst
of sending his threatening e-mails to K.S.  [Tab E, ¶ 4].

extortion crime relevant here are (1) a malicious threat (2) made to a named person (3) to accuse someone of a crime or to injure someone's person or property (4) with intent to extort money. See Mass. Gen. L. ch. 265, § 25; Commonwealth v. Miller, 385 Mass. 521, 526 (1982). As the United States pointed out at sentencing, Alcott completed each element of the crime when he sent that Federal Express package (and clearly continued with the crime with the threatening e-mails up to February 16, 2005). [Tab C at 7-8]. Any e-mail Alcott may have sent after February 16, 2005 could not retroactively convert the completed crime into an attempt.

Alcott's second legal error is that he wrongly assumes that it would have mattered to the career offender designation that his extortion crime was an attempt. More specifically, Alcott claims he suffered prejudice because, if the e-mail showed he had engaged in an attempt to extort, rather than actual extortion, he would not have been deemed a career offender. [Petition at 18 ( "An ATTEMPT would not have subjected [him] to [sentencing] under Career Offender treatment.")]. Alcott apparently believes that an attempted extortion cannot be a "crime of violence" under the career offender guideline. The relevant guideline, however, states that a "crime of violence" includes attempts. See USSG § 4B1.2 n.1 ("Crime of violence" . . . include[s] the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."). The question of whether Alcott committed attempted extortion or extortion is irrelevant to his career offender status. Either way, Alcott's crime against K.S. was a "crime of violence" triggering the career offender designation. That is fatal to his argument that he suffered prejudice.

**2.    Alcott Cannot Reargue His Claim That The
Travel Act Crime Was Not Properly Considered
A Crime Of Violence.**

Alcott also asserts in his Petition that the Travel Act violation should not have been

considered a crime of violence (Issue 3).  Alcott's arguments simply repeat arguments he

asserted on his direct appeal, which he cannot do in a § 2255 petition.  See Singleton v. United

States, 26 F.3d 233, 240 (1st Cir.1994) (issues disposed of in a prior appeal will not be

relitigated in a § 2255 motion); see also United States v. Doyon, 16 Fed. Appx. 6, 9 (1st Cir.

2001) ("To the extent that Doyon is reasserting the argument that he made on direct appeal, he is

barred from relitigating that issue on collateral review.").  Alcott raised the same challenge to

DeLuca in his direct appeal that he does here – arguing that Shepard v. United States, 544 U.S.

13 (2005) overruled DeLuca.  [Petition at 22].  The First Circuit rejected the argument on direct

appeal, [Tab D], and it cannot be relitigated here.

**3.    Alcott's Criminal History Argument Is Not An
Appropriate Basis For Relief Under Section
2255.**

Alcott's argument that the Court miscalculated his criminal history points (Issue 4) is a

challenge to the Court's application of the sentencing guidelines.  The First Circuit has

recognized that such errors are almost never cognizable under § 2255.  See Knight v. United

States, 37 F.3d 769 (1st Cir. 1994) ("Several circuit courts have considered the availability of

collateral attack for various errors in the application of the sentencing guidelines and have

concluded that such errors are not cognizable under § 2255." (citing cases)).  Alcott also failed to

raise this issue on the direct appeal.  He cannot raise this issue now.  See  Id. ("The proper place

for Knight to raise these issues was on direct appeal. Knight has failed to show cause for his

failure to raise these two issues on appeal.  Having bypassed his opportunity to raise these claims

on direct appeal, he cannot raise them now on collateral attack.").  Furthermore, for the reasons

stated above, see Section A, n. 9, there was no error in the computation of the criminal history

points.

### D.    Alcott's Ineffective Assistance Claim Does Not Satisfy Strickland

 In order to make out a claim of ineffective assistance of counsel entitling him to any

relief, Alcott must satisfy the requirements of Strickland v. Washington, 466 U.S. 668 (1984).

Strickland requires Alcott to show (1) that counsel's performance fell below an objective

standard of reasonableness and (2) prejudice.  To meet the first part, Alcott must show that his

counsel's advice was not within the range of competence demanded of attorneys in criminal

cases.  Id.  To meet the second part, Alcott must show that there is a reasonable probability that,

but for counsel's errors, the result of the proceeding would have been different.   Id.  Alcott

cannot meet this test because he cannot show that he suffered any prejudice as a result of the

claimed errors.

Alcott says he was harmed by his counsel's conduct in three ways:  (a) in that counsel did

not make him aware that he would be subject to being considered a career offender before he

pled guilty, (b) in that counsel failed to make a discovery request for the purported e-mail saying

"Forget it," and (c) in that counsel mismanaged a psychological evaluation and downward

departure argument.  The United States addresses each issue in turn.

The basic problem with Alcott's argument about his plea is that he is not seeking to

withdraw his plea.  So far as the United States can tell, Alcott is only asking to be re-sentenced,

not to withdraw his plea.  Alcott cannot proceed piecemeal, challenging only those parts of the

plea agreement he does not now like, while continuing to keep the parts of the plea agreement that benefitted him.  In addition, Alcott cannot on this record allege that he was not given fair notice that he faced the possibility of imprisonment of up to 92 months.  The United States and the Court made clear at the plea hearing that Alcott was facing up to 137 months under the guidelines.  Finally, much of Alcott's argument about the plea agreement veers off into a discussion of whether he knowingly waived his right to collaterally challenge his state court convictions.  [Petition at 14-16].  As his own Petition admits, however, Alcott has not successfully made any collateral challenges to his convictions to date.  [Id.].  Accordingly, he has suffered no prejudice, and the question of whether he knowingly waived his right to mount such challenges is not a basis for declaring his initial sentence invalid.  It is not properly brought in this § 2255 motion.

For the reasons set forth in Section C(1), counsel's decision not to file a motion for discovery of the purported e-mail saying "Forget it" caused no prejudice to Alcott.  Even assuming counsel should have filed a motion for discovery of the e-mail, its existence was irrelevant to the question of whether Alcott was a career offender.  As discussed above in Section C(1),  Alcott does not dispute the conduct.  He only disputes whether the extortion should have been considered an "attempt."   For the reasons discussed above, regardless of whether the conduct was an "attempted extortion" or "extortion," Alcott's crime was a crime of violence under the guidelines and appropriately qualified him as a career offender.

Finally, Alcott's claim that defense counsel mismanaged a psychological evaluation provides no basis for the relief he seeks.  Alcott asks for the Court to permit an additional "Psych evaluation and downward departure argument."  [Petition at 17].  Alcott says he is entitled to that

relief because he is "currently responding well to medications and therapy." [Id.].  Alcott's

argument that he is currently responding well to medications and therapy in prison does not

mean that he suffered prejudice at the sentencing nearly two years ago.

     For these reasons, Alcott suffered no prejudice, as required under Strickland, and the

Court should deny the Petition.  Should the Court wish to inquire further about the

communications between Alcott and counsel or between Alcott and his doctors (including the

psychologists/psychiatrists treating him), the United States requests that the Court order that

Alcott has waived his attorney/client and doctor/patient privileges.  The United States will then

collect additional information regarding Alcott's communications with counsel and doctors.

### Conclusion

     For the foregoing reasons, the Court should deny the Petition in all respects.


Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

**/s/ Jack W. Pirozzolo**
Jack W. Pirozzolo
Assistant U.S. Attorney
U.S. Attorney's Office
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210

Date: March 7, 2008

## CERTIFICATE OF SERVICE

I, Jack W. Pirozzolo, hereby certify that on March 7, 2008, I served a copy of the foregoing document via mail on petitioner.

**/s/ Jack W. Pirozzolo**
Jack W. Pirozzolo