# ATTACHMENT C
# (PAGES 1-33)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff | ) | |
| | ) | |
| -VS- | ) | Criminal No. 04-10286-PBS |
| | ) | Pages 1 - 65 |
| MICHAEL W. ALCOTT, | ) | |
| | ) | |
| Defendant | ) | |

**SENTENCING HEARING**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

JACK W. PIROZZOLO, ESQ., Assistant United States Attorney, Office of the United States Attorney, 1 Courthouse Way, Boston, Massachusetts, 02210, for the Plaintiff.

KEVIN L. BARRON, ESQ., 453 Washington Street, 5th Floor, Boston, Massachusetts, 02111-1325, for the Defendant.

ALSO PRESENT: Jo Lyness, U.S. Probation Department

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 3, 2006, 9:10 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

2

<u>P R O C E E D I N G S</u>

1

2         THE CLERK:  The case of the United States V.

3 Michael Alcott, Criminal Action 04-10286, will now be heard

4 before this Court.  Will counsel please identify themselves

5 for the record.

6         MR. PIROZOLLO:  Good morning, your Honor.  Jack

7 Pirozzolo for the government.

8         MR. BARRON:  Good morning, your Honor.  Kevin

9 Barron for Mr. Alcott.

10         THE COURT:  This is our second sentencing hearing

11 on this.  We resolved certain things at the last hearing, as

12 in loss amount.  I accepted the loss amount provided in the

13 Presentence Report.  The parties agreed on acceptance of

14 responsibility, and because of ex post facto considerations,

15 I applied the earlier Guideline manual that benefited

16 defendant.

17         Today we have some more issues, and I think the

18 reason we suspended was because the government was thinking

19 about putting on evidence to support the use of a minor to --

20 I forget the exact wording of it -- the use of a minor to

21 conceal a crime or conceal -- I forget exactly how --

22         MR. PIROZOLLO:  That's correct, your Honor, we

23 intended to put on evidence of an additional act of

24 obstruction where Mr. Alcott used his seventeen-year-old son

25 to take custody and potentially dispose of a trash bag full

1    of evidence.

2            THE COURT:  Right, and the Presentence Report had

3    said "no," it wasn't concealment of a crime.  You pointed out

4    that it also captured a broader thing, which is concealment

5    of being caught.  What section is it so I can phrase it

6    exactly?  Do you remember?  It's 3 --

7            MR. PIROZOLLO:  The section that deals with the use

8    of a minor is Section 3B1.4 --

9            THE COURT:  Got it.

10           MR. PIROZOLLO:  -- although it's not the

11   government's position here today that that application, that

12   particular Guideline applies by its terms.

13           THE COURT:  Right, it was a use of a minor to avoid

14   detection of or apprehension for the offense.  So you're

15   abandoning that particular Guideline?

16           MR. PIROZOLLO:  Well, because of the particular

17   offense of conviction here.  The use of the minor wasn't in

18   relation to the particular offense of conviction, so it's the

19   government's position that by its terms, that doesn't apply.

20           THE COURT:  All right.

21           MR. PIROZOLLO:  But it is a basis for a departure

22   upward, however, and that's the government's position.

23           THE COURT:  Let me put it this way:  If you want

24   it, prove it up.

25           MR. BARRON:  There's another issue, a threshold

1   here, and that is, Page 4 of the plea agreement says that the

2   government agrees not to make any additional departures.

3          THE COURT:  And you do too, right?  So it was

4   reciprocal.

5          MR. BARRON:  Well, I didn't make any -- the

6   Castellano argument, but that's actually not a departure

7   argument or a variance from the plea agreement.

8          THE COURT:  Back up a minute.  You agreed not to

9   seek any departure other than for psychiatric purposes.

10          MR. BARRON:  Correct.

11          THE COURT:  Did they agree not to seek any upward

12   departures?

13          MR. PIROZOLLO:  No, we did not, your Honor.

14          THE COURT:  This should be easily resolvable.

15   Let's look.

16          MR. PIROZOLLO:  "The U.S. Attorney reserves the

17   right to seek an adjustment under 3B1.4 for the defendant's

18   attempted use of a person less than eighteen years of age to

19   commit the offenses set forth in the superseding information,

20   or, in the alternative, to have an upward departure based on

21   his use of a minor to obstruct the investigation and

22   prosecution of his crimes."

23          MR. BARRON:  And on Page 4, "Accordingly, neither

24   the U.S. Attorney or the defendant will seek departure on any

25   grounds from the Sentencing Guidelines except under

1    conditions (Inaudible)."

2            MR. PIROZOLLO:  And we explicitly reserved below.

3    And we explicitly reserved that right below.

4            THE COURT:  All right, now, but, point two was, the

5    last time we were here, they denied that he used a minor, if

6    I remember correctly, and you were going to put on a

7    witness.  That's why we continued this.

8            MR. PIROZOLLO:  Your Honor, my understanding is

9    that there's something that was asserted in the brief about

10   some -- that could be read to contest that there was the use

11   of a minor.  But, I mean, I can put the agent on right now,

12   and he can testify what he was told.

13           THE COURT:  This can be quite simple.  Do you

14   contest that he used a minor to throw the trash away that

15   included some of these items in the affidavit?

16           (Discussion off the record between Mr. Barron and

17   the defendant.)

18           MR. BARRON:  That's not a contest.  The question is

19   more whether this applies as a basis even for an upward

20   departure.  There was a minor involved who possessed the

21   trash bag at one point.  We disagree with how it's

22   characterized.

23           THE COURT:  Excuse me.  Was it to throw it away, or

24   was it --

25           MR. BARRON:  That's right, he was given the trash

1  to throw away.

2          THE COURT:  I don't know why I continued this last

3  time.  Wasn't this the issue?

4          MR. PIROZOLLO:  There were some additional issues

5  related to criminal history issues, your Honor.  You may not

6  recall this, but there's a contested issue over whether he's

7  going to be considered a career offender, and if so, what his

8  criminal history -- and if not, what his criminal history

9  level should be.  That's a substantial point of contention.

10          THE COURT:  All right, so what we're going to do

11  is -- the question is whether I upwardly depart because he

12  told his son to throw away the trash, and it included the

13  items in the affidavit.  Is that the issue?

14          MR. PIROZOLLO:  Correct, your Honor.

15          THE COURT:  So I'm not going to have an evidentiary

16  hearing, right?  I don't know why -- I could have probably

17  dealt with the other one a lot sooner than today.

18          The motion to strike the affidavit is denied.

19  Whether I upwardly depart, I don't know.  I mean, I'm pretty

20  annoyed about the lying about the cancer.  This seems to pale

21  in comparison on the scheme of things, shall we say, because

22  it was an out-and-out fraud on the Court, and he's going to

23  get the two-point hit for that, and that he deserves to live

24  with.

25          But, in any event, why don't we do this:  The only

1    issue left legally -- I guess there are two issues.  You sort

2    of raised the attempt issue, but when I reread the facts,

3    this is far more than an attempt.  I mean, in other words, I

4    don't know that it gets a three-level reduction.  He sent

5    letters and multiple E-mails.

6          MR. BARRON:  He sent letters and multiple E-mails

7    under attempt, but when you withdraw from the crime and

8    disclose your identity in a situation like this, he's broken

9    it off.  He's not received the money.  So, I mean, in

10    treating this crime as whether it's a completed crime or not

11    when he actually stops, and the only reason -- it seems that

12    the reason he's detected is because he's given up his

13    identity -- remember Dr. Storm says at some point, he says,

14    "Well, you know, I'm going to bring this to the FBI."

15    Several weeks go by and nothing happens, and then he

16    discloses his identity to Miss Bain, and the next day the

17    FBI --

18          THE COURT:  Do you want to say something about

19    this?

20          MR. PIROZOLLO:  It doesn't apply because it wasn't

21    an attempt.  The elements of the crime are threatening to

22    injure a reputation under a demand for money, and the very

23    first letter he sent via FedEx, which is attached to an

24    earlier pleading in the case, does just that.  He writes a

25    letter to the doctor:  "I have reviewed some pictures from an

1    adult Web site showing Miss Bain as the --" that's the woman

2    who the doctor was dating -- "I have proved that you met

3    Miss Bain by hiring her as a GSE escort while visiting his

4    daughter.  It wouldn't do a whole lot for the father-daughter

5    relationship. . . . attract you to Boston, Florida, Georgia,

6    and, of course, California.  Suffice it to say that the

7    information that I have could bring you down.  Think about

8    the humiliation with your parents, Bill and Joanne, your

9    children, and especially your colleagues and patients if the

10   seedy side of your life comes out.  And trust me when I tell

11   you that the above is just a sampling of what I have

12   gathered," and it goes on, your Honor.

13          THE COURT:  All right, I think it was not an

14   attempt.  I think he did it, and then maybe months later, you

15   know, decided, "Well, maybe I shouldn't be doing this

16   anymore," but that's not an attempt.

17          MR. BARRON:  And there's a letter that goes back to

18   him that says "Forget it."

19          THE COURT:  You know what, I'm not going to give

20   the three-level reduction for attempt.  So now the real issue

21   is whether he's a career offender and --

22          MR. PIROZOLLO:  If I may, your Honor, there is an

23   additional issue that is raised by the defendant at this time

24   that had been agreed to in the plea agreement, but now the

25   defendant is backing away from that, and that has to do with

1    whether the financial institution enhancement of the

2    defendant derived more than $1 million individually should

3    apply to him.

4            THE COURT:  Would that be a violation of the plea

5    agreement?

6            MR. PIROZOLLO:  Your Honor, I'm prepared to address

7    it on the merits if the Court is willing to hear it.

8            THE COURT:  Are you pressing that?

9            MR. BARRON:  Well, may I explain why I do it?  When

10   we discussed this, I looked at the majority view on this

11   that's expressed by the Fourth Circuit's case.  I cite it in

12   the brief.  It says "individually derived."  We looked at an

13   agency theory.  There is a case now, though, which I had not

14   considered when we did this plea agreement involving United

15   States V. Castellano.  It's a Judge Easterbrook decision.  It

16   has some weight.  It's been given some consideration in

17   white-collar defense, and it says that the Federal Courts do

18   not have federal common law about piercing the corporate

19   veil.

20           Now, without addressing the issue of whether that

21   argument is waived, there's still an argument under Booker to

22   look at, whether or not we should be giving him the full two

23   points, even if that applied on a Guideline calculation,

24   because we've offered you his Social Security income, we've

25   shown you his corporate books.  It is a corporation.

1    Portions of his -- and his articles of incorporation are

2    included.

3              THE COURT:  Did he use it for his personal expenses

4    the way the government alleges?  Did he use this income?

5              MR. BARRON:  He used the income.  It went into the

6    business.  He then paid himself a salary from the business.

7    The business was kept afloat because of the loan.  It was a

8    losing business.  The fraud on the bank was committed to keep

9    the money coming into the business, and then he drew himself

10   a salary.  It appears he's observed the regular corporate

11   formalities.  The government wants to say, well, this is a

12   fraud nonetheless, and in fraud under -- Massachusetts law

13   doesn't allow a defendant to hide behind the corporate

14   shield.  But that's not what's happening here.  He's

15   committed a fraud as a corporate officer and paid himself a

16   salary and gotten substantially less individually than a

17   million dollars.

18             What we were going to have your Honor look at is,

19   there's a going concern that employed as many as 30 people at

20   a time; that Mr. Alcott did profit personally from some of

21   these things like a country club expense, improvements to his

22   house, but these were recovered.  The country club membership

23   was recovered, given back to the creditor in the proceedings.

24             THE COURT:  He paid for personal improvements to

25   his house from the corporate account?

1          MR. BARRON:  Yes, not from the corporate account,

2   but I believe it was paid to a contractor.  And in essence

3   the house was sold anyway, and that was also an asset

4   recovered, so indirectly it went back in.

5          THE COURT:  So it would meet the My Bread factors

6   under state law, or you're not sure?

7          MR. BARRON:  I'm not certain whether it would or

8   not, but I don't think it looks like it would meet all the

9   factors to pierce the corporate veil.

10         THE COURT:  You know what, I've done piercing the

11  corporate veil cases, and it takes me weeks, weeks to get

12  through.  I have one that lasted three weeks with Goodwin,

13  Procter on one side, and it turns out the My Bread factors

14  are extremely complicated, so I would not be prepared right

15  now to say it does or does not meet the My Bread criteria.

16  So I'm a little confused about what I should do.

17         It's been waived in the plea agreement.  I

18  actually, quite candidly, didn't spend any time on it last

19  night.  I was much more worried about the other stuff, simply

20  because it had been pled away.  Now there's this new case out

21  there, and I suppose you could say that's a new situation,

22  but I am not prepared today to do a piercing discussion.

23         MR. BARRON:  It's still a factor to look at under

24  Booker even if you didn't.  And I don't mean that merely as

25  an end run.  There's a whole new legitimate set of issues

1    under _Booker_ concerned with, you know, how should we treat

2    the offense, what is the real damage in this case, how much

3    was really derived?  And some of this is money that went to

4    other people to pay their just wage claims, and it didn't go

5    into Mr. Alcott's pocket.

6            THE COURT:  And some did go to him, so I don't know

7    what to do with that.

8            MR. BARRON:  Some did.  I think we can see pretty

9    clearly that a half million dollars went to Mr. Alcott in the

10   form of salary and the country club membership.

11           THE COURT:  Well, let's see if it makes a

12   difference at the end of the day.

13           MR. PIROZOLLO:  I did address it in the sentencing

14   memorandum, your Honor.

15           THE COURT:  You did, but I didn't pay any attention

16   to it because it was not in the plea agreement.  And I don't

17   have the --

18           MR. PIROZOLLO:  Well, it was in the plea agreement,

19   your Honor.

20           THE COURT:  It was waived in the plea agreement.  I

21   don't have a record that I can decide that _My Bread_ right

22   here -- now, we can spend the next two days on it, if you'd

23   like, about whether or not there should be a piercing.  I had

24   thought it was a done deal.  You are now raising a new case.

25   I've spent a lot of time on career offender and all the other

1    stuff, but this is -- I don't believe I have -- I just got

2    your gigundous appendix a couple of days ago.  I do not feel

3    prepared right now to make a fact-finding as to whether or

4    not the corporate veil should be pierced, so we've got to

5    figure out what to do with that.

6            Some money went to him, some didn't, right?  We

7    don't know if the books were separate.  There's like eight

8    factors, right?

9            MR. PIROZOLLO:  It doesn't matter, your Honor,

10   whether all the money went to him for what is deemed a

11   personal expense.  The relevant question is whether there was

12   the use of the corporate form in connection with perpetrating

13   a fraud.  That's the critical element in the My Bread

14   factors.

15           THE COURT:  It's one.

16           MR. PIROZOLLO:  It's the most significant one, your

17   Honor.  And as to all of the others, all of the others are

18   met in this case.  There was no meaningful corporate form.

19   Mr. Alcott controlled the company completely.

20           THE COURT:  I don't know that.  I'd have to have

21   evidence on that.  I don't know that.  Do you want to have

22   someone go on and prove that to me, that he used most of the

23   money for himself, there was no meaningful corporate form,

24   there were no other shareholders?  I'm willing to do it if

25   you care that much about the two points.

1          MR. BARRON:  I have provided some of that

2     information in my memorandum, the articles of incorporation,

3     the information from Social Security to show that a wage has

4     been paid.

5          THE COURT:  Right, I'm assuming that's true.

6          MR. BARRON:  Unanimous written consent with Mary

7     Alcott, Kenneth Daley.

8          THE COURT:  Do you want to spend the next two hours

9     on it, both of you?  I mean, this is really what it takes.

10    Let me put this aside for a minute and see if it makes a

11    difference, because under First Circuit case law,

12    unfortunately for you, this is extortion.  So we've done some

13    research on it.  I understand why you think that that's not

14    fair, because there's this other Guideline that seems to view

15    it as a crime that's not violent.  That may be something I

16    should take into account in how I allocate it, but the truth

17    at the end of the day is, the First Circuit case says

18    extortion is a crime of violence for purposes of the career

19    offender guideline.  Right?

20         MR. BARRON:  I don't agree that that case is in

21    line with this case.

22         THE COURT:  It says extortion.

23         MR. BARRON:  Extortion, violent extortion.  There

24    are different kinds of extortion, and that's why this is

25    different.  I mean, I just finished trying an extortion

1    case.  Extortion under the federal statutes and extortion in

2    Massachusetts usually involves the threat of violence or the

3    understanding of violence.  This has to do with exposing

4    sexual behavior, and that's extremely different.  It's not --

5    it doesn't ever involve the question of -- if somebody is of

6    a sexual sort of makeup where he wouldn't be embarrassed,

7    then there's no threat at all.  It's a very different kind of

8    threat than to say, "I'm going to burn your house down," or

9    do whatever else.

10             THE COURT:  I understand that.  On the other hand,

11   extortion is listed.  This is a state statute that picks up

12   extortion.  I think that it applies.

13             Now, I think that doesn't mean I can't -- I hear

14   what you're saying, and I also understand that the other

15   Guideline is not a -- that picks up is a nonviolent

16   blackmail.  I understand that it's not the clearest area of

17   the Guidelines, but I have a First Circuit case that pretty

18   much says it.

19             MR. BARRON:  Again, you know, you don't have to

20   apply the career offender statute because this is one of the

21   areas, even as a Guidelines analysis, because it's an

22   encouraged area of departure.

23             THE COURT:  Possibly.  That's another issue.

24             MR. BARRON:  I mean, you know, we fall back into

25   that.  And when we start looking at it from a Booker point of

1    view, where we take totality of these facts together, it

2    looks much less like a career offender question.

3          THE COURT:  Thank you.  I find that the career

4    offender guidelines apply under First Circuit law.  It may be

5    a ripe area for a criminal history overstating, given the

6    fact this was a nonviolent blackmail.

7          Now, the question is whether or not I go down from

8    the career offender guidelines because this was a nonviolent

9    blackmail under any theory, so that's going to be a basis for

10   debate.  And I may mush that into the financial issues.  I

11   don't know what to do about the piercing the veil.  I've now

12   resolved attempt.  I've now resolved career offender.  I had

13   thought that this was put to bed because the plea agreement

14   bound you to the financial institutions.  You don't want to

15   hold him to that, so now I'm caught a little bit behind.  We

16   can spend the next two hours on the financial institutions

17   thing and argue about it.

18         MR. PIROZOLLO:  Well, if the Court is inclined to

19   have an evidentiary hearing on that and is not going to apply

20   the guideline without such a hearing, then the government

21   would like a hearing on that because I think the fact --

22         THE COURT:  Put your guy on the stand then.

23         MR. PIROZOLLO:  Well, I don't know that he's the

24   one who's prepared to address it.

25         THE COURT:  I'm not extending again.  I did it last

1   time because I thought there was going to be a debate over

2   the minor.  I didn't even know this.  This didn't even come

3   up last time.

4          MR. PIROZOLLO:  Well, your Honor, this was not an

5   issue that the government raised.

6          THE COURT:  Well, show me where you can prove in

7   your appendices that I should pierce the corporate veil.

8   You're relying totally on the fraud piece, right?

9          MR. PIROZOLLO:  I'm relying on two -- that there

10  are two separate reasons why it should apply.  One, as a

11  matter of law, you don't need an evidentiary hearing on

12  that.  The Fourth Circuit has held that whether or not the

13  money goes directly into the defendant's pocket or not and

14  whether the corporate veil should be pierced or not is

15  irrelevant.  If it was a closed corporation -- and there is

16  no question that this is a closed corporation -- then for

17  purposes of application of that guideline, it is --

18          THE COURT:  Well, tell me about the corporation.

19  I've not focused on it.  The closed corporation, does he own

20  a hundred percent of the stock?

21          MR. PIROZOLLO:  Under the terms of the articles of

22  incorporation, as I read them, there were three people who

23  were named:  There was Mr. Alcott, Mary Alcott, his wife, and

24  then the third person whose name is not familial.

25          MR. BARRON:  The third person is an officer of

1   Citizens Bank.

2           THE COURT:  And what percentage does everyone own?

3           MR. PIROZOLLO:  Mr. Alcott I believe owned almost

4   all of the stock.  But, your Honor, if I may, your Honor, in

5   the --

6           MR. BARRON:  Fifty-one.

7           MR. PIROZZOLO:  The terms of the articles of

8   incorporation --

9           THE COURT:  Where are you looking, since I have a

10  pile of paper?

11          MR. PIROZOLLO:  In the defendant's appendix to his

12  sentencing memorandum, it's attached, the articles of

13  incorporation.

14          THE COURT:  Which of the many attachments is this?

15  Where are we into it, do you know?

16          MR. BARRON:  Toward the back, your Honor.  It's

17  before the letter from Burke and Foster.  It's the second

18  from the back.  It starts out "Articles of Organization."

19  There's also a --

20          THE COURT:  Which tab is it under for you?

21          MR. BARRON:  That would be Tab S, I believe.  I

22  used a binding service that gave me a little trouble here, so

23  I think the copies came out differently.  I got some upside-

24  down pages.  I tried to give your Honor the right one, but it

25  should be the second-to-last tab.  It looks like this, your

1    Honor.  It starts with a D in the upper right corner.

2              THE COURT:  Tell you what, you can find it.

3              MR. BARRON:  May I approach?

4              THE COURT:  Here.  All right, good.  Thank you.

5              MR. BARRON:  You're welcome.

6              MR. PIROZOLLO:  Your Honor, my understanding is,

7    it's one-third to Mr. Alcott, one-third for Mary Alcott, and

8    one-third was at the time a U.S. Trust, which has

9    subsequently become Citizens Bank.

10             THE COURT:  All right.  And?

11             MR. PIROZOLLO:  The company was at all times in all

12   meaningful ways controlled by Mr. Alcott.

13             THE COURT:  How do I know that?

14             MR. PIROZOLLO:  I don't think that's disputed, your

15   Honor.  I don't think that's a matter of dispute.

16             THE COURT:  Well, just help me through it.  Was he

17   president?

18             MR. PIROZOLLO:  Mr. Alcott was the president,

19   treasurer, and one of two directors.  The other director was

20   Mary Alcott.

21             THE COURT:  Who's that, the wife?

22             MR. PIROZOLLO:  Under the articles of

23   organization.  That's the wife, yes.  And that's at Page --

24             THE COURT:  Did they file separately taxes?

25             MR. PIROZOLLO:  Did who file separately taxes?

1    THE COURT:  Did the corporation file taxes?

2    MR. PIROZOLLO:  I believe there was a separate tax

3    return for the corporation.

4    THE COURT:  Did he commingle his personal assets

5    with that of the corporation?

6    MR. PIROZOLLO:  Well, he used corporate assets for

7    personal expenses.

8    THE COURT:  All right, well, tell me about that.

9    MR. PIROZOLLO:  Well, in addition to drawing a

10   salary, he had a country club expense of $120,000, your

11   Honor.  In addition to that, he had cars.  I believe that

12   house payments, your Honor --

13   THE COURT:  House payments?

14   MR. PIROZOLLO:  Construction of a home was paid for

15   with company funds, your Honor.

16   THE COURT:  In what amount?

17   MR. PIROZOLLO:  I don't know the answer to that,

18   your Honor.  I don't know.  Your Honor, if we are going to

19   have a hearing on this, I guess I would ask --

20   THE COURT:  It's not worth the two levels.  I

21   bounced it once.  Whatever my record is I'm going to go with

22   now.  So there were some house payments and some cars, a

23   country club.

24   MR. PIROZOLLO:  $120,000.

25   THE COURT:  $120,000.  You're saying -- I'm just

1    trying to remember the My Bread factors.  Did it exist as a

2    real entity?  Was it doing business?

3              MR. PIROZOLLO:  It was doing business purportedly.

4              THE COURT:  How many employees did it have?

5              MR. PIROZOLLO:  It had at one point in time about

6    30 employees, according to the defendant's assertion, and I'm

7    not in a position to contest that.  There were two branch

8    offices.  There was an office in Quincy, Massachusetts, and

9    there was an office in Burlington.  It was thinly

10   capitalized.

11             THE COURT:  Now, this is the part that takes

12   forever in a trial usually.  Do you know whether it was --

13   the extent of the thin capitalization?

14             MR. PIROZOLLO:  The type of business it was, your

15   Honor, is a placement firm.  It had no meaningful hard

16   assets.  What it was is, it essentially rented employees out,

17   accounting employees out to other companies.

18             THE COURT:  And usually you have economists or

19   accountants or something to talk to you about how thinly

20   capitalized it has to be.

21             MR. PIROZOLLO:  Well, it was thinly capitalized

22   enough that any loan or line of credit had to be personally

23   guaranteed by Mr. Alcott and his wife.

24             THE COURT:  I can't say that -- I don't know

25   whether that's too thinly capitalized, so you don't meet the

1    thinly capitalized prong.  You do meet the intermingling

2    personal assets prong; in other words, the payment of the

3    country club and some home construction.

4            MR. BARRON:  I don't think that meets the prong

5    because the country club assets existed, they were on the

6    books.  In other words, they weren't hidden or disguised as

7    something else, and they were recovered as a corporate

8    asset.  Sometimes you can use a club membership for a

9    corporate officer to go and get business from the club.

10           THE COURT:  Well, is it true that he paid for his

11   house payments on it?

12           MR. BARRON:  No, not the house payments.  I think

13   they were improvements they were talking about, the

14   electrician and some contracting.  But, again, all the

15   sources of information, it's on the books.  It is a respect

16   to the corporate form, and there's a full set of tax

17   returns.  I was unable to uncover them, but I know from the

18   litigation and from the letter from Mr. Burke that all these

19   things were disclosed in the litigation.

20           THE COURT:  Well, the fact that they were recovered

21   doesn't matter.  The question is whether or not -- as I said,

22   I wrote one of the definitive opinions on this, the George

23   Hyman Construction Company.  It took me three and a half

24   weeks of trial to work through it.  So I had thought this was

25   pretty much agreed to, so I have to say quite candidly I

```
 1    didn't focus on this, and this is what's worrying me now.

 2    And I know you both briefed it, but I really put it aside.

 3              I went back and checked the plea agreement.  I

 4    understand you're saying there's a new opinion, so I have --

 5              MR. PIROZOLLO:  Your Honor, it's actually not a new

 6    opinion.  It's an opinion that was -- that had been --

 7              MR. BARRON:  It's 2000.

 8              MR. PIROZOLLO:  -- issued out of the Seventh

 9    Circuit in 2003.

10              THE COURT:  But you're not pressing it, right?

11              MR. PIROZOLLO:  Your Honor, I just don't think it's

12    fair, okay?  I think that the issue should rise or fall on

13    its merits.  But if you're telling me that you're not going

14    to give me the opportunity to put on the evidence to

15    establish that, then I think that's a little unfair, your

16    Honor.

17              THE COURT:  No.  I said today I'm not bumping it

18    again.  I'm going to go through the evidence that I've got

19    today, and I'm going to see if there's a piercing based on my

20    knowledge of the piercing law.  I'm not sure simply that

21    using the corporate form to perpetrate a fraud, I don't

22    remember that as standing alone.  You may be right.  But

23    usually you go through all these different factors, right?

24              MR. PIROZOLLO:  There are twelve factors.

25              THE COURT:  Right.
```

1        MR. PIROZOLLO:  They're not all of equal weight,

2   your Honor.  The fact that they are relevant doesn't mean

3   they're of equal weight.  The basic concept of piercing the

4   corporate veil which is discussed in My Bread, in the

5   Pepsi-Cola decision, is:  Are you using this corporate form

6   in order to perpetrate a fraud?  And one of the essential

7   components here is the fact that at the time he secured the

8   line of credit for $2.5 million.  And this developed over

9   time, your Honor.  The way this worked is, there was

10   originally a line of credit of $500,000, and then it was

11   bumped to $1 million, then $1.5 million, then eventually

12   $2.5 million.  That was done based upon false and fraudulent

13   accounting records that he was supplying to the bank in the

14   form of bogus receivables and fake financial statements.  The

15   company was insolvent at the time that he was securing these

16   loans, and the basis for the loans -- and the banker is here

17   if you want to hear from him on that --

18        THE COURT:  Why are they here, for restitution?

19        MR. PIROZZOLO:  They're here for purposes --

20        THE COURT:  Excuse me, if I can interrupt you.

21   I've had many of these cases in the state court.  It's the

22   use of the corporate form to perpetrate a fraud for the

23   benefit of the individual.  In other words, somebody's hiding

24   behind the corporate shield to get money for himself.  But

25   here the fraud -- there's no doubt there's a fraud.  He's

1    pled guilty, and there's ample evidence of it, so there was

2    was a fraud, but it was a fraud to benefit the corporate

3    structure.

4            MR. PIROZOLLO:  Not true, your Honor.

5            THE COURT:  Wait, wait, wait, unless you can show

6    me that the proceeds of it were going to come to him or he

7    was intermingling his personal assets with that of the

8    corporation.  And so that's why I'm probing these other

9    factors.  The fraud isn't enough.  That would make every

10   single fraud perpetrated by a corporation a veil-piercing

11   situation, and that's not true.

12           MR. PIROZOLLO:  Not necessarily, your Honor.  If I

13   could be heard on this, the issue of the fraud in this

14   particular instance turns on the use and manipulation of

15   corporate receivables.  In this case, the funds were lent to

16   Mr. Alcott's company based upon his representations that the

17   corporation had certain receivables of a certain amount.

18           THE COURT:  Right.

19           MR. PIROZOLLO:  It was the use of the false

20   corporate records, the use of the corporate form, the

21   corporate receivables, not receivables -- not -- this is not

22   a bogus guarantee, for example.  This is not he claimed he

23   had a house that was guaranteeing the loan that didn't

24   exist.  That's not it.  He's representing bogus corporate

25   receivables that motivates the bank to lend the money.  It's

1    the use of that corporate form that generated the loan.

2                THE COURT:  I'm not sure that's true under state

3    law.  I think that's one factor.  You need all the others:

4    Was he observing the corporate formalities?  Was he

5    intermingling his personal assets?  It goes on and on.  And

6    some of these you're telling me did apply; he did use some to

7    pay the electrician and pay for his country club.  Some it

8    seems as if there really were other shareholders, and the

9    money was supposed to go into the corporate coffers, not his

10   personal coffers.

11               I don't know if it applies, and if you're not going

12   to insist on the plea agreement, which is where I thought

13   you'd be going probably, then --

14               MR. PIROZOLLO:  Well, your Honor, I just don't

15   think -- if Mr. Barron has a meritorious argument, we should

16   address it.

17               THE COURT:  I appreciate that, but I just think on

18   this record, I am not ready to pierce.  And I'm not putting

19   it off again.  This has gone off and off and off.  I hear

20   where you're going.  I think there's a career offender

21   status.  I'm going to hear for a minute on downward

22   departure, and why don't we launch into that.

23               You are a little bit bound here on the downward

24   departure situation because you agreed not to seek one under

25   4A1.3.

1          MR. BARRON:  This is a horizontal issue so much as

2    a downward departure.  But I'm not hanging it merely on

3    that.  The treatment we give -- first of all, career offender

4    and the offense level was never mentioned in the plea

5    agreement.  That was left open because Mr. Alcott and I had

6    discussed it, and Mr. Pirozzolo and I could not come to a

7    sharp determination of what the criminal history category

8    could be, so we left that open.  It was too difficult at the

9    time.  We wanted to put together an agreement, so that the

10   charges were not handled separately, and we could benefit the

11   defendant from grouping, and the government would not have to

12   go about bringing into this court seriatim prosecutions for

13   related conduct.  At least in terms of the proceedings, they

14   were related.

15         So we're here with an open issue on criminal

16   history category, to my way of thinking; and when we talked

17   about upward and downward departures, we had not determined

18   whether or not Mr. Alcott was a career offender.  And in

19   spite of what the First Circuit has said about extortion

20   being a violent offense, it still is not an offense in this

21   case that involves violence.  And I think your Honor can hear

22   the issue and keep that open in Guideline terms merely

23   because the Guidelines encourage departures, both upward and

24   downward, in the criminal history arena, and that standing --

25         THE COURT:  The concern I have here is, if he had

1    nothing else on his record except this, and assuming the plea

2    agreement doesn't preclude you, here's a guy who committed

3    essentially three crimes while on pretrial release, three:   a

4    blackmail scheme, lied to me point-blank looking at me in the

5    face about having cancer, lied to his own lawyer, as far as I

6    could tell, and lied to every member of his family; and,

7    three, then tries to get rid of all the evidence through his

8    minor son.  And I don't know if it applied to an

9    obstruction -- I thought you just agreed to that.  I thought

10   that was a disputed fact last time.

11          MR. BARRON:  The garbage was given to the son.

12   What I wanted to say on that point with the garbage bag is,

13   none of this matters because Mr. Alcott admitted and turned

14   himself in.  The garbage was not meant to obstruct the FBI

15   investigation.  That stuff was there when the warrant was

16   executed.  It was not hidden.  It was meant to prevent it

17   from falling into Mrs. Alcott's hands because of the nature

18   of what's on file.  You can see from looking at it why

19   Mr. Alcott didn't want Mrs. Alcott to see it.  It's not

20   particularly evidence of a crime under investigation, and I

21   don't think it applies, period, as a grounds for either an

22   upward departure or for additional --

23          THE COURT:  Was it disposed of before the "guilty"

24   plea, attempted to be disposed of?

25          MR. BARRON:  Yes, it was, but it was given to the

1    son on the way out to come in to confess and to go into jail

2    on that day, so I don't think that it counts.  It was not

3    taken out of the FBI's control.  It was left in the house,

4    and the FBI was called about it, and it was given over by his

5    family.  I really -- I think it's going too far to

6    characterize this as an attempt to keep it from the

7    government.

8            THE COURT:  So --

9            MR. BARRON:  And none of this information would be

10   any different from what the government already got by

11   Mr. Alcott's open court admission of the lie.

12           THE COURT:  Thank you.

13           Do you want to respond?

14           MR. PIROZOLLO:  I do.  Just addressing the very

15   last point, it is not true that we got whatever it was we

16   were going to get by Mr. Alcott's admitting that he had lied

17   to the Court about cancer.  Within that trash bag was

18   evidence that is relevant to the sentencing in a couple of

19   different respects:  First off, within the documents that he

20   disposed of were documents that detailed just how great the

21   lengths were that he went to deceive not only the Court but

22   the United States but also his own attorney and his own

23   family about the cancer.  It's a fair inference that what

24   Mr. Alcott was trying to do was to truncate the inquiry into

25   exactly what he was up to during the course of time that he

1    was claiming that he had cancer.

2         Within the documents that were found in the trash

3    bag include a handwritten practice signature for the doctor

4    for MGH, a letter that details the various steps that he took

5    to try to lie to the Court and to deceive his own attorney,

6    including apparently sitting at the MGH at a number he had

7    given his attorney that he was intending to pick up, had

8    there been a conference call that was anticipated to discuss

9    what to do about his cancer.

10        If you recall, your Honor, when we were here a year

11   ago, the Court expressed considerable concern over what to do

12   about the sentencing on the bank fraud charges in light of

13   the cancer, and the family obligations that he purportedly or

14   that he did have is his two young children.  And as I recall,

15   there was an issue that the Court had expressed about not

16   giving somebody a life sentence, essentially a life sentence,

17   leaving widows and orphans.  I believe that's what the Court

18   had expressed.

19        These documents detail the true scope of that

20   scheme.  They also show -- and this was not confessed to, as

21   far as I'm aware, to Pretrial Services -- that he was taking

22   information that he had received as an employer, some tax

23   information that was provided to him by employees, and was in

24   the process of stealing their identities.  The defense

25   concedes now that what was going on is that Mr. Alcott was

1    buying time in order to disappear, to flee; and that what he

2    threw out in the trash bag was the evidence of the tax

3    information, Social Security information, driver's license

4    information, the communications and payments to

5    fakeid.google.com to try to obtain an additional identity.

6    None of that came out when he confessed to Pretrial Services

7    back in May of 2005.

8              So, first, it clearly was an attempt to truncate

9    our ability to investigate and understand truly the scope of

10   the conduct with respect to the obstruction. And, recall,

11   the obstruction occurs well before. The obstruction is when

12   he gives the letter to the Court. Frankly, it's when he

13   makes representations to his attorney that's then repeated to

14   the government that he has cancer. There were a lot of

15   accommodations that were made up until the point the letter

16   was given. This is a separate act. This is disposing of

17   information when he knows that the U.S. Attorney's office is

18   probing and pressing to get verification and information

19   about the cancer. So that's first.

20             Second, there's additional evidence that he had

21   raided his own wife's 401K. There is a document that shows

22   that he had withdrawn and committed some credit card fraud.

23   So there's evidence of other wrongful conduct that he was

24   trying to dispose of prior to coming in to speak to the Court

25   or to confess to the Court.

1           And in fact, frankly, giving the bag to the minor

2    son on the eve or hours before he comes in and confesses to

3    Pretrial Services, frankly, aggravates, it does not mitigate,

4    culpability.  At that point in time he knows he's coming in

5    to confess.  At that time he knows that people are going to

6    discover what he's been up to, and he gives to his

7    seventeen-year-old son a bag, this bag full of this

8    information that is highly incriminating.

9           And there's a claim, I think, that it has something

10   to do with hiding it from his wife, not hiding it from the

11   government.  Frankly, I don't think that should be credited.

12   The information that he's hiding here goes directly to the

13   fraud that he perpetrated on the Court and to the additional

14   identity theft, and information that his wife clearly would

15   have discovered about finances immediately upon his

16   confessing that he had been perpetrating a fraud on the

17   Court, because at that point I think it was reasonable to

18   expect that he would have been taken into custody, and she

19   would have had to deal with the finances on her own there.

20   Then she would have discovered that he had taken her

21   retirement money.  So it's clearly relevant --

22           THE COURT:  How much retirement money did he take?

23           MR. PIROZOLLO:  It was a hundred thousand dollars

24   or something, in excess of a hundred thousand dollars.

25           MR. BARRON:  I don't think that's relevant conduct

1    here.  He's a part owner of that.  And, you know, we're

2    taking the sentencing hearing afield into information that's

3    connected with, and that's all this is, is connected with the

4    offense of obstructing justice in this court.  It's not

5    different from a bank robber throwing his gun in the river.

6    It can be used to show that, yes, this is another piece of

7    evidence to show how far Mr. Alcott went to create the

8    fiction that he had cancer.  He went and tried to back up

9    information with Massachusetts General Hospital, but that's

10   all this is.  All this information is information that pales

11   in comparison to writing the doctor's letter.  It was not

12   hidden.

13             THE COURT:  All right, thank you.  I think I

14   understand the issues.  So are you conflating your argument

15   here on downwardly departing with your request for an upward

16   departure?

17             MR. PIROZOLLO:  Am I -- I don't understand.

18             THE COURT:  In other words, is this the same

19   argument you're going to make with respect to why you want an

20   upward departure?

21             MR. PIROZOLLO:  This is essentially the upward

22   departure argument.

23             THE COURT:  So not only are you sort of opposing

24   the downward departure, but you're seeking an upward

25   departure?