# ATTACHMENT C
# (PAGES 34-66)

1         MR. PIROZOLLO:  Yes.  If I could address the

2    downward departure, I think under the terms of the plea

3    agreement, it's very clear that they reserved only one basis

4    to depart downward.  In the defendant's memorandum, there are

5    arguments made as to why he's not a career offender, but the

6    substantial meat of their argument relates to cases that are

7    downward departures, and so it's really a downward departure

8    argument, which is really not, I don't think, appropriately

9    raised.

10         THE COURT:  So if in fact --

11         MR. BARRON:  We're in a new legal world.  In fact

12    those are the only precedent out there to discuss these

13    issues.

14         THE COURT:  Well, let me get to Booker in a minute,

15    but I'm now applying the Guidelines.  That's what I'm

16    supposed to start with, and these are unusually, yes, not --

17    that's what I'm supposed to start with, and I'm going to

18    apply the Guidelines, and then I'm going to discuss Booker

19    and the reserved downward departure area, which is the

20    psychiatric area.

21         Now, if in fact I find the following --

22    Mr. Pirozzolo has very graciously not pressed the waiver

23    issue with respect to the financial institutions, which is

24    what I was coming in here expecting to do.  Having heard oral

25    argument on the financial institutions and having applied

1   My Bread at a time in the past, I find that the record is

2   evenly balanced with respect to whether or not a piercing is

3   appropriate here.  Some of the My Bread factors are fully

4   appropriate.  For example, there was some intermingling of

5   personal assets with corporate assets; that is, the country

6   club and the house payments.  However, there were other

7   aspects which would not comply where there was not adequate

8   proof; i.e., whether or not it was too thinly capitalized, I

9   don't know that; what role the officer of U.S. Trust played,

10  I don't know that; how dominant this defendant was as opposed

11  to the other 30 employees, I don't know that.  I just don't

12  know too much.  I think Mr. Pirozzolo makes a strong argument

13  for a piercing, but based on this record, I'm not prepared to

14  say it's by a preponderance.  And I also find the issue

15  wasn't waived because the government has waived the waiver,

16  and I think that was gracious of it to do, even though it

17  relied on preexisting case law.

18          So I also, though, don't think, while I do believe

19  I have the authority on my own to downwardly depart, and I

20  might otherwise have been tempted to because this was a

21  nonviolent blackmail, and I actually don't agree with that

22  First Circuit case -- that's the First Circuit case -- and it

23  also is supported by a Guideline, I am going to find that he

24  is a career offender based on the extortion/blackmail.  And

25  given everything else in his record -- in particular, the lie

1    and the blackmail occurred while on pretrial supervised

2    release -- I'm not going to downwardly depart.  And I think

3    that puts us at 23 and 6.  Is that right?

4            THE PROBATION DEPARTMENT:  I believe so, your

5    Honor.

6            THE COURT:  Is everyone at least on the same page

7    so we can start discussing the rest of this?

8            THE PROBATION DEPARTMENT:  Would you like me to go

9    through the numbers?

10           THE COURT:  If you could just recrunch them just to

11   make sure I'm right.  You did this, right?  You're the one

12   who worked through this?  And this is fully giving the

13   defendant the benefit of the earlier Guidelines, acceptance

14   of responsibility, which would at least be questionable, and

15   that puts us at 92 to 115.  Is that right?

16           THE PROBATION DEPARTMENT:  Yes, your Honor.

17           THE COURT:  And that puts us at -- supervised

18   release stays the same, three to five.

19           THE PROBATION DEPARTMENT:  Yes, your Honor.

20           THE COURT:  And as far as the fine range, it puts

21   us at --

22           THE PROBATION DEPARTMENT:  $10,000 to -- I believe

23   it's $9 million.

24           THE COURT:  $10,000 to $100,000?

25           THE PROBATION DEPARTMENT:  To $9 million.

1          THE COURT:  All right.  How did it get there?

2          THE PROBATION DEPARTMENT:  Because of the statutory

3   fine provisions.

4          THE COURT:  $9 million, and a $400 special

5   assessment.

6          All right, now, there are two motions for a

7   departure.  The government has preserved the right to go up,

8   you've preserved the right to go down, and you're also going

9   to present your Booker arguments.

10         MR. PIROZOLLO:  You want to hear the upward

11   departure first?

12         THE COURT:  Yes, and then the downward.

13         MR. PIROZOLLO:  Well, I think I've really covered

14   most of it.

15         THE COURT:  That's what I meant before, I think you

16   have.

17         MR. PIROZOLLO:  I think that what is clear, based

18   on the calculations that have been made under the Guidelines,

19   is that the separate act of disposing of the evidence and

20   using his son to do so is clearly not taken into

21   consideration in any of the Guidelines calculations that have

22   been made.  It is, the government submits, very relevant to

23   sentencing.  It ought to be taken into consideration in

24   imposing the sentence, and for the reasons that I've already

25   expressed, it is appropriate.  And the government's motion is

1   for a one-level increase from the otherwise applicable

2   Guidelines.

3           THE COURT:  Thank you.  And your downward

4   departure, this is based on the psychiatric history and the

5   unfortunate thing that happened to him in high school?

6           MR. BARRON:  Yes.

7           THE COURT:  There are people who are taking this

8   down, so I leave it up to you as to how much you want to put

9   on the record.

10          MR. BARRON:  Yes, I'm going to focus less on

11  details in the open record and leave the details to the

12  record that's in my brief.  I do want to make some comments

13  because the government has suggested at times that they are

14  skeptical of the events in the past.  I think the record,

15  though, that I've provided you with --

16          THE COURT:  Well, was it a public settlement?

17          MR. BARRON:  Yes.

18          THE COURT:  I mean, just for the record, we're

19  referring to the fact that -- why don't you state it.

20          MR. BARRON:  Yes, the fact is that Mr. Alcott was

21  abused by Father James Talbot as a child when he was fifteen

22  years old and a student at Boston College High School.

23  Father Talbot has been involved in litigation in

24  Massachusetts and in Maine.  He's currently in a retreat

25  now.  He was well known.  The church dealt with him in the

1    way it's reported to have dealt with many of these cases,

2    which is to move him or allow him to move on to other places;

3    and eventually, when things broke open, he's been secreted or

4    secluded, but there are a number of people who have raised

5    this issue.   And the church put Father Talbot on a list of

6    some 80 priests who were suspect, and they established a hot

7    line, and one of the people they contacted was Mr. Alcott

8    over this, over the potential that there had been abuse in

9    the past.

10    Mr. Alcott obtained the services of Jeffrey Newman,

11    an attorney, I guess, at the time at Greenberg Traurig.   The

12    case was one of a number that settled.   I've put together a

13    fair amount of information in that regard in the binder I've

14    submitted to the Court.

15    There's also the picture that's very consistent

16    with these kinds of cases.   You see his grades are good as a

17    child in middle school, they're high.   He comes into high

18    school.   There's acting out.   There's lots of trouble in his

19    childhood.   From that point forward, his life looks rather

20    bad.   It does fit the picture.

21    We have Dr. Savagian's letter.   Dr. Savagian's

22    letter does take into account many other factors, but it's

23    something that we can't ignore.   It looks from this record

24    like it did happen.   And while it's not considered an excuse,

25    like somebody who's not criminally responsible because of a

1    mental condition like an active bipolar disorder or

2    schizophrenia, it's a factor.  It's a environmental and

3    sociological factor that's difficult to ignore.  We're

4    grappling with all these things Mr. Alcott has done and

5    admitted to:  the lying in open court and looking your Honor

6    in the eye and telling you he had cancer.

7            THE COURT:  How long ago was this with the priest,

8    the '60s, '70s?

9            MR. BARRON:  It was a long time ago.  This was the

10    '70s, '77, '78.

11            THE COURT:  It's been thirty years.  I mean, didn't

12    he get treatment for it?

13            MR. BARRON:  He did to some extent.  He did to some

14    extent, and he sought -- but never specifically sex offender

15    treatment; in other words, somebody who's a perpetrated

16    survivor.  I think Dr. Savagian called it PTSD.  To a great

17    extent, people who are burdened with this in their lives

18    require treatment.  The problem is, they don't disclose it,

19    and that's been seen again and again and again.

20            THE COURT:  Sure, but I thought I read in the

21    record that he did get psychiatric treatment for this.

22            MR. BARRON:  He got psychiatric treatment not for

23    this but for alcoholism and for a number of other disorders.

24    He was reviewed when he first committed the crime, the

25    robbery that's at the beginning of his record, but this was

1    not disclosed until later.  It was not disclosed until Boston

2    College made the call to him.

3           THE COURT:  Right, and so then the question I

4    really have is, didn't he receive some treatments after

5    that?

6           MR. BARRON:  No, he never received treatment after

7    that other than counseling with Dr. Savagian.

8           THE COURT:  Right.

9           MR. BARRON:  And that was -- and, you know, he

10   referred that out, and it never went anywhere.  This history

11   has not been addressed in its totality ever.  He's seen

12   psychologists starting in his school days in his early life.

13   He went into a psychiatric hospital at one point, but this

14   was never worked or disclosed.  There were a lot of issues

15   perhaps with his mental health but never anything

16   conclusive.

17          This is a factor in the person in front of you

18   who's done some bizarre things.  I mean, this is somebody

19   who -- this is why the career offender seems so inappropriate

20   in some ways, appropriate in some but inappropriate in

21   others.  Here's somebody who founds a family, who has a

22   business, who works regularly and who succeeds to some point.

23   But then when the pressure is on, he reverts to a mode of

24   lying and really hurting the people who are close to him.

25   And even his banker in some sense becomes a partner in his

1    business.

2              But this is part of the pattern of what Mr. Alcott

3    has done.  It has to do with being a child and having one's

4    trust breached, and, you know, having one's emerging

5    sexuality damaged in this sense.  And it's a large factor in

6    the kind of strange behavior that Mr. Alcott has been

7    involved in.  This stuff is essentially bizarre.  Some of the

8    things in that bag are so dramatic that they become silly,

9    the voice scrambler and all this elaborate nonsense.  There

10   are probably many other ways -- I haven't sat down and

11   thought of them -- to commit a crime, but there's this crazy

12   sense of the dramatic.  I mean, Mr. Alcott when he first

13   robbed a bank stole $4,000.  It was the amount he needed.  I

14   mean, these are strange, strange criminal acts, and I think

15   they're very consistent with somebody who's been sexually

16   abused.  And it's been that way throughout his history.  And

17   now we're getting somebody who's older.  You know, the

18   recidivism risk begins to fall from this point.

19             THE COURT:  He's not a violent man in the sense of,

20   you know, he's not going to shoot someone.  He did do an

21   armed robbery, which I don't demean for a minute.  I don't

22   care if it's a toy gun that terrifies people.  But he seems

23   to be a serial cheat, for want of a better word, a fraud, and

24   that could continue.  I read one of those letters where he

25   said, "I can't help myself, I need to lie."  The truth is,

1    that is a concern about recidivism that he's just going to go

2    out and commit a fraud and cheat someone else.

3         MR. BARRON:  How much punishment is the question.

4    We're here accepting punishment, and these answers like

5    188 months are --

6         THE COURT:  Well, but we're not there now.

7         MR. BARRON:  Even at 100 months, it's eight years

8    for this kind of conduct.  It's very harsh for somebody with

9    this history.  This is not the person, you know, with a

10   history of being a tough and a violent person.  There's a

11   highly personal kind of behavior.  And, you know, Mr. Alcott

12   did go straight at many times.  I mean, he worked for that

13   New Jersey firm.  I gave you as much of a history as they

14   were willing to give me.  When they understood where he is,

15   they didn't want to talk very much.  But he got promoted many

16   times.  I mean, that is not somebody who makes crime a habit

17   of life like one would originally experience with a career

18   offender.

19        THE COURT:  The concern is that he's made fraud a

20   way of life.

21        MR. BARRON:  Has he?  In some senses, maybe not.  I

22   mean, there is the bank fraud and lying to the Court.  I

23   mean, in some ways, when this bank fraud started, it was

24   meant -- he's running a legitimate business and bringing the

25   money into the business.  It's not like the person who sets

1    up a company solely to defraud Medicare and run through a

2    series of false payments to present.

3              THE COURT:  The third fraud, also called blackmail,

4    is what he did with that guy.  I mean, it's a way of cheating

5    or defrauding.  It's of concern.  And I read that letter that

6    said, "I can't help myself, I need to lie."

7              MR. BARRON:  He gets seven years of supervised

8    release, you know, to deal with these things.  And

9    incarcerating him and warehousing him for these long periods,

10    I mean, he doesn't make the kinds of repayments that he's

11    supposed to make in restitution, he sits in the institution.

12    And, I mean, if he is a serial fraud person, he's got all

13    this period of supervised release with the opportunity to be

14    put back again and again.

15              THE COURT:  What are you recommending?

16              MR. BARRON:  Well, I mean, on the specific issue of

17    downward departure, I'm recommending a period --

18              THE COURT:  For a sentence.

19              MR. BARRON:  Oh, for a sentence in toto, I think

20    that three times the average offense for somebody involved in

21    white collar at 48 months, plus the period of parole and the

22    other restrictions on his liberty, adding to that the

23    community sentence of six months, the 500-hour program, that

24    would be a sufficient sentence.  I mean, Mr. Alcott's staying

25    inside for more than four years doesn't seem to benefit a lot

1    of the corrective purposes of the statute.  It's harsh.  It

2    can be held up as an example, but it might even be an

3    inconsistent example, given what the average sentences are in

4    these kinds of cases.  Yes, he's got a record, but therefore

5    his sentence will be much higher.  But to work the Guidelines

6    as they exist and as the Department of Probation has

7    calculated them, and as we've all calculated them, it doesn't

8    seem to really use the correction system as well as it

9    might.  I mean --

10              THE COURT:  Thank you.

11              What are you looking for, Mr. Pirozzolo?

12              MR. PIROZOLLO:  Bottom line, our recommendation is

13    120 months, and that represented the midrange of the

14    Guidelines, applicable Guideline range, had there been a

15    total of 25.  Now, the Court has already ruled that it should

16    be a Level 23.  The government, of course, is arguing for an

17    upward departure.  But under the circumstances, and based on

18    the recommendations in the sentencing memorandum, should the

19    Court depart upward, the government would be recommending

20    what we said, which is the low end of the applicable

21    Guideline range, which is 100 months, if you were to depart

22    upward.

23              THE COURT:  Thank you.  Now, what about

24    restitution?  Help me on restitution.

25              MR. PIROZOLLO:  As to restitution, if I may, the

1    bank is entitled to restitution of approximately $2 million.

2            THE COURT:  How much has been paid back?

3            MR. PIROZOLLO:  That is net, that's a net number.

4            THE COURT:  That's a net number.  Which bank is

5    it?

6            MR. PIROZOLLO:  South Shore Savings Bank.

7            THE COURT:  And they're the ones who are here?

8            MR. PIROZOLLO:  Correct.

9            THE COURT:  Okay.

10           MR. PIROZOLLO:  The government is not going to

11   press restitution with respect to Clover Capital.  We've

12   discussed this with Clover Capital.  They're aware that we

13   have taken the position they're entitled to restitution, but

14   they are willing to forgo that for today -- well, forever.

15           THE COURT:  This is it, this is it.  I put this off

16   too many times.

17           MR. PIROZOLLO:  No, no, no, forever.  They've

18   agreed, they've written it off.  I think the prospect of

19   Mr. Alcott repaying the $2 million, which is the prior

20   preferred creditor, that realistically I think Clover decided

21   that they're not going to get that money back, and they're

22   willing to move on.

23           THE COURT:  So $2 million is what you're seeking in

24   restitution?

25           MR. PIROZOLLO:  Yes, as set forth in the PSR.

1           THE COURT:  Is there an objection to that figure?

2           MR. BARRON:  No.

3           THE COURT:  Is there any other restitution?

4           MR. PIROZOLLO:  No, your Honor.

5           THE COURT:  Is somebody here from South Shore?

6           MR. PIROZOLLO:  Yes, but I've spoken with them.

7  They don't intend to make a statement.

8           THE COURT:  They don't want to make a victim

9  statement?

10          MR. PIROZOLLO:  No, your Honor.

11          MR. BARRON:  Before we go, are we going to be heard

12  on criminal history category at all?

13          THE COURT:  I thought we had.  I thought that was

14  the --

15          MR. BARRON:  Well, that was one area where I

16  didn't -- I didn't know if you were finished and were going

17  to stop altogether on the substantive --

18          THE COURT:  If you want to make another argument,

19  you can, but I had thought we were done too.

20          MR. BARRON:  Oh, well, I didn't think we were.  I

21  misread how the Court was proceeding, so --

22          THE COURT:  All right, I'll get to you.  Let him

23  finish, and then if you think there's something else that

24  needs to be said --

25          MR. PIROZOLLO:  I think that I've answered the

1    questions you've posed, but there are a couple of things I do

2    want to be heard on with respect to the Booker arguments.    I

3    had understood you were going to do the departure first and

4    then get to the Booker arguments, but they morph, I

5    understand.

6        THE COURT:  So what else would you like to say?

7        MR. PIROZOLLO:  Well, first off, as to a departure,

8    I don't know that the sexual abuse history is properly framed

9    as a departure argument at all.

10        THE COURT:  Did you get in touch with the dentist

11    from California?

12        MR. PIROZOLLO:  Yes, we did.

13        THE COURT:  And did the dentist put in any kind of

14    statement or want to be heard?

15        MR. PIROZOLLO:  He declined to put in a statement.

16        THE COURT:  Under this new Victims Rights Act, I

17    want to make sure that's all been followed.  So the dentist,

18    the one who was blackmailed, didn't want to be heard?

19        MR. PIROZOLLO:  We contacted him, and within the

20    last couple of days, he declined to be heard.  We'll notify

21    him of the results, obviously.

22        THE COURT:  He never actually paid money, right?

23        MR. PIROZOLLO:  No.

24        THE COURT:  So there's no loss figure there.  Okay,

25    go ahead.

1          MR. PIROZOLLO:  As to the departure issue, it's my

2     understanding it's actually not really even properly framed

3     as a departure issue.  It's more being presented, I believe,

4     as a Booker factor.  I don't know that the government --

5          THE COURT:  Well, the psychiatric history was a

6     reserved basis for a downward departure.  The rest of it

7     would be a Booker kind of argument.

8          MR. PIROZOLLO:  Actually, no, your Honor.  What was

9     reserved in the plea agreement was a downward departure based

10    on psychiatric history.

11         THE COURT:  Right.

12         MR. PIROZOLLO:  However, however, the plea

13    agreement provided that the government would receive notice

14    that there would be a departure motion that would be made on

15    that ground, and the attorney for Mr. Alcott called me within

16    the notice period and informed me that he was not going to be

17    moving for a downward departure.  And in fact, if you read

18    the papers, he is not moving for a downward departure.  The

19    papers are framing the sexual abuse issue as a Booker factor,

20    not a departure argument.  So just so that the record is

21    clear, this is not a departure argument.  It's, rather, a

22    Booker factor, something that should be taken into

23    consideration for purposes of sentencing.

24         MR. BARRON:  I called to say that the psychiatric

25    expert we'd be using under the procedure, where we were given

1    30 days' notice before hearing, would not be called on the

2    issue of another disorder that we've been talking about.

3            THE COURT:  Did you actually file a separate motion

4    for downward departure?

5            MR. BARRON:  I did not file a separate motion based

6    on that.  That is, the basis of this argument is one that

7    we've had from the beginning, however, yes.

8            MR. PIROZOLLO:  And I understood it was going to be

9    a component of the argument, but it's not a departure

10   argument, your Honor, as I understand it.  And I don't know

11   that we're really in a position to address the merits of the

12   claim, and so the record is what it is on that, and the

13   government has nothing more to say about the facts that

14   underlie the sexual abuse claim.  However, much of the

15   conduct that is at issue here today occurred subsequent to

16   when this was identified, diagnosed, and he did receive some

17   counseling for that issue.

18           There were two points made in the memorandum that I

19   do want to address.  The first is this notion of an average

20   sentence, an average white collar sentence.  The defense has

21   made much of this in its papers.  I don't think it's a fair

22   characterization of this case to measure it as an average or

23   even measure it against the average white-collar defendant.

24   This is a person with a lengthy record.  This is a person who

25   defrauded the Court, who committed extortion while on

1    pretrial release, had his son try to dispose of evidence of

2    the obstruction and of other wrongful acts. By no measure is

3    this an average case, and it's not appropriate to compare it

4    in any way to an average white-collar defendant.

5         And as to the age, as the Court has pointed out,

6    there's this notion that Mr. Alcott is not a recidivist

7    risk. I can think of no clearer case where there is in fact

8    a demonstrated, documented risk of recidivism here. A person

9    who is facing a substantial bank fraud charge goes out and

10   commits at least two crimes while on pretrial release. There

11   isn't a meaningful argument that can be made that he is not a

12   recidivist. And that's all the government would say with

13   respect to the Booker factors.

14        THE COURT:  Thank you.

15        MR. BARRON:  First, I want to talk about criminal

16   history category, and one of the important things to look in

17   this record in this categorization has been how he

18   accumulated many of the points. There's a cluster of points

19   in 1992 and 1993 that involve being habed in from one court

20   to another and pleading guilty and accepting sentences of

21   lengths that probably no defendant on the outside, so to

22   speak, would ever accept. These are a number of financial

23   things in his record, and I think that the accumulation of

24   points as I calculated in my memorandum is probably more an

25   accurate way of looking at his criminal history.

1            Now, I know your Honor is making the career

2    offender finding, but I think, if I'm going to address the

3    career offender and what criminal history category he's in

4    and whether we should depart backward from criminal offender,

5    we ought to be looking at those.  I think that given that

6    you've made this finding on Criminal History Category 6, you

7    at least should go back two categories to Category 4 or

8    Category 3 as I'd originally argued, and putting him in more

9    of a range of 57 to 71 in Category 3 or 70 to 87 in

10   Category 4 as a Guideline range.

11           These offenses are normally not ones that would

12   have merited a jail sentence, even with a predicate

13   conviction, 1987.  They are essential financial crimes.  One

14   of them is more of a commercial dispute for failing to clear

15   the UCC lien on a boat.  He pled guilty so that he didn't

16   keep coming back into court.  I think that's fairly clear

17   from the record.  And he was given a rather lengthy sentence

18   for that, which accumulates him three points under these

19   calculations.

20           There were two other theft or bounced check type

21   offenses.  They're low.  They don't register usually.  And

22   because the plea of guilty occurs when he's in incarceration,

23   you know, that is one factor, at least, in looking at his

24   criminal history category.  And it's somewhat peculiar to

25   Massachusetts because of this way we have of habing people in

1   and moving them around.  The original sentence, after all,

2   that he was given was a suspended twelve-year sentence, and I

3   think it gives your Honor a view of how the court looked at

4   Mr. Alcott when he committed the initial robbery from issues

5   of the boat.  He was in jail once, and essentially the way

6   Massachusetts looks at his record is, he was paroled on the

7   second application.  And I think that has to be taken into

8   account when we look at what criminal history category he's

9   in.  So that's why I think a lower criminal history category

10  of two or three categories lower might be an appropriate way

11  of looking at his sentence.

12          Now, viewing these, if I --

13          THE COURT:  My big concern is, all of this would be

14  very meritorious if it weren't for all the conduct that

15  happened while on pretrial release.  And when you say

16  overstate, I mean, you make your bed, you lie in it.  How can

17  you trust him?

18          MR. BARRON:  I see that, but this is what

19  Mr. Alcott has done under periods of extreme stress, and it

20  has to do with his upbringing and the way that he was treated

21  as a teen.  I mean, we've got the psychologist letter in the

22  record, we have some background information; and I think that

23  it's not the sole determiner of your sentence, but it should

24  be taken into account in how we treat him.  And when we have

25  seven years of supervised release waiting for him, that's

1    something that we can look at now with <u>Booker</u> in terms of the

2    overall corrective purposes of what we're doing.

3        And, I mean, you know, he made it through seven

4    years of parole without any events until this recent

5    flare-up.  This seems to be episodic.  Initially this was one

6    of the reasons for my psychiatric review.  We didn't pursue

7    that because the picture, as you see it yourself, is murky,

8    but we have these long periods of good behavior, of somebody

9    producing.  You know, he's raised two children into

10   adulthood.  He has two more.  He's done things, he's been

11   involved in their lives, they're supportive of him; and they

12   don't understand how this man who can do well raising

13   children, keeping a job, and keeping a family suddenly breaks

14   down into this bizarre kind of conduct.  But it's part of

15   Mr. Alcott's history, but he does function very well.

16       The other thing is, he's forty-four.  The

17   statistics are what they are.  I mean, that's true,

18   Mr. Pirozzolo wants your Honor to look at these individual

19   characteristics.  But we also have to look at some other

20   statistics, and that is -- and your Honor sees it better as a

21   judge than any other person.  "I'm getting too old for this"

22   is the mantra that we hear from defendants once they reach

23   their late thirties and early forties.  People in their

24   forties do not recidivate.  They become less of a reoffense

25   risk.  And the fifteen-year report of the Sentencing

1    Commission, which I've included portions of it, and it's

2    available to your Honor online, is very clear about that,

3    that career offender determinations for people at that age

4    are not -- they do not serve the purposes of the Sentencing

5    Reform Act.  Just, as they get older, career offender

6    determination is not as valid a basis to be applied, I guess.

7    There isn't as valid a basis to apply career offender as

8    somebody gets older.

9            THE COURT:  Thank you.  Does he want to say

10   anything?

11           MR. BARRON:  Yes.

12           THE COURT:  Mr. Alcott, do you want to say

13   anything?  I think probably members of your family, is that

14   right, are sitting back there?

15           THE DEFENDANT:  Yes.

16           THE COURT:  I've received many letters from them, a

17   few just this morning.

18           THE DEFENDANT:  I'd like to start by apologizing to

19   your Honor and U.S. Attorney Pirozzolo for the awful lies.  I

20   sit here today with my head down shamed and embarrassed about

21   what I've done.  I've spent a lifetime trying to justify my

22   actions, and with the lies about the cancer and the extortion

23   and everything else, there's no justification, and I'm not

24   here to try and justify it, and I apologize to you.

25           To Mr. McGowan at South Shore Savings Bank, I'm

1 sorry. I wasn't man enough to come to Mr. McGowan when the

2 business started going bad. I wasn't man enough to accept

3 the failure, and I hope that I won't affect the way that you

4 do business with future clients because you became a friend

5 and a partner, and it made you special, and I'm sorry that I

6 violated your trust.

7          I'm sorry to all my friends and family and

8 community, how my actions and my lies have hurt a lot of

9 people.

10          Your Honor, one thing that's brought me happiness

11 in my life is my role as a father. Although I was divorced

12 when my older children were toddlers, I remained close, and I

13 was emotionally loving and financially supportive. And my

14 daughter Kerry is here today. She's a wonderful girl who is

15 respected and loved by many. But I'm embarrassed. I'm

16 embarrassed that I tried to share my mistakes with my kids,

17 but I now realize that I raised them with a philosophy of

18 "Do what I say, not what I do," and that's been wrong.

19          I've hurt a lot of people but nobody as bad as my

20 beautiful wife Mary and my twin babies, Emma and Harrison.

21 Emma and Harrison don't know where daddy is anymore, and they

22 miss him terrible. Mary has had to move halfway across the

23 country to be near her family and for love and support.

24 She's not just been hurt by me; she's been humiliated. Yet

25 she remains loving and supportive. Thank you.

1          I only wish that I had the tools at the time to see

2    the consequences of my actions because I never would have

3    given up this beautiful family just to succeed financially.

4    Since I've been in Plymouth for the last eleven months, I've

5    spent a lot of time looking at myself, seeing who I am and

6    who I want to be, and I don't want to be this person

7    anymore.  I don't want to lie.  I don't want to hurt people.

8          I look in the mirror now and I see the

9    imperfections that I never saw, and I feel the pain, pain

10   that I haven't felt since 1976 when I met Father Talbot.  I

11   was a young man from an alcoholic and abusive household

12   searching for a mentor, and I thought, who better than my

13   teacher, coach, and priest?  And he wasn't a mentor.  He was

14   an animal, he was a predator, and he took a lot of my life

15   away, and he took my self-esteem away.

16         And you addressed the issue today, your Honor, of,

17   well, hasn't he gotten psychiatric help for this?  I didn't

18   acknowledge myself as a victim until 2002.  I had gotten

19   psychiatric help for issues that I had no idea why they

20   existed.  I knew that when the pressure hit, I didn't act

21   normal, and I would go to therapy; but I never brought that

22   out until 2002, already in the middle of my financial crisis

23   and the fraud with the bank.  I now understand that I suffer

24   from post-traumatic stress disorder, and I need regular

25   therapy to address these issues and to center on these

1    issues.

2           Also while at Plymouth, the doctor at Plymouth has

3    diagnosed me for the first time with bipolar disorder.  As my

4    attorney mentioned, that was not brought out today because

5    there's a conflict of some different diagnosis.  But I'm

6    currently on lithium and Prozac for the bipolar, and I'm

7    excited by the results.  For the first time in my life, the

8    post-traumatic stress disorder and the bipolar make sense of

9    what I've done in my life and what I have to do to change

10    it.  And I know that what I have to do is stay on medication,

11    get regular therapy, attend Alcoholics Anonymous which I have

12    been sober for thirteen years through, and address gambling

13    addiction, probably through Alcoholics Anonymous.

14           The last thing I'd say is that my wife several

15    months ago sent me a quote that's on my cell wall.  It's from

16    George Elliot, and it says, "it's never too late to be what

17    you could have been."  If I read that over a year ago, I

18    would have thought of houses, cars, money, success, because I

19    believed I needed that for anybody to love me.  I'm sorry I

20    thought that.  Now I know that what I need to be to be loved

21    is honest and unconditionally loving.  And when I read that

22    quote today, all I want to be is an honest and supportive

23    husband and father.  I want to be called "Daddy" again.

24           So, your Honor, I know that today the Guidelines

25    come to a significant amount of incarceration.  I would ask

1  you to use your discretion and give me less incarceration

2  with alternative sentencing.  I'd ask you to give me

3  supervised release incorporating everything that's been

4  mentioned:  restitution, parental responsibility, medication,

5  therapy, AA.  I'd ask you to help me to try and be a father

6  to my children.

7        I thank you for your time today, your Honor.

8        THE COURT:  Thank you.  This is one of the best

9  apologies that I've heard in a very long time, and it makes

10  me feel sad that you really have thrown your life away.  Your

11  attorney represented in the memo that you were very bright

12  and showed huge promise at Boston College High School.  Then

13  after the sexual abuse, your grades dropped, and you

14  essentially fell apart as a person.  And I'm going to assume

15  for a minute that that's all true.  I think the record plays

16  that out.  But that was thirty years ago, and while I pity

17  you for that and you're still suffering from that, you have

18  to move on with your life because all of these crimes

19  happened within the last what, five years?

20        THE DEFENDANT:  Yes.

21        THE COURT:  You have this loving family.  I got

22  letters from Kerry and a nephew and your family.  I mean,

23  they've loved you.  And yet all I've seen -- you know, sort

24  of you make your bed, you lie in it kind of thing -- is one

25  bad act after another.  And so it's hard for me to evaluate

1    how much of this eloquence is heartfelt, which it seems to be

2    right now, and how much of it is just for the moment because

3    what I've seen are one act after another.

4              This isn't your typical white-collar case, and in

5    fact, given your history, I might have been right where

6    Mr. Barron wants me to be if we didn't have these other

7    things.  The letters to that dentist were horrible.  I mean,

8    you didn't mention that horrible blackmail.  And standing

9    here looking me in the face, having me almost jump on

10   Mr. Pirozzolo for looking for a life sentence for a fraud

11   because you were dying of cancer, you were taking advantage

12   of me.

13             THE DEFENDANT:  Yes.

14             THE COURT:  And the issues with respect to your

15   family, I read some of those letters, et cetera, what

16   happened with your family.  I mean, you have lived a life of

17   lying and cheating and fraud in a way that I hope you go

18   beyond, because I hear a man with a great heart, now that I'm

19   hearing you do some of this internal reflection.  But, you

20   know, it's sort of like I see what you've done, and that's

21   speaking louder to me than the words that you just

22   articulated.

23             On the other hand, I do appreciate that apology.  I

24   don't usually get an apology like that, both to the family

25   and to me.  I do think that you've had the sexual abuse

1    problem with the priest, and I'm not inclined to upwardly

2    depart.  I'm not inclined to go to the high end of the

3    Guidelines.  I'm balancing the various acts in not downwardly

4    departing because I don't view this as overstating the

5    criminal history, actually, given the serial nature of what's

6    happened here, but I don't see any basis for upwardly

7    departing or going to the high end.

8        It's a mixed bag here, but I am going to do the

9    following:  I am going to impose incarceration of 92 months,

10   which is the absolute lowest end and I think is fair and

11   appropriate here, evaluating all the 3553(a) factors, which

12   weigh both ways, the last six months of which are served as a

13   consecutive sentence pursuant to U.S.S.G. 25, whatever it is;

14   the fact that one of the crimes, in fact probably the most

15   serious of the crimes, the extortion and blackmail, happened

16   while on supervised release from the Court.  Five years of

17   supervised release, subject to Alcoholics Anonymous, mental

18   health counseling, gambling counseling, and with a special

19   focus on the sexual abuse to try and work that through.

20       Is there a special program to deal with that?  I

21   want that focused on.

22       THE PROBATION DEPARTMENT:  The Probation Office

23   would have to work with the psychiatrist.

24       THE COURT:  The last six months I can do for -- is

25   that the acceptable way of segmenting this?

1              THE PROBATION DEPARTMENT:  Yes.

2              THE COURT:   -- for the fact that one of the crimes

3      was done while on the supervised release of the court, which

4      is one of the things that I'm doing, I take with particular

5      gravity.  No fine because I think a fine would be impossible

6      to pay in this situation.  $2 million restitution to the

7      South Shore Savings Bank.

8              THE PROBATION DEPARTMENT:  Your Honor, I believe

9      the number, if I'm correct, is $2,032,345.60.

10             THE COURT:  Say it again?

11             THE PROBATION DEPARTMENT:  $2,032,345.60.

12             THE COURT:  Payable to South Shore, and a $400

13     special assessment.

14             MR. BARRON:  There is some concerns about a

15     judicial recommendation to Minnesota to Rochester.

16             THE COURT:  A judicial recommendation to Minnesota,

17     and I would be amenable to transferring supervised release

18     out there if the family decides to stay in Minnesota, which

19     might be a good thing to get away from all of this.

20             MR. BARRON:  He has a very significant history of

21     alcoholism.  It's throughout his record.  Going way back,

22     there are OUIs, and drinking has been a big problem.  Could

23     he be recommended to the so-called 500-hour program?

24             THE COURT:  Yes.

25             MR. BARRON:  With a specific statement of that in

1    the judgment?

2              THE COURT:  Yes, the 500-hour alcohol program.  I

3    don't see any history of drug abuse.

4              MR. BARRON:  No.  It's alcohol.

5              THE COURT:  And the issue that's striking me a

6    little bit is, I don't know what to do with his bipolar

7    piece.

8              MR. BARRON:  I think if he were in Rochester, it's

9    an FMC, there they can look at it more.  We have some

10   disagreements from the doctors.  This is an open session, so

11   I haven't gone into it in greater detail, but you have --

12             THE COURT:  He was excellent here, better than -- I

13   mean, and I'm wondering whether the drugs actually have made

14   a difference, compared to the way I've seen him in the past.

15   At this point we now have a record, and so maybe he should be

16   evaluated at a federal medical center.

17             MR. BARRON:  I think that going to Rochester would

18   help that.  He is on mood-stabilizing drugs, yes, the lithium

19   and the Prozac.

20             THE COURT:  So why don't we recommend an evaluation

21   at the FMC.

22             MR. BARRON:  Yes.

23             THE COURT:  Anything else on supervised release?

24   The standard financial conditions, the other standard

25   conditions, yes.

1          THE PROBATION DEPARTMENT:  Yes.

2          THE COURT:  Anything else?

3          MR. PIROZOLLO:  Just as to the designation, I just

4    want to note for the record that's really a matter for BOP,

5    your Honor.  I know that the Court can make a

6    recommendation --

7          THE COURT:  I will make that recommendation.  They

8    try and give it weight.

9          MR. PIROZOLLO:  But as to whose authority it is,

10   it's ultimately BOP's authority to determine where he should

11   serve.

12         THE COURT:  I actually know that, okay?  I know

13   that.  I can't promise it, but I'm going to recommend it.

14         MR. BARRON:  We understand, and I've explained to

15   Mr. Alcott.  But it looks like a good fit.  It's not an

16   overpopulated area.  I've done some research into it.

17         THE COURT:  It makes sense.  His family is out

18   there.  He needs to build that again with the twins.  And it

19   makes sense for someone to look at this mental health

20   situation.  It's very hard for me to believe that thirty

21   years later, after some counseling, et cetera, this is all

22   about dealing with that priest.  It makes me think that

23   someone else should look at it to see whether there's another

24   issue going on.

25         Mr. Alba?

1          THE CLERK:  Will the defendant please stand.

2    Mr. Michael Alcott, the Court hereby notifies you of your

3    right to appeal the sentence.  If you cannot afford the cost

4    of an appeal, you may move to proceed in forma pauperis.  If

5    you cannot afford counsel for an appeal, one will be

6    appointed for you.  You are also notified that the Clerk of

7    Court will file an appeal on your behalf if requested by you

8    to do so.  Any appeal from the sentence must be filed within

9    ten days of entry of judgment on the docket.

10          Do you understand these rights?

11          THE DEFENDANT:  Yes.

12          THE CLERK:  Thank you.  Court is in recess.

13          (Adjourned, 10:35 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )

5

6

7

8           I, Lee A. Marzilli, Official Federal Court

9   Reporter, do hereby certify that the foregoing transcript,

10  Pages 1 through 65 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in

12  Criminal No. 04-10286-PBS, United States of America Vs.

13  Michael W. Alcott, and thereafter by me reduced to

14  typewriting and is a true and accurate record of the

15  proceedings.

16          In witness whereof I have hereunto set my hand this

17  4th day of July, 2006.

18

19

20

21

22

23  _____
    LEE A. MARZILLI, CRR
24  OFFICIAL FEDERAL COURT REPORTER

25